Adam Wolek  (Pro Hac Application to be Submitted)
Brian Noack (Pro Hac Application to be Submitted)
Wolek & Noack
333 S. Wabash Avenue
Suite 2700
Chicago, IL  60604
P:312.860.9006
F: 708.843.0509
adamw@wonoip.com
briann@wonoip.com

DAVID A. MAKMAN (SBN 178195)
david@makmanlaw.com
LAW OFFICES OF DAVID A. MAKMAN
655 Mariner's Island Blvd, Suite 306
San Mateo, CA 94404
Telephone:  (650) 242-1560
Facsimile:   (408) 716-3052

Attorneys for Defendant
GORDON HOWARD ASSOCIATES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| On Behalf of PARKRIDGE LIMITED, a Hong Kong corporation, by Mabel Mak, and MABEL MAK, an individual,<br><br>    Plaintiffs,<br><br>        v.<br><br>INDYZEN,  INC.,  a  California  corporation,  and PRAVEEN NARRA KUMAR, an individual,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Parkridge Limited was founded in 2013 to create a mobile software application combining health and fitness information with social media networking.  Possessing limited technical expertise himself, Parkridge's CEO, Randy Dobson ("Dobson"), discussed a potential collaboration with Praveen Narra Kumar ("Narra"), due to Narra's self-proclaimed experience in software development. Following these discussions, Narra was appointed as Chief Technology Officer ("CTO") of Parkridge.  Rather than providing Parkridge with its best option, Narra took advantage of his position, failed to fulfill his obligations as CTO of Parkridge, and used his own independent software company, Indyzen, Inc., to develop the mobile app to the disastrous detriment of Parkridge. Indyzen charged Parkridge exorbitant prices for developing a mobile app that not only did not work, but was grossly inferior to comparable apps in the industry.  In short, Narra abused his position as CTO to siphon money from Parkridge to benefit himself and his company, Indyzen.  Narra's and Indyzen's conduct constitutes breaches of fiduciary duties under California and Hong Kong law, aiding and abetting breach of fiduciary duties under California law, breach of contract, fraudulent misrepresentation, and fraudulent concealment under California law.

**PARTIES**

1.      Plaintiff Parkridge Limited ("Parkridge") is a company established under the laws of Hong Kong, with its principle place of business at The Landmark 15 Queen's Rd. Central 8/F Gloucester Tower, Central Hong Kong, China.

2.      Plaintiff Mabel Mak ("Mak") is an individual with a passport issued by the Government of Hong Kong, and resides at 11A Bo Shek Mansion Block 1, 328 Sha Tsui Road, Tsuen Wan, Hong Kong.

3.      Upon information and belief, Defendant Indyzen, Inc. ("Indyzen") is a company organized and existing under the laws of the State of California, with its principal place of business at 2033 Gateway Place, San Jose, California 95110, United States of America.

4.      Upon information and belief, Defendant Praveen Narra Kumar ("Narra") is an individual who resides at 2107 Ashley Ridge Court, San Jose, California 95138, United States of America.

## JURISDICTION AND VENUE

5.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that complete diversity of citizenship between the parties exists, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6.      Venue is proper herein pursuant to 28 U.S.C. § 1391(b) and (c), in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Defendant Praveen Narra Kumar resides in this District, and Defendant Indyzen resides in and is doing business in this District.

## FACTUAL BACKGROUND
### Formation of Parkridge

7.      Around 2013, Randy Dobson ("Dobson") began working on developing an online personal training platform that would connect personal trainers with clients by utilizing a personality matching system, which was later known as Morfit (the "Morfit App").

8.      In 2013, while at a 'Business Mastery Event' hosted by Tony Robbins, Dobson shared the idea for the Morfit App with Tony Robbins and a small group of business individuals, including Narra.

9.      Subsequently, Dobson discussed the Morfit App idea at length with Narra.

10.     Dobson also communicated to Narra, and Narra understood, that Dobson had no technical expertise.

11.     Narra then pitched his services to assist with the technical side of the Morfit App, stating that his background and expertise are in application and software development, including founding companies, and that he owned and was the Chief Executive Officer ("CEO") of a software development company known as Indyzen.

12.     Parkridge was formed on August 23, 2013.

13.     Narra requested that his father, Parasurama Naidu Narra ("Naidu Narra") be listed as the shareholder in the shareholders' agreement for the new company, Parkridge.  Mabel Mak ("Mak") and Naidu Narra (instead of Narra) executed the Shareholders Agreement ("SH Agreement") for Parkridge on January 1, 2015.  Exh. A. The SH Agreement gave Mak 7000 shares, equivalent to 70% of the total shares, in exchange for her: (1) industry expertise in the business; (2) professional support; (3) a promise to register all of Parkridge's intellectual property; and, (4) initial funding of Parkridge up to a maximum amount of $1,000,000 in the form of a loan.  Exh. A.

14.     The SH Agreement permitted Naidu Narra 3000 shares, equivalent to 30% of the total shares, in exchange for his promises to: (1) have his son, Narra, provide software development industry expertise to develop, operate, and maintain the Morfit app; (2) have Narra serve as CTO of Parkridge; (3) have Narra lead development of the Morfit App to successfully achieve Beta Version; and, (4) have Indyzen offer a $300,000 discount to develop the Morfit App.  Exh. A.

15.     Mak appointed two individuals (including Dobson) as Directors of Parkridge, each with 35% voting power.

16.     Dobson is Parkridge's Director, Chairman, and Chief Executive Officer ("CEO").

17.     Naidu Narra appointed his son, Narra, as a Director of Parkridge, with 30% voting power.

18.     Dobson and Narra then entered into discussions in California to collaborate and use Parkridge to develop and implement the Morfit App. Narra would serve as Chief Technology

**COMPLAINT**                                    4

Officer of Parkridge and oversee the development of the Morfit App, while Dobson would provide the conceptual and business expertise.

**Development of the Morfit App**

19.     Dobson told Narra that they would be relying on Narra's expertise in all technical matters.

20.     Dobson asked Narra to vet a real-time software computing company known as TIBCO (The Information Bus Company) Software Inc. ("TIBCO") to determine if it was qualified to build the Morfit App.

21.     Dobson and Narra communicated to TIBCO that the Morfit App is meant to be primarily a mobile platform.

22.     Based on Narra's recommendation, Parkridge hired TIBCO to develop the Morfit App, memorialized in a work order dated November 13, 2013.

23.     However, Narra knew that TIBCO did not have mobile expertise.

24.     During the following year, Dobson flew out to California with Narra on a quarterly basis, with Narra being in charge of managing and overseeing TIBCO's progress with the Morfit App.

25.     Narra failed to monitor TIBCO's progress with the Morfit App, in particular, that it was developing a mobile platform.

26.     Under Narra's management as Chief Technology Officer of Parkridge, TIBCO delivered only a desktop platform and failed to deliver the Morfit App that Parkridge had requested.

27.     Even after many delays and chances to fix the app were given, the correct form of the Morfit app – the mobile platform – was never delivered.

28.     As a result of TIBCO's failure to deliver a mobile platform, Parkridge stopped paying TIBCO.

### INDYZEN

29.     Subsequently, Narra then recommended his own software company, Indyzen, to develop the Morfit App.

30.     Narra and Indyzen promised an extensive set of characteristics for the Morfit App, including, but not limited to: personality matching, open API, social media, geolocation, augmented reality, and facial recognition aspects.

31.     As a result of these discussions, all working relationships between Parkridge and TIBCO were terminated.  On January 5, 2015, Parkridge and Indyzen entered into a software development and licensing agreement.

32.     In April 2015, Indyzen delivered a version of the Morfit App ("Indyzen's App") to Parkridge. However, Indyzen's App's quality was grossly inferior to comparable apps in the industry, had only very basic functionality, a bad user interface, and was not ready to be marketed to the public.

33.     When concerns over the quality of Indyzen's App were raised to Narra, he attempted to shift the blame to Parkridge's lack of guidance, despite being Parkridge's CTO and source of guidance on all technical issues.

34.     Once again, further discussions were entered into between Indyzen and Parkridge to resolve the technical issues with, and complete development of, the Morfit App.

35.     A September 2015 launch date was planned for the Morfit App.

36.     However, Indyzen's delivered product was far below the industry standards and agreed-upon quality. Accordingly, Parkridge pushed the launch date back to December 2015.

**COMPLAINT**                                          6

37.     When the December 2015 launch date arrived, the Morfit App still failed to meet industry standards, let alone those agreed-upon by the parties. So the Morfit App still could not be released.

38.     At about the same time, Dobson appointed another Chief Technology Officer, Martin Papy ("Papy"), to a sister company of Parkridge, and gave him power to oversee all technological matters for the related group of companies.

39.     Papy quickly identified many issues with Indyzen's development of the Morfit App, and requested Indyzen's documentation for the development of the Morfit App.

40.     Despite Papy's requests, Indyzen and Narra refused to provide any documentation relating to the project.  Instead, they demanded payment-in-full from Parkridge and that 30% of the shares in Parkridge be transferred to Narra's father, Parasurama Naidu Narra, prior to allowing Parkridge to see any documents.

41.     Despite not receiving a functional app, and in a good faith effort to resolve the dispute, Parkridge paid Indyzen the amount it requested.

42.     Even after payment of the requested fee, neither Narra nor Indyzen delivered the requested documents or a functioning Morfit App.

**THE AGREEMENT BETWEEN PARKRIDGE & INDYZEN**

43.     Following the termination of the  relationship between Parkridge and TIBCO, Narra, as CTO of Parkridge and CEO of Indyzen, advised Dobson and Parkridge what resources, skills and design specifications would be needed in order to develop the Morfit App. Narra further promised an extensive set of characteristics that would be developed for the Morfit App, which included, but were not limited to, personality matching, open API, social media, geolocation, augmented reality, and facial recognition capabilities.

44.     Acting as both CEO of Indyzen and CTO of Parkridge, Narra proposed, developed, and negotiated the Agreement in the best interests of Indyzen, to the detriment of Parkridge.

45.     Narra had previously promised to give a 50% discount to Parkridge on the labor rate for the development of the Morfit App. However, it later turned out that Narra's and Indyzen's "discount" rate was actually the standard rate for developers from that region.

46.     On January 5, 2015, Parkridge executed the Software Development and Licensing Agreement ("Agreement") with Indyzen to develop the Morfit App.  Exh. B.

47.     Indyzen was to develop the Morfit App for Web, iOS and Android platforms, and the Morfit App was to meet various functional specifications, listed in greater detail in Exh. B at 9 and 10.

48.     Ultimately, the Morfit App, as described in the Agreement, was never delivered by Indyzen.

49.     During Phase I of development of the Morfit App, the total price for the above services was to be $420,000, but was discounted by $300,000, so the total due for Phase I by Parkridge was $120,000.

50.     Parkridge paid Indyzen $40,000 for Phase I on January 21, 2015, and $80,000 on May 19, 2015, for a total of $120,000.

51.     Phase II began on May 16, 2015, and as promised by Narra, and pursuant to the Agreement, Indyzen was to allocate a 24-person team of full-time personnel who would work an average of at least 40 hours per week to develop the application.

52.     Pursuant to "Schedule A" of the Agreement, Parkridge was to pay Indyzen any fees incurred in relation to the services in Phase II on a monthly basis, with 50% being paid by Parkridge within 14 business days of receiving an invoice, and 50% of the fee being treated as a loan made by Indyzen to Parkridge.  Exh. B.

53.     However, Narra and Indyzen charged Parkridge a "loan" rate substantially higher than the industry average.

54.     Between August 2015 and December 2015, Parkridge paid Indyzen $300,000 during Phase II, with the payment schedule occurring as follows:

| Payment Date | Payment Amount |
|---|---|
| August 7, 2015 | $50,000 |
| August 7, 2015 | $50,000 |
| October 26, 2015 | $50,000 |
| October 26, 2015 | $50,000 |
| December 18, 2015 | $50,000 |
| December 18, 2015 | $50,000 |
| **Total Paid in Phase II** | **$300,000** |

55.     During Phase I and II of the Morfit App's development, Narra consulted for Parkridge, however, given his role as Indyzen's CEO and Parkridge's CTO, he had no oversight. In other words, Narra acted as the point of contact for both corporations, despite the apparent conflict of interest.

56.     Narra was able to do this because he knew Dobson relied on him for all technical matters, and that Narra would be guiding Dobson's acceptance and quality approval for the Morfit App during Phase I and Phase II with Indyzen.

57.     Additionally, pursuant to clause 3(c) of the Agreement, "Indyzen may not withhold delivery of any work product produced in accordance with Schedule 'A' and paid for by Parkridge..." Exh. B.

**INDYZEN & NARRA'S CONDUCT**

58.    During Phase I, neither Narra nor Indyzen provided helpful consultations or presentations on the status of the Morfit App's platform and technical design decisions, despite being part of Narra's obligations as Parkridge's CTO.

59.    Because development was taking so long, Dobson sought a second opinion in January 2016 regarding development of the Morfit App. A number of industry experts and professionals advised that the price paid for Indyzen's services massively exceeded market standards and that, relative to the price, the quality of the Morfit App was extremely low.

60.    Some consultants in the field were so shocked that they said Parkridge was "substantially ripped off," and that it could have obtained the same "generic" application at "a fraction of the cost."

61.    They also said that there is "categorically no way that 24 qualified developers were working on this software for the last 9 months."

62.    Phase II came to a halt around February 2016 due to disagreement between Parkridge and Indyzen about the direction of the Morfit App.

63.    Despite a 24-person team spending 9 months developing the Morfit App, Indyzen failed to meet many of the Agreement's functional specifications.

64.    For instance, under the Web portal segment, the registration and log-in features are nonfunctional, rendering the rest of the features under this segment obsolete.

65.    iOS users were not able to sign-in or register with Facebook, instead, the device went into a loop.

66.    Web users could not create or add information to their profile, while iOS, Android, and Web users could only partially edit profile info, including profile photo. Nor could iOS and Android users consistently see their profile page, followers, or friends.

67.     For iOS, Android and Web users, the platform caps video uploaded at 8.5MB.

68.     iOS, Android and Web users were unable to scroll their newsfeed, tap a notification to go to the corresponding post, load additional posts, or receive notifications for comments.

69.     Indyzen failed to deliver the Morfit App or any other deliverables produced in accordance with Schedule A, Phase I, or Phase II, to Parkridge.

70.     Accordingly, Parkridge could not verify whether iOS, Android or Web users could chat with friends via the Morfit App, or whether the Morfit App was built using third party and/or open source software modules.

71.     Indyzen also refuses to provide Parkridge with the source or object code of the Morfit App.

72.     Indyzen's ongoing delay has prevented Parkridge from launching the Morfit App on time, or at all.

73.     Because of these delays, Parkridge has lost and is continuing to lose business, goodwill, customers, and is failing to fulfill promises to third parties.

74.     Parkridge has repeatedly requested that Indyzen and/or Narra cease withholding delivery of its products.

75.     Defendants, however, have rejected all of Plaintiff's reasonable requests to settle the matter amicably.

76.     In order for Parkridge to authorize certain decisions, like commencing litigation, the directors who together represent at least 80% of Parkridge's total share capital have to unanimously agree to authorize the matter, but because Narra's father purports to be a shareholder, his consent would purportedly be required and given but for his relationship with his son.

# COUNT I
## BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

77.     Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-76 as if fully set forth herein.

78.     As Director, Vice Chairman and CTO of Parkridge, Narra owed fiduciary duties of good faith, care, and loyalty to Parkridge.

79.     As a Director and CTO at Parkridge, Narra had a duty to use the amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

80.     As a Director and CTO at Parkridge, Narra had a duty of loyalty to place Parkridge's interests above any interest he possessed that was not shared by Parkridge generally.

81.     As a Director and CTO of Parkridge, Narra had a duty of good faith not to intentionally fail to act where he has a known duty to act.

82.     Narra controlled and was founder and CEO of Indyzen, which entered into an Agreement with Parkridge on January 5, 2015, to build the Morfit App.  As a result, Narra had a competing interest in, and failed to act in an independent manner for the benefit of Parkridge with respect to, the Agreement between Indyzen and Parkridge.

83.     Also, because at least 80% of Parkridge's total share capital was required to consent to commencing litigation, and Narra's voting power would ostensibly equal 30%, any proposal by the other directors (as nominated by Mak) to commence litigation against Narra and Indyzen would have been futile.

84.     Narra proposed, led negotiations, and facilitated the Agreement between Parkridge and Indyzen, convincing Dobson that such proposals and negotiations were favorable to Parkridge.

85.     As CEO of Indyzen, Narra controlled Indyzen and accordingly, at the time he made the misrepresentations, he knew and/or had no reasonable ground to believe that Indyzen was the best possible value for software development services.

86.     Narra intended to induce Parkridge to contract with Indyzen so that he, as CEO of Indyzen, and Indyzen, his company, could profit from the Agreement with Parkridge, to the detriment of Parkridge.

87.     At the time that Narra misrepresented that Indyzen was the best value for software development, Narra intended to make a substantial profit by overcharging Parkridge for an inferior application.

88.     In other words, Narra acted in his own interests, and/or the interests of entities other than Parkridge, in facilitating the Agreement, even though he knew, or was recklessly or grossly negligent in not knowing, that it would result in harm to Parkridge.

89.     At a minimum, Narra was willfully blind to the foreseeable disastrous consequences of the Agreement, and acted with gross negligence and/or recklessness in advocating for and facilitating a transaction that would result in harm to Parkridge.

90.      Narra failed to exercise the necessary care, and breached his respective duties of good faith, care, and loyalty.

91.     Narra breached his duties by engaging in self-dealing by advocating for and facilitating execution of the Agreement with Indyzen even though it favored interests (including his own) other than those of Parkridge, which he was obligated, as its CTO, to serve.

92.     Narra also breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen had the skills and know-how to successfully develop the Morfit App, when it did not.

93.     Narra further breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that the price Indyzen offered was the best possible value for the Morfit App, despite knowing that the Morfit App could be built at a lower price.

94.     Furthermore, Narra breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen would make the Morfit App operational in time for Parkridge's planned launch, when he either knew Indyzen could not do so or he had no reasonable basis for believing Indyzen could do so.

95.     Additionally, Narra breached his duties by designing the Agreement to benefit himself and his company, and not in a genuine effort to advance the welfare of Parkridge.

96.     Narra also breached his duties by acting in bad faith and failing in his duty as Parkridge's CTO, to make a reasonable inquiry about other entities, aside from his own, that could have successfully built the Morfit App at a lower price.

97.     Narra breached his duties by neglecting to require Indyzen to provide Parkridge with presentations and updates during Phase I and Phase II development, which would have been in Parkridge's best interests.

98.     Narra further breached his duties by acting in bad faith and failing in his duty as Parkridge's CTO, to advise Dobson to perform acceptance testing during Phase I and Phase II of the Morfit App development, which would have been in Parkridge's best interests.

99.     Narra also breached his duties by acting against Parkridge's best interests by representing to Dobson that the Morfit App met the Agreement's specifications in order to induce Dobson to give quality and acceptance approval.

100.     Narra failed to act in the best interest of Parkridge, and instead acted in his own interest, as CEO of Indyzen, and in the interests of Indyzen.

101.    Narra knowingly and intentionally acted in the sole pursuit of his personal interest and for the purpose of furthering Indyzen's welfare.

102.    Narra did not act in order to achieve any benefit for Parkridge in either the short term or long term.

103.    Narra's actions were adverse to Parkridge's interests.

104.    Narra engaged in self-dealing, did not act in good faith, and failed to exercise a reasonable amount of prudence and care as CTO, and therefore Narra breached his respective fiduciary duties to Parkridge.

105.    Parkridge has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Narra.

106.    Accordingly, Plaintiff Parkridge is entitled to judgment against Narra in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement and the breach of fiduciary duties by Director and CTO Narra.

**COUNT II**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW**

107.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-106 as if fully set forth herein.

108.    Narra owed Parkridge fiduciary duties of good faith, care, and loyalty.

109.    As alleged above, Narra breached his respective duties of good faith, care, and loyalty.

110.    Narra was a founder, CEO, and member of Indyzen's board of directors at the time he was also Parkridge's CTO.

111.    There exists a unity of interest between Narra and Indyzen such that any individuality and separation between them has ceased to exist.

112.    Given this relationship, Indyzen knew or should have known of Narra's service as Parkridge's CTO and director in 2015 and 2016 and that Narra had the fiduciary duties alleged above.

113.    Given this relationship, Indyzen knew or should have known Narra was interested in, and/or lacked independence with respect to Parkridge.

114.    Given this relationship, Indyzen knew or should have known that Narra had a fiduciary duty to represent the interests of Parkridge to the exclusion of other interests, and that Narra separately had duties to Parkridge that were different from and inconsistent with Narra's duties to Indyzen.

115.    Indyzen knew or should have known that Narra had an interest in obtaining the highest Agreement price possible, and that this interest was inconsistent with Parkridge's interest.

116.    Indyzen knowingly exploited these conflicts of interest and substantially participated in the breaches of fiduciary duty.

117.    Indyzen participated in Narra's breaches by proposing terms for the Agreement, despite knowing it could not successfully meet those terms, or by negligently or recklessly representing that it could successfully meet those terms.

118.    Indyzen also participated in Narra's breaches by concealing its lack of qualifications and inability to meet the functional specifications and deadlines set by the Agreement and discussed by the parties.

119.    Indyzen further participated in Narra's breaches by proposing an inflated Agreement price that was detrimental to the interests of Parkridge.

120.    Furthermore, Indyzen participated in Narra's breaches by continuing its routine operations, which constituted substantial participation in Narra's breaches of fiduciary duties and acted to further Narra's breaches.

121.    Indyzen thereby aided and abetted the breaches of fiduciary duties by Narra, and was an active and knowing participant in those breaches of fiduciary duties.

122.    Parkridge has been substantially damaged as a direct and proximate result of the actions and operations of Indyzen in aiding and abetting the breaches of fiduciary duties set forth fully herein.

123.    Accordingly, Plaintiff Parkridge is entitled to judgment against Indyzen in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement, the breaches of fiduciary duties by Narra, and the aiding and abetting in those breaches by Indyzen.

## COUNT III
## BREACH OF FIDUCIARY DUTY UNDER HONG KONG LAW

124.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-123 as if fully set forth herein.

125.    Pursuant to Hong Kong Companies Ordinance Part 10, Division 2, § 465 (1)-(2), and as Director, Vice Chairman, and CTO of Parkridge, Narra received confidential information from Parkridge about development of the Morfit App, and thus owed Parkridge fiduciary duties of reasonable care, skill, and diligence while performing his functions and exercising his powers for Parkridge.

126.    Pursuant to Hong Kong Companies Ordinance, Part 11, Division 5, § 536(1), and as Director, Vice Chairman, and CTO of Parkridge, Narra owed Parkridge a duty to declare all material interests in a transaction, arrangement or contract or a proposed transaction, arrangement or contract with a company where the director's interest is material.

127.    As a director and CTO at Parkridge, Narra had a duty of care to act in good faith in the interest of the company as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

128.    As director and CTO of Parkridge, Narra had a duty of skill to exercise his powers for the proper purpose, as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

129.    As director and CTO of Parkridge, Narra was obligated by his duty of diligence to avoid conflicts of duty and interest that he may possess that are not shared by Parkridge generally, as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

130.    Narra controlled and was founder and CEO of Indyzen, which entered into an Agreement with Parkridge on January 5, 2015, to build the Morfit App.

131.    As a result, Narra was interested in, and failed to act independently with respect to, the Agreement between Indyzen and Parkridge.

132.    Narra failed to exercise the necessary care, and breached his respective duties of reasonable care, skill, and diligence.

133.    Narra breached his duties by engaging in self-dealing by advocating for and facilitating consummation of the Agreement with Indyzen even though it favored interests (including his own) other than those of Parkridge, which he was obligated as its CTO to serve.

134.    Narra also breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen had the skills and know-how to successfully develop the Morfit App when it did not.

135.    Narra additionally breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that the price Indyzen offered was the best

possible value for the Morfit App, despite knowing, as someone with Narra's technical skills, knowledge, and experience would know, that the Morfit app could be built at a lower price.

136.    Narra further breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen would make the Morfit App operational in time for Parkridge's planned launch, when he either knew Indyzen could not do so or had no reasonable basis for believing Indyzen could do so.

137.    Additionally, Narra breached his duties by designing the Agreement to benefit himself and his company, and not in a genuine effort to advance the welfare of Parkridge.

138.    Furthermore, Narra breached his duties by acting in bad faith and failing in his duty, as Parkridge's CTO, to make a reasonable inquiry about other entities, aside from his own, that could successfully build the Morfit App at a lower price.

139.    Narra also breached his duties by neglecting to require Indyzen to provide Parkridge with presentations during Phase I and Phase II development, which would have been in Parkridge's best interests.

140.    Narra breached his duties by acting in bad faith and failing in his duty, as Parkridge's CTO, to advise Dobson to perform acceptance testing during Phase I and Phase II of the Morfit App development, which would have been in Parkridge's best interests.

141.    Narra also breached his duties by acting against Parkridge's best interests by representing to Dobson that the Morfit App met the Agreement's specifications in order to induce Dobson to give quality and acceptance approval.

142.    Narra breached his duty to declare his material interests in a transaction, arrangement or contract and/or proposed transaction, arrangement or contract when he failed to declare to Parkridge directors that he had a material interest in Parkridge's Agreement with Indyzen, and that he would benefit directly from such Agreement.

143.     Narra failed to act in the best interest of Parkridge, and instead acted in his own interest, as CEO of Indyzen, and in the interests of Indyzen.

144.     Narra knowingly and intentionally acted in the sole pursuit of his personal individual interest and for the purpose of furthering Indyzen's welfare.

145.     Narra did not act in order to achieve any benefit for Parkridge in either the short or long term.

146.     Narra abused his position and engaged in actions that did not confer any benefit upon Parkridge and that could never have conferred any benefit upon Parkridge.

147.     Narra's actions were adverse to Parkridge's interests and he acted in service of interests wholly separate and distinct from those of Parkridge, which he was obligated, as its CTO, to serve.

148.     Narra failed to act in the interests of Parkridge, failed to exercise his powers as CTO for the proper purpose, failed to avoid conflicts of duty and interest between Parkridge and Indyzen, and failed to declare his material interests in the Agreement to Parkridge directors; Narra therefore breached his respective fiduciary duties to Parkridge.

149.     Parkridge has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Narra.

150.     Accordingly, Plaintiff Parkridge is entitled to judgment against Director and CTO Narra in an amount to be determined at trial, including but not limited to the damages incurred by Parkridge as a result of the Agreement and the breaches of fiduciary duties by Narra.

**COUNT IV**
**BREACH OF CONTRACT, INCLUDING BREACH**
**OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

151.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-150 as if fully set forth herein.

152.    The parties negotiated and signed a contract for the development of the Morfit App in 2015.

153.    The Agreement, entered into between Parkridge and Indyzen on January 5, 2015, was and is a binding and enforceable agreement, supported by mutual assent and consideration.

154.    Parkridge performed and continues to perform all of its obligations under the Agreement, except as performance thereof has been excused by the acts, conduct and/or omissions of Indyzen.

155.    Indyzen breached the Agreement by failing to meet the functional specifications set in the Agreement.

156.    Indyzen further breached the Agreement by failing to provide the Morfit App in time for Parkridge's launch.

157.    Indyzen also breached the Agreement by withholding delivery of the Morfit App despite having been paid by Parkridge.

158.    These actions by Indyzen constitute a breach of the duty of good faith.

159.    Parkridge has been substantially damaged as a result of these breaches because Parkridge experienced damages for the delay in the released app and lost opportunity.

160.    Accordingly, Plaintiff Parkridge is entitled to recover damages from Indyzen in an amount to be determined at trial, and is entitled to reasonable sums for attorneys' fees in the discretion of the Court.

161.    Plaintiff Parkridge also requests relief in the form of enjoining Indyzen from distributing the Morfit App and/or Parkridge's wrongfully withheld deliverables to third parties.

## COUNT V
## UNJUST ENRICHMENT (IN THE ALTERNATIVE)

162.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-161 as if fully set forth herein.

163.    By virtue of receipt of payments from Parkridge and through Indyzen's failure to deliver the Morfit App on time with functions that meet the Agreement's functional specifications, Indyzen is therefore liable to Parkridge for unjust enrichment.

164.    Plaintiff Parkridge seeks restitution from Indyzen and an order from this Court disgorging all payments, transfers and other things of value obtained by Indyzen as a result of its wrongful conduct.

165.    By virtue of the above, Indyzen is liable to reimburse Parkridge for the amount of payments, transfers and other things of value it received in connection to the Agreement.

## COUNT VI
## FRAUDULENT MISREPRESENTATIONS

166.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-165 as if fully set forth herein.

167.    Narra, on behalf of Indyzen, knowingly and intentionally misrepresented Indyzen's skills, qualifications and pricing in an effort to induce Parkridge to execute the Agreement.  These misrepresentations were made on or about January 5, 2015, and are contained in the Agreement.

168.    In order to induce Parkridge into executing the Agreement with Indyzen and to create the illusion that Indyzen was offering Parkridge a special discount, Narra misrepresented that

the usual price of Phase I development was $420,000 and that $120,000 was the steeply discounted price he would offer Parkridge.

169.    In reality, Narra knew that even $120,000 for Phase I development was a "substantial rip off" and that the same generic application could be developed for a much lower price.

170.    In order to further induce Parkridge into executing the Agreement with Indyzen, Narra also misrepresented that Indyzen could build the Morfit App to meet certain functional specifications desired by Parkridge, despite knowing that Indyzen did not have the skills, resources or know-how to do so.

171.    In order to induce Parkridge into executing the Agreement with Indyzen, Narra further represented that Indyzen could successfully develop the Morfit App in time for Parkridge's launch, when Narra knew it could not and had no reasonable basis for believing Indyzen could do so.

172.    In order to induce Parkridge into executing the Agreement with Indyzen, Narra further misrepresented that Indyzen was the best possible value for software development services, despite knowing it was not.

173.    Narra's and Indyzen's affirmative representations that it could and would build the Morfit App successfully at a lower price than other companies, in time for Parkridge's launch, and that Indyzen was the best possible value for software development services, were representations that Parkridge considered important in its choice of contractors.

174.    Because Parkridge relied substantially on Narra's misrepresentations in choosing to contract with Indyzen, Narra's misrepresentations were material.

175.    Narra's misrepresentations were false because Indyzen did not have the resources, skills, or know-how to develop the Morfit App in accordance with Parkridge's functional standards, time restraints, and/or specifications.

176.     Narra's representations were also false because $120,000 was not a discount and/or was not lower than the usual cost of developing such an application.

177.     As CEO of Indyzen, Narra controlled Indyzen and accordingly, at the time he made the misrepresentations, he knew and/or had no reasonable ground to believe that Indyzen was the best possible value for software development services.

178.     Narra intended to induce Parkridge to contract with Indyzen so that he, as CEO of Indyzen, and Indyzen, his company, could profit from the Agreement with Parkridge, to the detriment of Parkridge.

179.     At the time that Narra misrepresented that Indyzen was the best value for software development, Narra intended to make a substantial profit by overcharging Parkridge for an inferior application.

180.     Parkridge was unaware Narra's representations were false, and justifiably relied upon Narra's assurances when it agreed to contract with Indyzen and subsequently signed the Agreement with Indyzen.

181.     Narra's fraudulent misrepresentations are the direct and proximate cause of Parkridge's injuries.

182.     Accordingly, Plaintiff Parkridge is entitled to judgment against Narra in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement and Narra's fraudulent misrepresentations.

## COUNT VII
## FRAUDULENT CONCEALMENT

183.     Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-182 as if fully set forth herein.

184.    By virtue of the fiduciary relationship that existed between Parkridge and Narra, and the fact that Narra had superior expertise and knowledge about the development of the Morfit App, that Narra planned the Agreement between Parkridge and Indyzen, and assisted in organizing the deal, and the relationship of trust and confidence that existed between Parkridge and Narra, and that Narra knew Parkridge was acting upon his guidance, Narra had an obligation to disclose to Parkridge all material information and all matters necessary to make his representations not misleading regarding the Agreement.

185.    Beginning on or about January 1, 2015, and January 5, 2015, Narra had communications with Parkridge concerning contracting with Indyzen for the Morfit App development.  Narra nevertheless failed to disclose material information to Parkridge about the deal and also failed to disclose matters necessary to make other representations he had made not misleading.

186.    Narra concealed that $120,000 was not a discount price for Phase I development of the Morfit App.

187.    Narra also concealed that an application similar to Parkridge's could be developed at a lower price than the one offered by Indyzen.

188.    Narra concealed that Indyzen did not have the skills, resources and know-how to build the Morfit App in line with Parkridge's time constraints and/or functional specifications.

189.    Narra further concealed that Indyzen was not the best possible value for software development services.

190.    Additionally, Narra concealed that he did not have a good faith basis for advising Parkridge to contract with Indyzen for development of the Morfit App.

191.    At the time that Narra concealed and/or failed to disclose the above-described facts to Parkridge, he knew that the facts existed and deliberately concealed them from Parkridge.

192.     Narra knew that these facts were not known to Parkridge and were not reasonably discoverable by Parkridge because Parkridge did not have access to this information personally, but instead relied upon Narra, as its CTO, to relay such information to Parkridge.

193.     The suppression and concealment of the above-described facts misled Parkridge to enter into an Agreement with Indyzen for the development of the Morfit App.

194.     Parkridge, at the time these failures to disclose and suppression of facts occurred, and at the time Parkridge took the actions alleged above, was ignorant of the existence of the facts that Narra suppressed and failed to disclose.

195.     Had Parkridge been aware of the existence of the facts not disclosed by Narra, Parkridge would not have entered into the Agreement with Indyzen.

196.     As a direct and proximate result of the fraudulent conduct of Narra as alleged herein, Plaintiff was induced to pay $420,000 in the deal and thereafter lost that sum when Indyzen wrongfully withheld the deliverables for which Parkridge paid.

197.     Narra intentionally concealed the above material facts known to Narra and made the above mentioned misrepresentations with the intention of depriving Parkridge of its funds and the application, and Plaintiff Parkridge is therefore entitled to an award of punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Parkridge and Mak respectfully request that this Court:

1.   Enter judgment in favor of Parkridge on each of its claims;

2.   Award Parkridge damages, actual, special, compensatory, exemplary and/or punitive, in an amount of U.S. $2.8 million, or in such other amount as is proven at trial;

3.   Enjoin Indyzen from distributing, releasing, or selling the Morfit App or Parkridge's Intellectual Property;

4.   Order Indyzen to provide Parkridge the Morfit App and its Intellectual Property;

COMPLAINT                                        26

5.  Award Parkridge all of its costs and reasonable attorneys' fees in this action as authorized by the Agreement and other applicable laws; and

6.  Grant to Parkridge such other relief as may be just and warranted under the circumstances.

**JURY DEMAND**

Plaintiffs Parkridge and Mabel Mak demand a jury trial on all issues so triable.

DATED:  December 29, 2016                     Respectfully submitted,

\By: /s/ *David Alan Makman*  /s

LAW OFFICES OF DAVID A. MAKMAN
David A. Makman, SBN 178195
david@makmanlaw.com

Attorneys    for    Plaintiffs    PARKRIDGE
LIMITED, and MABEL MAK
.

692106-v1/7065-04600

COMPLAINT                                          27