# EXHIBIT A

SHAREHOLDERS AGREEMENT

PARKRIDGE LIMITED

DATED

1 JANUARY 2015

# TABLE OF CONTENTS

1.   INTERPRETATION ..................................................................................... 4

2.   THE BUSINESS OF THE JVC ..................................................................... 7

3.   SHARE CAPITAL ...................................................................................... 7

4.   MANAGEMENT STRUCTURE OF THE JVC ................................................. 8

5.   BOARD OF DIRECTORS ............................................................................ 8

6.   GENERAL MEETING OF SHAREHOLDERS ................................................ 10

7.   FINANCE FOR THE JVC .......................................................................... 11

8.   RESTRICTIONS ON THE PARTIES ............................................................ 11

9.   THE BUSINESS PLAN .............................................................................. 13

10.   ACCOUNTING ......................................................................................... 14

11.   DIVIDEND POLICY .................................................................................. 14

12.   INTELLECTUAL PROPERTY ...................................................................... 14

13.   TRANSFER OF SHARES/RIGHT OF FIRST REFUSAL .................................. 15

14.   OBLIGATORY TRANSFER EVENT ............................................................. 16

15.   PRE-EMPTION RIGHTS ............................................................................ 18

16.   DRAG-ALONG RIGHTS ............................................................................ 18

17.   TAG-ALONG RIGHTS .............................................................................. 19

18.   EXPERT ................................................................................................. 21

19.   TERMINATION AND LIQUIDATION .......................................................... 22

20.   TERMINATION FOLLOWING DEADLOCK .................................................. 26

21.   STATUS OF AGREEMENT ........................................................................ 26

22.   CONFIDENTIALITY .................................................................................. 27

23.   WARRANTY ........................................................................................... 28

24.   WHOLE AGREEMENT .............................................................................. 29

25.   ASSIGNMENTS ........................................................................................ 29

26.   VARIATION AND WAIVER ....................................................................... 30

2

27.   COSTS ................................................................................................................30

28.   GOOD FAITH ......................................................................................................30

29.   THIRD PARTY RIGHTS .......................................................................................30

30.   NOTICE ..............................................................................................................31

31.   LANGUAGE ........................................................................................................32

32.   SEVERANCE ......................................................................................................32

33.   FURTHER ASSURANCE .......................................................................................32

34.   COUNTERPARTS .................................................................................................32

35.   AGREEMENT SURVIVES CLOSING .......................................................................32

36.   GOVERNING LAW AND JURISDICTION ..................................................................33

**THIS SHAREHOLDERS' AGREEMENT** ("**Agreement**") is entered into as of 1 January 2015 ("**Effective Date**"), by and between:

(1)   **Ms. Mabel Mak**, an individual with passport no. BA686615 issued by the Immigration Department, the Government of the Hong Kong Special Administrative Region with a residential address at 11A Bo Shek Mansion Block 1, 328 Sha Tsui Road, Tsuen Wan, Hong Kong ("**Mabel**"); and

(2)   **Mr. Parasurama Naidu Narra**, an individual with passport no. P3307180 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 19-9-11/2, Lakshmi Puram, Tiruchanoor Road, Tirupati, A.P - 517501, India ("**PN**").

Each party is referred to as "**Party**" and collectively referred to as "**Parties**".

BACKGROUND

This Agreement is entered into for the purpose of regulating the relationship between the Parties as the Shareholders of the JVC and setting out the rights and obligations of the Parties in respect of the JVC.

AGREED TERMS

1.   INTERPRETATION

1.1.   The definitions and rules of interpretation in this clause apply in this Agreement.

**Articles of Association**: memorandum and articles of association of the JVC as may be amended or supplemented from time to time.

**Beta Version**: a version of the Product that is made available for testing by a limited number of users outside the JVC before its general release.

**Board**: board of directors of the JVC as constituted from time to time.

**Business**: has the meaning given in clause 2.

**Business Day**: a day (other than a Saturday or Sunday) when banks in Hong Kong are open for business.

**Business Plan**: has the meaning given in clause 9.

**Confidential Information**: has the meaning given in clause 22.

**Control**: in relation to a body corporate, means the power of a person to secure that the affairs of the body corporate are conducted in accordance with the wishes of that person:

(a)   by means of the holding of shares, or the possession of voting power, in or in relation to that or any other body corporate; or

4

(b)     by virtue of any powers conferred by the constitutional or corporate documents, or any other document, regulating that or any other body corporate,

and a **Change of Control** occurs if a person who controls any body corporate ceases to do so or if another person acquires control of it.

**Core Intellectual Property:** means all patents, patent applications, registered designs and applications thereof, copyright material, computer software, technical information, inventions, trademarks, trade secrets, and all applications and registrations thereof that relate to the fundamental essence of the Product or Business, which are set forth in Schedule 1.

**Directors:** directors from time to time of the JVC.

**Encumbrance:**   includes any mortgage, charge, pledge, lien, hypothecation, guarantee, trust, right of set-off or other third party right or interest including any assignment by way of security, reservation of title or other security interest of any kind, howsoever created or arising, or any other agreement or arrangement (including a sale and repurchase agreement) having similar effect.

**Expert:** a person appointed in accordance with clause 18 to resolve a matter under this Agreement.

**Fair Value:** the value of shares determined in accordance with clause 14.

**Financial Year:** in relation to the JVC, means a financial accounting period of 12 months ending on the date given in clause 4.7.

**JVC:** Parkridge Limited, a company established under the laws of Hong Kong with certificate of incorporation no. 1956916 issued by the Registrar of Companies of Hong Kong Special Administrative Region on 23 August 2013.

**Minority Shareholders:** Shareholders, individually or collectively holding less than five percent of the shares in the JVC.

**Notice of Obligatory Transfer Event:** has the meaning given in clause 14.2.

**Obligatory Transfer Event:** in relation to a Party, any event specified in clause 14.1 that happens to that Party.

**Praveen Narra Kumar:** Mr. Praveen Narra Kumar, an individual with passport no. Z1418789 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 2107 Ashley Ridge Ct, San Jose, CA 95138, United States of America.

**Product:** a piece of social media networking software to be developed by the JVC for the purposes of its Business.

**Product Development Period:** means the period commencing 1 January 2015 until the termination of this Agreement.

**Reserved Matters:** matters requiring the written approval of all Shareholders as set out in Schedule 2.

**Robin**: Ms. Robin Starbuck Farmanfamaian, an individual with passport no. 058264790 issued by Department of State of the United States of America with a residential address at 360 Forest Ave Apt 506, Palo Alto, CA 94301 United States of America.

**Shareholders**: the holders of the shares in the JVC.

1.2.    Clause, schedule and paragraph headings do not affect the interpretation of this Agreement.

1.3.    A reference to a clause or a schedule is a reference to a clause of, or a schedule to, this Agreement. A reference to a paragraph is to a paragraph of the relevant schedule.

1.4.    A **person** includes an individual, a corporation, partnership, limited liability company, association, trust, unincorporated organization, or other legal entity or organization, or a government body.

1.5.    Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.6.    Unless the context otherwise requires, a reference to one gender includes a reference to the other genders.

1.7.    All warranties, representations, agreements and obligations expressed to be given or entered into by more than one person are given or entered into jointly and severally by the persons making the warranties and representations or entering into the agreements or obligations.

1.8.    A reference to a law is a reference to it as it is in force from time to time taking account of any amendment, extension, application or re-enactment and, includes any subordinate legislation for the time being in force made under it, provided that, as between the parties, no such amendment, extension, application or re-enactment shall apply for the purposes of this Agreement to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any Party.

1.9.    **Writing** or **written** includes faxes but no other electronic form.

1.10.    Documents in **agreed form** are documents in the form agreed by the parties and initialled by them or on their behalf for identification.

1.11.    A reference in this Agreement to a document is a reference to the document whether in paper or electronic form.

1.12.    Where the words **include(s), including** or **in particular** are used in this Agreement, they are deemed to have the words "without limitation" following them and where the

context permits, the words **other** and **otherwise** are illustrative and shall not limit the sense of the words preceding them.

1.13.   Any obligation in this Agreement on a person not to do something includes an obligation not to agree, permit, allow, or acquiesce in that thing to be done.

**2.   THE BUSINESS OF THE JVC**

2.1.   The **Business** of the JVC is to operate and maintain the Product in the health and wellness sector.

2.2.   Each Party shall use its reasonable endeavours to promote, develop and protect the interests of the Business of the JVC to the best advantage of the JVC.

**3.   SHARE CAPITAL**

3.1.   All shares issued by the JVC are ordinary shares. The total authorized share capital of the JVC shall be HK$ 10,000 divided 10,000 shares of HK$ 1 par value each.

3.2.   Each Shareholder has the right to maintain the same percentage of share ownership in the JVC, until the JVC receives third party equity funding on terms acceptable to each Shareholder, or as otherwise agreed in writing between the Parties.

3.3.   The shareholding of the JVC is as set out below:

| No. | Shareholders | No. of Shares | Percentage (%) |
|---|---|---|---|
| 1. | Mabel Mak | 7000 | 70% |
| 2. | Parasurama Naidu Narra | 3000 | 30% |
| **Total** | | 10,000 | 100% |

3.4.   Mabel shall subscribe and be issued by the JVC 7000 shares, equivalent to 70% of the total shares of the JVC ("**Mabel Shares**"). Mabel shall also be expected to contribute to the JVC in accordance with Schedule 3.

3.5.   PN shall subscribe and be issued by the JVC 3000 shares, equivalent to 30% of the total shares of the JVC ("**PN Shares**"). PN shall also be expected to contribute to the JVC in accordance with Schedule 4.

7

3.6.   Notwithstanding anything else in this Agreement, PN agrees that Mabel may, at her absolute discretion, transfer from the Mabel Shares to Robin 0.5208% of the total shares of the JVC ("**Robin Shares**"). Such shares shall only be transferred or issued to Robin in stages, within the period of May 2014 to September 2014.

3.7.   PN shall waive all pre-emption rights arising in connection with any transfer by Mabel of the Robin Shares to Robin.

3.8.   For the avoidance of doubt, PN shall not be expected to transfer any PN Shares to Robin.

3.9.   However and subject to clause 13, if additional shares beyond the Robin Shares are required to be transferred to Robin or to other future Shareholders, both Mabel and PN shall participate pari passu in such share transfer and their respective percentage of shareholding in the JVC shall be reduced accordingly.

**4.      MANAGEMENT STRUCTURE OF THE JVC**

4.1.   The chairman and chief executive officer shall be Mr. Randy Gene Dobson.

4.2.   The vice chairman and chief technology officer shall be Mr. Praveen Kumar Narra.

4.3.   The company secretary shall be Secreco Limited with a head office is located at the 8th Floor, Gloucester Tower, the Landmark, 15 Queen's Road Central, Hong Kong.

4.4.   The auditors shall be _____.

4.5.   The bankers shall be Hong Kong and Shanghai Bank Corporation (Hong Kong).

4.6.   The Financial Year shall end on 31 December in each year.

**5.      BOARD OF DIRECTORS**

5.1.   The Board has responsibility for the supervision and overall management of the JVC and its Business, in a manner which is consistent with the then current Business Plan as approved by the Directors from time to time.

5.2.   The Board shall initially consist of three Directors and Mabel shall have the right to nominate two Directors for appointment and PN shall have the right to nominate one Director for appointment, provided that in the event PN's total shareholding in the JVC shall for any reason fall below 10%, his entitlement to nominate one Director shall cease. If the Shareholders unanimously agree, the number of Directors comprising the Board may be increased from time to time. Each Shareholder agrees to procure the appointment of the Directors nominated by the other Shareholder in the manner set out in this clause.

8

5.3.   For the purposes of clause 5.3, the following three Directors shall be appointed:

(a)   Mabel shall appoint:

(i)   Mr. Randy Dobson, an individual with passport no. 488442801 issued by Department of State of the United States of America with a residential address at EA2-7-1 Riverside Residence, Tan Phu Ward, District 7, Ho Chi Minh City, Vietnam; and

(ii)   Mr. Mark Charles Oakley, an individual with passport no. 761331611 issued by the Identity & Passport Service of the United Kingdom of Great Britain and Northern Ireland with a residential address at B2-1106 City Garden Apartment, 59 Ngo Tat To Street, Ward 21, Binh Thanh District, Ho Chi Minh City, Vietnam.

(b)   PN shall appoint:

(i)   Mr. Praveen Kumar Narra, an individual with passport no. Z1418789 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 2107 Ashley Ridge Ct, San Jose, CA 95138, United States of America.

5.4.   In the event that a seat on the Board becomes vacant, the Shareholder entitled to nominate the Director previously holding such seat shall have the right to fill such vacancy, and the Shareholders shall procure the appointment of such nominee. In the event that a Shareholder wishes to remove a Director previously nominated by it, it shall give notice to the other Shareholder to such effect whereupon the Shareholders shall procure such removal accordingly. In no case shall any Shareholder seek to remove a Director nominated by the other Shareholder unless the other Shareholder shall have so requested in writing.

5.5.   Subject to the provisions in this Agreement, the Directors shall have all the authority granted to the directors in the Articles of Association and, to the extent not expressly provided therein, under the laws of Hong Kong.

5.6.   The quorum of any Board meeting shall be three Directors, who may attend in person or by telephone or video conference. In the event all Directors have received proper notice of the meeting and a quorum is not present at the meeting, (i) the meeting may be adjourned for not less than ten Business Days and may be rescheduled with proper notice to all Directors of the new time and place for the meeting, and (ii) when the adjourned meeting resumes, a quorum for such meeting will be two Directors then comprising the Board, which shall include one Director nominated by Mabel and one Director nominated by PN.

5.7.   At any meeting of the Board, each Director shall have one vote with respect to each matter upon which action is to be taken. Subject to clause 6.2 and 6.9, all decisions involving Reserved Matters shall be passed by a unanimous vote of the Directors present at the meeting and all other decisions shall be by a majority vote of the Directors present at the meeting. The Board may also approve actions by unanimous written consent, which such written consent shall have the same force and effect as a resolution duly passed at a meeting of the Board.

5.8.   All Directors shall serve without compensation, but shall be reimbursed by the JVC for all out of pocket travel, lodging, food and incidental expenses incurred in connection with their attendance at Board meetings and their other duties performed on behalf of the JVC. The Parties agree that they will cause the Board to meet at least once in each calendar quarter in such locations as the Board may from time to time determine.

6.     **GENERAL MEETING OF SHAREHOLDERS**

6.1.   The general meeting of shareholders ("**General Meeting of Shareholders**") shall be the highest authority of the JVC and shall pass decisions within its power and authority by way of voting at meetings (or passing written resolutions) with respect to such matters as may be agreed between the Parties and such other matters required under the laws of Hong Kong.

6.2.   Any decision on any Reserved Matters requires the written consent and approval of Shareholders who together represent not less than 80% of the total share capital of the JVC.

6.3.   General Meeting of Shareholders shall be held regularly at least once every year and shall be held upon request of the Chairman or request of a Shareholder that represents not less than 20% of the share capital of the JVC.

6.4.   Each General Meeting of Shareholders shall, unless otherwise agreed by the Parties, be held at the registered address of the JVC or in such places as the General Meeting of Shareholders shall determine from time to time.

6.5.   Meetings shall be held 30 Business Days from the date of the notice thereof, provided that the Shareholders may waive such notice by unanimous written consent. The Chairman shall be responsible for giving such notice and for convening and presiding over the meeting. No final decision shall be reached at a meeting of the General Meeting of Shareholders on any matter which has not been specified in the agenda contained in the notice convening such meeting unless each of the Shareholder represented on the General Meeting of Shareholders is present or so represented.

6.6.   General Meeting of Shareholders shall be held when the number of participating Shareholders represents at least 80% of the share capital of the JVC.

6.7.   If a Shareholder is unable to participate in a General Meeting of Shareholders, such Shareholder may issue an authorisation/power of attorney signed by such Shareholder and/or entrust a proxy to participate in the meeting or to sign a resolution on his behalf. The attorney-in-fact or proxy, who may, but is not required to be a Shareholder, shall have the same rights and powers as the absent Shareholder. If no representative is appointed by the absent Shareholder to attend a meeting or to sign a resolution of the General Meeting of Shareholders, the absent Shareholder shall be deemed to have waived his right to participate or vote in such resolution and decisions made at such meeting shall be binding upon him.  No proxy shall be appointed who is, in the reasonable opinion of the General Meeting of Shareholders, associated with any company, organisation which it would be commercially inappropriate to allow to participate in the General Meeting of Shareholders.

10

6.8.    Each share in the JVC shall equal one vote. Each Shareholder shall be entitled to vote in accordance with their respective shareholding of the Party in the JVC for which he is authorised to represent.

6.9.    All resolutions by the General Meeting of Shareholders to be validly adopted must be signed affirmatively by the Shareholders present and voting pursuant to this clause 6. In lieu of a meeting of the General Meeting of Shareholders, a written resolution may be adopted by the General Meeting of Shareholders and shall be deemed to have been validly adopted by the General Meeting of Shareholders if such resolution is sent to all Shareholders and is approved by the Shareholders representing at least 80% of the share capital of the JVC for a Reserved Matter or 51% of the share capital of the JVC for all other matters.

6.10.   The minutes of a General Meeting of Shareholders shall be prepared in English and signed by every attending Shareholders or a proxy authorised to attend such a meeting. The original signed minutes shall be kept on file in the head office of the JVC or as otherwise agreed by the Parties and copies thereof shall be provided to each Shareholder upon request.

7.    **FINANCE FOR THE JVC**

The Parties envisage that for the Business and operation of the JVC shall be initially financed by the following ("**Initial Funding**"), further details of which are set out in Schedules 3 and 4:

    (a)    a loan from Mabel up to a maximum amount of US$ 1,000,000; and

    (b)    a loan from PN in the form of a discounted service fee arranged by PN with a value of US$ 300,000.

Subject to clause 3.2, the Parties acknowledge that the terms of the financing must be acceptable to all Shareholders.

Beyond the Initial Funding, if the JVC needs any additional funding for the operations and expansion of the JVC, the JVC may seek a loan from its principal bankers subject to written approvals from each of the Shareholders.

There is no obligation on the Parties to provide any further finance to the JVC but, if they do so, the Parties shall each provide the amount proportionate and equivalent to their respective shareholding in the JVC on the same terms unless they agree otherwise in writing.

8.    **RESTRICTIONS ON THE PARTIES**

8.1.    Neither Party may, unless otherwise agreed in writing by the other Party and the JVC, during the times specified below, carry on or be employed, engaged or interested in any business which would be in competition with any part of the Business of the JVC including any developments in the Business after the Effective Date. The times during which these restrictions apply are:

11

(a)    any time when the Party in question is a Shareholder; and

(b)    for a period of two years after the Party in question ceases to be a Shareholder.

8.2.    Neither Party may, during the times specified below, deal with or seek the custom of any person that is, or was within the previous twelve months, a client or customer of the JVC or, where the party is no longer a Shareholder, any person that was a client or customer of the JVC at any time during the period of twelve months immediately preceding the Party in question ceasing to be a Shareholder. The times during which these restrictions apply are:

(a)    any time when the Party in question is a Shareholder; and

(b)    for a period of two years after the party in question ceases to be a Shareholder.

8.3.    Neither Party may, during the times specified below, offer employment to, enter into a contract for the services of, or attempt to solicit or seek to entice away from the JVC any individual who is, at the time of the offer or attempt a director, officer or employee holding an executive or managerial position with the JVC, or procure or facilitate the making of any such offer or attempt by any other person. The times during which these restrictions apply are:

(a)    any time when the party in question is a Shareholder; and

(b)    for a period of two years after the Party in question ceases to be a Shareholder.

8.4.    Neither Party may, during the times specified below, solicit or endeavour to entice away from the JVC any supplier who supplies, or has supplied within the previous twelve months, goods **AND/OR** services to the JVC or, where the party is no longer a Shareholder, any supplier who has supplied goods **AND/OR** services to the JVC at any time during the period of twelve months immediately preceding the Party in question ceasing to be a Shareholder if that solicitation or enticement causes or would cause such supplier to cease supplying, or materially reduce its supply of, those goods **AND/OR** services to the JVC. The times during which these restrictions apply are:

(a)    any time when the party in question is a Shareholder; and

(b)    for a period of two years after the party in question ceases to be a Shareholder.

8.5.    The undertakings in this clause are given by each Party to the other and apply to actions carried out by each Party in any capacity and whether directly or indirectly, on the Party's own behalf, on behalf of any other person or jointly with any other person.

8.6.    Nothing in this clause prevents a Party:

12

(a)  from holding for investment purposes only any units of any authorised unit trust;

(b)  from holding for investment purposes only not more than 10 % of any class of shares or securities of any company whose shares are publicly listed; or

(c)  acquiring a holding of shares in a company or other undertaking engaged in a business that competes with the Business of the JVC if the competing business contributes less than five percent of the annual turnover of such company or undertaking.

8.7.  Each of the covenants in this clause is considered fair and reasonable by the Parties, but if any such restriction is found to be unenforceable but would be valid if any part of it were deleted or the period or area of application reduced, the restriction shall apply with such modifications as may be necessary to make it valid and effective.

## 9.    THE BUSINESS PLAN

9.1.  The **Business Plan** is an annual business plan for the JVC prepared by the JVC and it shall include in relation to the Financial Year to which it relates:

(a)  a cashflow statement giving:

(i)  an estimate of the working capital requirements; and

(ii)  an indication of the amount (if any) that it is considered prudent to retain, for the purpose of meeting those requirements, out of those profits of the previous Financial Year that are available under the laws of Hong Kong for distribution to Shareholders;

(b)  a monthly projected profit and loss account;

(c)  an operating budget (including capital expenditure requirements) and balance sheet forecast;

(d)  a management report giving business objectives for the Financial Year; and

(e)  a financial report which shall include an analysis of the estimated results of the JVC for the previous Financial Year compared with the Business Plan for that year, identifying variations in sales revenues, costs and other material items.

9.2.  The Business Plan for each Financial Year shall be:

(a)  prepared by the Board within 45 Business Days of the end of the preceding Financial Year (the first day being the first day of the Financial Year to which the plan relates); and

(b)  adopted and approved by the Parties in accordance with this Agreement as soon as possible after it has been prepared.

13

**10.  ACCOUNTING**

10.1.   The JVC shall at all times maintain accurate and complete accounting and other financial records in accordance with the requirements of all applicable laws and generally accepted accounting principles applicable in Hong Kong.

10.2.   Each Party and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of the JVC.

10.3.   The JVC shall supply each Party with the financial information necessary to keep the Parties informed about how effectively the Business of the JVC is performing.

**11.  DIVIDEND POLICY**

11.1.   Any profit retention shall be decided by the General Meeting of Shareholders. Any undistributed profits from previous Financial Year(s) may also be distributed with the profits of the current Financial Year. The after-tax net profit of the JVC shall, as and when the cash position of the JVC permits, be distributed to the Parties, in accordance with their respective shareholding in US$ or any other freely convertible currency subject to the Laws of Hong Kong.

11.2.   Loss of the JVC shall be distributed between the Parties based on their respective shareholding at the time of loss distribution.

11.3.   A distribution under this clause 11 in relation to any Financial Year shall be made within six months of the day to which the audited accounts for that Financial Year are made up.

**12.  INTELLECTUAL PROPERTY**

12.1.   If either Shareholder at any time during the Product Development Period generates Core Intellectual Property in relation to the Product or Business or engages or employs a person or persons who make or conceive such Core Intellectual Property, such Core Intellectual Property shall be solely owned by the JVC.

12.2.   The Shareholders agree and acknowledge that any other intellectual property contributed to the JVC that is not identified a Core Intellectual Property, it will not be considered to be owned by the JVC. In such an instance, the JVC shall receive an irrevocable, royalty-free, non-exclusive license to use such other intellectual property.

12.3.   Notwithstanding clauses 12.1 and 12.2, the Core Intellectual Property and such other intellectual property shall be made freely available to all the Parties solely for the purpose of research and development activities of the Business.

14

**13.    TRANSFER OF SHARES/RIGHT OF FIRST REFUSAL**

13.1.   No Party shall mortgage, pledge, charge or otherwise encumber or permit any third party's interest to subsist in respect of all or any part of its shares in the JVC without the prior written consent of the other Party and subject always to the Laws of Hong Kong.

13.2.   Subject to the terms and conditions of this Agreement, when a Party desires to transfer the whole or part of its shares in the JVC ("**Transferor**") to any third parties ("**Transferee**"), the procedures shall be as follows:

(a)    The Transferor shall deliver a written notice ("**Transfer Notice**") to the other Party and the JVC stating (i) his bona fide intention to sell all or any portion of its shares ("**First Offer Shares**"); (ii) the number of First Offer Shares; and (iii) the name of the Transferee; and (iv) the price and terms upon which he proposes to offer such First Offer Shares.

(b)    By written reply to the Transferor and the JVC within 30 Business Days after receipt of the Transfer Notice, the other Party may elect to purchase the First Offer Shares.

(c)    If the other Party does not elect to purchase the First Offer Shares in accordance with this clause 13.2, the Transferor shall, during the 60 day period following the expiration of the 30 day period set out above offer the First Offer Shares to the Transferee at a price not less than, and upon terms no more favourable to the Transferee than those specified in the Transfer Notice. The Transferor must give a copy of any agreement with the Transferee relating to the sale of the First Offer Shares to other Party within three Business Days after execution of the agreement. If the Transferor does not enter into an agreement for the sale of the First Offer Shares within the aforementioned 60 day period, then the right of the Transferor to sell the First Offer Shares to the Transferee shall terminate and shall be re-offered to the other Party in accordance with this clause 13.2.

(d)    No transfer or other disposal shall be effective until:

(i)    the Transferee agrees in writing that it will comply with every provision and condition of this Agreement and the Articles of Association;

(ii)   relevant approvals have been obtained for this share transfer; and

(iii)  the share transfer shall be registered with or approved by the relevant authority, if required by the Laws of Hong Kong.

13.3.   The Parties agree that the Transferor shall bear all share transfer tax in accordance with the Laws of Hong Kong except as otherwise agreed by the Parties.

13.4.   No Party may subcontract or delegate all or part of its obligations hereunder. Notwithstanding the right of first refusal of the Parties as set out here, PN is allowed to transfer or otherwise dispose of the whole or part of its shares of the JVC, provided

that PN shall first give Mabel the first right of refusal to acquire the whole or part of its equity interest at the purchase price offered to other third parties. If Mabel does not purchase such capital in whole or in part, or the Parties cannot agree on the terms and conditions of the share transfer, PN may transfer his shares in whole or in part to a third party(ies) on such terms and conditions which are not more favourable than those proposed to Mabel.

13.5.    The restriction set out in clause 13.4 shall not apply if the transfer of shares held by either Party is made to an immediate family member, or to an entity that is majority owned of at least 80% by the relevant Party. For the avoidance of doubt, such transfer of shares as set out in this clause 13.5 must not be a partial transfer and as such must be full transfer of the Party's shares and subject to consent of the other Party which shall not be unreasonably withheld.

**14.    OBLIGATORY TRANSFER EVENT**

14.1.    The occurrence of any of the following events shall be deemed as an **Obligatory Transfer Event**:

(a)    if the Party is insolvent or unable to pay its debts within the meaning of the insolvency legislation applicable to that Party and has stopped paying its debts as they fall due.

(b)    if a step has been taken to initiate any process by or under which:

(i)    the ability of the creditors of the Party to take any action to enforce their debts is suspended, restricted or prevented;

(ii)    some or all of the creditors of the Party accept, by agreement or in pursuance of a court order, an amount of less than the sums owing to them in satisfaction of those sums with a view to preventing the dissolution of the Party;

(iii)    a person is appointed to manage the affairs, business and assets of the Party on behalf of the Party's creditors; or

(iv)    the holder of a charge over assets of the Party is appointed to control the business and assets of the party.

(c)    if a process has been instituted that could lead to the Party being dissolved and its assets being distributed among the Party's creditors, shareholders or other contributors.

(d)    if there is a Change of Control of the Party, other than a permitted transfer pursuant to this Agreement.

(e)    if a Party, being claimed dead or disabled by an order of the competent court, except for a transfer made pursuant to clause 13.5.

(f)    if a Minority Shareholder decides to sell her shares in the JVC to an unrelated third party.

14.2.   Where an Obligatory Transfer Event occurs to a Party (in this clause the "**Seller**"), shall give notice of it to the other **Party** (in this clause the "**Buyer**") as soon as possible and, if it does not, it is deemed to have given notice of it on the date on which the Buyer becomes aware of such Obligatory Transfer Event ("**Notice of Obligatory Transfer Event**").

14.3.   As soon as practicable after service, or deemed service, of the Notice of Obligatory Transfer Event, the Parties shall appoint an Expert to determine the Fair Value of the Seller's shares in the JVC ("**Sale Shares**")

14.4.   The Buyer has the right, within 30 Business Days of receiving notification of the Fair Value determined by the Expert (the first day being the day after the Buyer receives the Fair Value notification), to serve a notice on the Seller to buy all of the Sale Shares at the Fair Value.  In case the number of the Buyer is plural, each Buyer shall have the right of first refusal to purchase the amount of the Seller's shares which bears the same ratio to the total shares being purchased as such Buyer's shareholdings bear to the total amount of shares owned by all Shareholders exercising their right of first refusal.

14.5.   In this clause, the **Fair Value** of the Sale Shares shall be the value that the Expert certifies to be the fair market value in his opinion based on the following assumptions:

   (a)   the value of the shares in question is that proportion of the fair market value of the entire issued share capital of the JVC that the Sale Shares bear to the then total issued share capital of the JVC (with no premium or discount for the size of the Seller's shareholding or for the rights or restrictions applying to the shares under this Agreement or the Articles of Association of the JVC);

   (b)   the sale is between a willing buyer and a willing seller on the open market;

   (c)   the sale is taking place on the date that the Obligatory Transfer Event occurred;

   (d)   the JVC's businesses shall continue to be carried on as a going concern (unless the JVC is insolvent or unable to pay its debts within the meaning of the insolvency legislation applicable to the JVC);

   (e)   the shares are sold free of all Encumbrances; and

   (f)   to take account of any other factors that the Expert reasonably believes should be taken into account.

14.6.   The Expert shall be requested to determine the Fair Value of the Sale Shares within 20 Business Days of his appointment and to notify the Buyer and Seller in writing of his determination.

14.7.   The service of a notice to buy under this clause shall bind the Parties to buy and sell the shares.

17

14.8.   Notwithstanding anything contrary to this Agreement, if the Board so determines, only Mabel or an entity or person nominated by Mabel shall have the right to be transferred or to purchase the shares of the Minority Shareholder who chooses to sell her shares in the JVC to an unrelated third party as set out in clause 14.1(f), provided that the purchase price of such shares shall be at Fair Value.

## 15.   PRE-EMPTION RIGHTS

If the JVC proposes to issue additional shares (including without limitation any shares issued either pursuant to a capitalisation of the reserve fund (fund for reserve and supplementation of the share capital of the JVC), share surplus account or retained earnings or otherwise or pursuant to any similar issuance of shares without further payment by the Shareholders), or any other securities which may be converted into shares, whether convertible bonds, options, warrants or otherwise, the Parties shall have the right, but not the obligation, to be issued or to subscribe to, on a pro-rata basis, and on an equal basis, based on its fully-diluted shareholding percentage at the relevant time, the new shares or other securities being issued or offered, so as to maintain its shareholding at the same percentage as existed immediately before such issuance or offering. In addition, the JVC shall ensure that the Parties are always given adequate notice and opportunity to exercise their pre-emption rights to which they are entitled.

## 16.   DRAG-ALONG RIGHTS

16.1.   At any time after the revenue of the JVC reaches US $5 million provided that there is no initial public offering of shares of the JVC, a Shareholder holding more than 60% of the shares in the JVC ("**Selling Shareholder**") wishes to transfer or dispose of any of its shares to a proposed transferee, the Selling Shareholder shall have the option to require all other Shareholders ("**Called Shareholder**") to transfer a proportionate amount of its Shares to the proposed transferee within 20 Business Days after demand is made by the Selling Shareholder by written notice to that effect ("**Drag-along Notice**") to the Called Shareholder accompanied by copies of all documents required to be executed by the Called Shareholder to give effect to the required transfer.

16.2.   The transfer of the shares by the Called Shareholder must be on the same terms and conditions as shall have been agreed between the Selling Shareholder and the proposed transferee, save it being understood that, whether or not those terms and conditions between Selling Shareholder and proposed transferee include the giving of warranties, the Called Shareholder shall only be required to provide warranties to the proposed transferee as to title to its shares and its capacity to transfer them.

16.3.   Each Drag-along Notice must include details of:

(a)   the number and class of shares to be transferred by the Selling Shareholder and the Called Shareholder;

18

(b)    the identity of the proposed transferee;

(c)    the price to be paid for each Share by the proposed transferee (or any person acting in concert with the proposed transferee); and

(d)    the place, date ("**Transfer Date**") and time of completion of the proposed transfer by the Called Shareholder being a date not less than 30 Business Days after service of the Drag-along Notice.

16.4.   For the purposes of  this clause, a "**proportionate amount**" of shares of a Called Shareholder shall mean the number of shares that is equal to the proportion of the shares (held by the Selling Shareholder) being transferred to the proposed transferee to the total number of shares held by the Selling Shareholder expressed as a percentage.

16.5.   If the Called Shareholder fails to transfer its Shares pursuant to this clause 16, the Selling Shareholder may take all necessary actions against the Called Shareholder as permitted by applicable law, including but not limited to requesting the Board to effect the transfer of the Called Shareholder's Shares on the Called Shareholder's behalf to the proposed transferee (or its nominee(s)) in accordance with this clause 16 as if the Shares were transferred by the Called Shareholder, and then authorise registration of the transfer. The Called Shareholder hereby authorises the Board to act on its behalf as provided for in this clause 16.5.

## 17.   TAG-ALONG RIGHTS

17.1.   In the event that a Shareholder in one or a series of transactions transfers more than 50% of its shares at the time of transfer ("**Transferring Shareholder**") to another party ("**Third Party Purchaser**"), such Transferring Shareholder shall not complete any of the proposed transfer of shares to the Third Party Purchaser unless:

(a)    such Transferring Shareholder procures that the Third Party Purchaser offers in writing to buy from the other Shareholders ("**Remaining Shareholders**") all of its shares on terms not less favourable than those applied to any purchase of shares of such Transferring Shareholder; the offer shall remain open for acceptance by the Remaining Shareholders for a period of at least 30 Business Days from the date the written offer is provided to the Remaining Shareholder ("**Third Party Offer**"); and

(b)    either (i) the Remaining Shareholders reject the Third Party Offer (or is deemed to have rejected it in accordance with this clause 17; or (ii) the Remaining Shareholders accept the Third Party Offer in accordance with the Third Party Offer.

17.2.   The Remaining Shareholders may accept or reject the Third Party Offer by notice in writing to the Third Party Purchaser and the Transferring Shareholder within the 30 Business Days offer period referred to in clause 17.1(a). If the Remaining Shareholders do not issue any written notice in response to the Third Party Offer

within the said 30 day offer period, the Remaining Shareholders shall be deemed to have rejected the Third Party Offer.

17.3.    If the Remaining Shareholders accept the Third Party Offer, the sale of the Remaining Shareholders' shares shall be conditional upon completion of the Transferring Shareholder's proposed sale of shares to the Third Party Purchaser, and the sale of the Transferring Shareholder's shares shall be conditional upon completion of the sale of the Remaining Shareholders' shares to the Third Party Purchaser in accordance with the Third Party Offer, and both sales shall be completed at the same time. If the Remaining Shareholders reject the Third Party Offer (or is deemed to have rejected it in accordance with clause 17.2), the proposed sale of the Transferring Shareholder's Shares to the Third Party Purchaser shall take place on the date falling no later than 30 Business Days from the date the Remaining Shareholders rejected the Third Party Offer.

**18. EXPERT**

18.1.   An **Expert** is a person appointed in accordance with clause 14 to resolve a matter arising under this Agreement.

18.2.   The Parties shall endeavour to agree on the appointment of an independent Expert and to agree the terms of appointment with the Expert.

18.3.   If the Parties are unable to agree on the appointment of an Expert within 10 Business Days of either Party serving details of a suggested expert on the other, either Party shall then be entitled to request a big four accounting firm to appoint an Expert of repute with international experience in the valuation of social media platforms and agree on the Expert's terms of appointment.

18.4.   The Expert is required to prepare a written decision and give notice (including a copy) of the decision to the Parties within the time frame set forth in clause 14.6.

18.5.   If the Expert dies or becomes unwilling or incapable of acting, or does not deliver the decision within the time required by clause 14:

    (a)   either Party may apply to discharge the Expert and to appoint a replacement Expert with the required expertise; and

    (b)   clause 14 applies in relation to the new Expert as if he were the first Expert appointed.

18.6.   All matters under clause 14 shall be conducted, and the Expert's decision shall be written, in the English language.

18.7.   The Parties are entitled to make submissions to the Expert and shall provide (or procure that others including the JVC provide) the Expert with such assistance and documents as the Expert reasonably requires for the purpose of reaching a decision subject to the Expert agreeing to give such confidentiality undertakings as the Parties may reasonably require.

18.8.   To the extent not provided for by clause 14, the Expert may, in his reasonable discretion, determine such other procedures to assist with the conduct of the determination as he considers just or appropriate, including (to the extent he considers necessary) instructing professional advisers to assist him in reaching his determination.

18.9.   Each Party shall, with reasonable promptness, supply (and procure that others including the JVC supply) each other with all information and give each other access to all documentation and personnel as the other Party reasonably requires to make a submission.

18.10.   The Expert shall act as an expert and not as an arbitrator. The Expert's written decision on the matters referred to him shall be final and binding in the absence of manifest error or fraud.

18.11.   Each Party shall bear its own costs in relation to the reference to the Expert. The Expert's fees and any costs properly incurred by him in arriving at his determination (including any fees and costs of any advisers appointed by the Expert) shall be borne by the Parties equally or in such other proportions as the Expert shall direct.

**19.   TERMINATION AND LIQUIDATION**

19.1.   Except for the provisions which clause 19.2 states shall continue in full force after termination, any Party may give notice to the other Party of its intention to require this Agreement to be terminated on the occurrence of any of the following:

    (a)   the mutual agreement of the Parties;

    (b)   if a Party commits a material, voluntary, or persistent breach of this Agreement which if capable of remedy has not been so remedied within 30 Business Days of the other Party requiring in writing such remedy;

    (c)   the General Meeting of Shareholders is deadlocked on any Reserved Matters requiring their approval and the deadlock cannot be resolved within 120 Business Days from the date the relevant decision is voted on; or

    (d)   when a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that will lead to the JVC being dissolved and its assets being distributed among the JVC's creditors, Shareholders or other contributors.

19.2.   The following provisions of this Agreement remain in full force after termination:

    (a)   Clause 1 (interpretation);

    (b)   Clause 8 (restrictions on the parties);

    (c)   Clause 19 (termination and liquidation);

    (d)   Clause 21 (status of agreement);

    (e)   Clause 22 (confidentiality);

    (f)   Clause 23 (warranty);

    (g)   Clause 24 (whole agreement);

    (h)   Clause 26 (variation and waiver);

    (i)   Clause 27 (costs);

    (j)   Clause 30 (notice);

    (k)   Clause 31 (language);

    (l)   Clause 32 (severance); and

19.3.   Upon the notice of termination served under clause 19.1, the JVC shall be liquidated as provided hereinafter.

(a)   At the time of liquidation, the JVC is actively engaged in the Business and is unable to make profits under existing circumstances and/or with the existing assets, the General Meeting of Shareholders shall adopt a decision to dissolve the JVC and form a liquidation committee consisting of five members, of which three members are appointed by Mabel and two members are appointed by PN ("**Committee**") in accordance with the laws of Hong Kong. All decisions of the Committee will be made on the basis of the approval of at least 75% of the total number of members of the Committee. The Committee shall be under the direction of the General Meeting of Shareholders and shall assist the General Meeting of Shareholders in the liquidation of the JVC. The value of the JVC shall be established by the Committee which shall be entitled to delegate the valuation to qualified independent appraisers, appointed at the cost of the JVC. The appraisers may be qualified accountants or auditors. Such appraisers shall value the JVC on a going-concern basis with reference to the previous profitability of the JVC, the current market share of the JVC and the future prospects of the JVC. In making such valuation, the appraisers shall take into account the debts and liabilities of the JVC. The appraisers shall also take into account the existence of any continuing relevant agreements.

(b)   The Committee shall first offer the JVC as a going concern for purchase by the Parties. The Parties shall also have the right of first refusal for the purchase of such Assets at the fair market value of such Assets, taking into account the future use that may be made of them and any costs associated with their future use including but not limited to removal and transportation costs. The offer shall be made in writing and shall stipulate the value of the JVC as being the value ascertained by the appraisers. The offer shall be for a purchase in cash of the whole of the JVC. The offer shall remain open for acceptance for a period of 30 Business Days from the date of the offer.

(c)   If one of the Parties hereto shall within such 30 days period indicate in writing its acceptance of the offer and the terms upon which it is willing to accept the offer, it shall, have a further 30 Business Days within which to make payment. If both wish to purchase, they shall forthwith negotiate with the Committee in relation to the price they are willing to pay and the Committee, subject to the laws of Hong Kong will accept the higher bid and the period of 30 Business Days shall run from the date on which the bid is accepted.

(d)   Payment by the purchasing Party shall be made against the transfer to the purchasing party or to its nominee of the Assets and Business of the JVC as a going concern in such form as may be reasonably required by the purchasing Party and, in particular, shall include the benefit of any

24

agreements entered into by the JVC so far as the JVC may be entitled to transfer the same.

(e) The purchasing Party shall be entitled to offset against payment the amount of any debt owing to it by the JVC at the time when payment is to be made (if any). For the avoidance of doubt, it is hereby agreed that the purchasing Party shall only pay for that part of the JVC which it does not own, save where it shall receive an equivalent amount from the Committee representing the purchasing Party's interest in the JVC.

(f) If no offer to purchase is made or if the purchasing Party shall duly withdraw its acceptance, the Committee shall proceed to dispose of the Assets and Business of the JVC to complete the dissolution of the JVC in accordance with the laws of Hong Kong.

(g) If a third party buyer is found, the Parties shall have the right of first refusal on the same terms and conditions as agreed with the potential buyer.

19.4. The Committee shall notify the relevant authorities of the date on which the decision of the General Meeting of Shareholders to dissolve the JVC was adopted. The Committee shall have a maximum period as prescribed by the laws of Hong Kong but may, with the approval of the relevant authorities, extend such period within which to complete its work.

(a) At the expiration of the period of time (as may be extended) provided for in this clause 19.4, the Committee shall cease its activity. Any dispute between the Parties shall be handled in accordance with the laws of Hong Kong.

(b) At the conclusion of its work, the Committee or the Parties shall make a liquidation report to the General Meeting of Shareholders who shall then submit it, to the relevant authorities in accordance with the laws of Hong Kong.

(c) Upon approval of the liquidation report, the relevant authorities shall proceed to delete the JVC from the business registration records. Thereupon, the Parties shall return the original certificate of incorporation of the JVC to the relevant authorities.

19.5. Termination of operation of the JVC shall be without prejudice to any rights and liabilities which have accrued under this Agreement including without limitation the right of any Party to damages (excluding indirect damages such as, but not limited to, loss of anticipated profits, business opportunities, corporate reputation) in respect of any default of the other Party with respect to wrongful termination or any other matter whatsoever. Further, any termination of operation of the JVC shall be without prejudice to any provisions expressly or impliedly intended by the Parties to survive such termination of operation.

19.6. Where the JVC is to be dissolved and its assets distributed, subject to the Articles of Association, the Parties shall agree a suitable basis for dealing with the interests and assets of the JVC and shall endeavour to ensure that:

25

(a)    all existing contracts of the JVC are performed to the extent that there are sufficient resources;

(b)    the JVC does not enter into any new contractual obligations;

(c)    the JVC is dissolved and its assets are distributed as soon as practicable; and

(d)    any other proprietary information or intellectual property rights belonging to or originating from a Party are returned to it by the other party or the JVC and all such proprietary information or intellectual property rights shall be erased from the computer systems (to the extent possible) of the JVC and the Party who is returning it.

19.7.    Where any Party is required by any law, regulation or governmental or regulatory authority to retain any proprietary information (or copies of such information) of the other Party or the JVC, it shall notify the other Party in writing of such retention giving details of the information that it has been required to retain.

**20.    TERMINATION FOLLOWING DEADLOCK**

20.1.    In no circumstances shall any of the Shareholders create an artificial deadlock, being a deadlock caused by any of the Shareholders voting or withholding consent in bad faith against an issue or proposal in any case where the passage or approval of the same is required to enable the Business properly and efficiently in accordance with the provisions of this Agreement.

20.2.    If the Shareholders are unable in good faith to decide on a course of action with respect to any Reserved Matters, either Shareholder may give notice in writing of such deadlock (**"Deadlock Notice"**) to the other Shareholder. The Deadlock Notice shall specify in reasonable detail the nature of the issue giving rise thereto. Within 30 Business Days after the receipt by the other Shareholder of the Deadlock Notice, the Shareholders shall meet in person or have a conference by telephone for the purpose of amicably resolving such deadlock.

20.3.    If after good faith discussions the deadlock is not resolved within 60 Business Days (or such longer period as the Shareholders may agree) from the date the Deadlock Notice is given, either Shareholder shall have the right to terminate this Agreement upon at least 120 Business Days' prior written notice of termination to the other Shareholder, and the termination procedures set out in clause 19 shall apply.

**21.    STATUS OF AGREEMENT**

21.1.    Each Party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the JVC to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of this Agreement.

21.2. If any provision in the constitutional documents of the JVC conflicts with any provision of this Agreement, this Agreement shall prevail.

21.3. The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the constitutional documents to the extent necessary to permit the JVC and its business to be administered as set out in this Agreement.

## 22. CONFIDENTIALITY

22.1. In this clause, **Confidential Information** means any information which:

    (a) either Party may have or acquire (whether before or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs of the JVC;

    (b) either Party may have or acquire (whether before or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs of the other Party as a consequence of the negotiations relating to this Agreement or any other Agreement or document referred to in this Agreement or the performance of this Agreement or any other agreement or document referred to in this Agreement; or

    (c) relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement).

22.2. Information is not Confidential Information if:

    (a) it is or becomes public knowledge other than as a direct or indirect result of the information being disclosed in breach of this Agreement;

    (b) either Party can establish to the reasonable satisfaction of the other Party that it found out the information from a source not connected with the other Party and that the source is not under any obligation of confidence in respect of the information;

    (c) either Party can establish to the reasonable satisfaction of the other Party that the information was known to the first Party before the date of this Agreement and that it was not under any obligation of confidence in respect of the information; or

    (d) the Parties agree in writing that it is not confidential.

22.3. Each Party shall at all times use all reasonable endeavours to keep confidential (and to ensure that its employees, agents, and the JVC shall keep confidential) any Confidential Information and shall not use or disclose any Confidential Information except:

    (a) to a party's professional advisers where such disclosure is for a purpose related to the operation of this Agreement;

(b)   with the written consent of such of the JVC or the Party that the information relates to;

(c)   as may be required by law or by the rules of any recognised stock exchange, or governmental or other regulatory body, when the Party concerned shall, if practicable, supply a copy of the required disclosure to the other before it is disclosed and incorporate any amendments or additions reasonably required by the other and which would not thereby prevent the disclosing Party from complying with its legal obligations;

(d)   to any tax authority to the extent reasonably required for the purposes of the tax affairs of the Party concerned; or

(e)   if the information comes within the public domain (otherwise than as a result of the breach of this clause 22.3).

22.4.   Each Party shall inform (and shall use all reasonable endeavours to procure that the JVC shall inform) any officer, employee or agent or any professional adviser advising it in relation to the matters referred to in this Agreement, or to whom it provides Confidential Information, that such information is confidential and shall require them:

(a)   to keep it confidential; and

(b)   not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this Agreement).

22.5.   On termination of this Agreement, either Party may demand from the other and the JVC the return of any documents containing Confidential Information in relation to the first Party by notice in writing, whereupon the other Party shall (and shall use all reasonable endeavours to ensure that the JVC shall):

(a)   return such documents; and

(b)   destroy any copies of such documents and any other document or other record reproducing, containing or made from or with reference to the Confidential Information,

save, in each case, for any submission to or filings with governmental, tax or regulatory authorities. Such return or destruction shall take place as soon as practicable after the receipt of any such notice.

22.6.   The obligations of each of the Parties in this clause shall continue without limit in time and notwithstanding termination of this Agreement for any reason.

## 23.   WARRANTY

23.1.   From the Effective Date, each Party warrants with each other Party that:

28

(a) neither the execution nor delivery of this Agreement or of any ancillary document nor the performance or observance of any of its obligations under this Agreement, does or will:

    (i) (if applicable) conflict with or results in a breach of its Articles of Associations or other constitutional documents;

    (ii) conflict with, or result in any breach or violation of, any judgment, order or decree, trust deed, mortgage, agreement or other instrument or arrangement by which it is bound; or

    (iii) result in any breach of law, rule, regulation, ordinance, order, judgment or decree of or undertaking to any court, government body, statutory authority or regulatory, administrative or supervisory body to which it is a party or by which it or its assets are bound, whether in Hong Kong or elsewhere;

(b) if required, all relevant statutory, governmental or other approvals for the transaction contemplated in this Agreement have been obtained;

(c) it has full power and authority to execute and deliver this Agreement; and

(d) the obligations expressed as being assumed by it under this Agreement constitutes its valid, legal and binding obligations enforceable against it in accordance with the terms of this Agreement.

## 24. WHOLE AGREEMENT

24.1. This Agreement, and any documents referred to in it or executed contemporaneously with it, constitute the whole agreement between the Parties and supersedes any previous arrangement, understanding or agreement between them relating to the subject matter they cover.

24.2. Each Party acknowledges that, in entering into this Agreement and any documents referred to in it or executed contemporaneously with it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

24.3. Nothing in this clause operates to limit or exclude any liability for fraud.

## 25. ASSIGNMENTS

25.1. Neither of the Parties may assign, or grant any Encumbrance over or deal in any way with, any of its rights and obligations under this Agreement or any document referred to in it without the prior written consent of the other Party (such consent not to be unreasonably conditioned, withheld or delayed).

25.2. Each Party that has rights under this Agreement is acting on its own behalf.

**26.    VARIATION AND WAIVER**

26.1.    A variation of this Agreement shall be in writing and signed by or on behalf of all Parties.

26.2.    A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

26.3.    A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

26.4.    No failure to exercise or delay in exercising any right or remedy provided under this Agreement or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part thereof.

26.5.    No single or partial exercise of any right or remedy under this Agreement shall preclude or restrict the further exercise of any such right or remedy.

26.6.    Unless specifically provided otherwise, rights arising under this Agreement are cumulative and do not exclude rights provided by law.

**27.    COSTS**

Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement shall be borne by the Party that incurred the costs.

**28.    GOOD FAITH**

28.1.    All transactions entered into between either Party or any company Controlled by it and the JVC shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such Agreement, on an arm's length basis.

28.2.    Each Party shall at all times act in good faith towards the other and shall use all reasonable endeavours to ensure that this Agreement is observed.

28.3.    Each Party shall do all things necessary and desirable to give effect to the spirit and intention of this Agreement.

**29.    THIRD PARTY RIGHTS**

29.1.    This Agreement is made for the benefit of the Parties and their successors and permitted assignees and is not intended to benefit, or be enforceable by, anyone else.

29.2.   The right of the Parties to terminate, rescind or agree any amendment, variation, waiver or settlement under this Agreement is not subject to the consent of any person that is not a party to this Agreement.

**30.    NOTICE**

30.1.   A notice given under this Agreement:

   (a)   shall be in writing in the English language;

   (b)   shall be sent for the attention of the person, and to the address, or fax number, given below (or such other address, fax number or person as the relevant party may notify to the other party); and

   (c)   shall be:

       (i)   delivered personally;

       (ii)  delivered by commercial courier;

       (iii) sent by fax;

       (iv)  sent by pre-paid first-class post, recorded delivery; or

       (v)   (if the notice is to be served outside the country from which it is sent) sent by reputable international overnight courier.

30.2.   The addresses for service of notice are:

   (a)   **Ms. Mabel Mak**

       Address       : 11A Bo Shek Mansion Block 1.
                       328 Sha Tsui Road,
                       Tsuen Wan,
                       Hong Kong.
       Fax number : (+848) 3943 5909

   (b)   **Mr. Parasurama Naidu Narra**

       Address       : 19-9-11/2, Lakshmi Puram,
                       Tiruchanoor Road,
                       Tirupati, A.P - 517501,
                       India.
       Fax number : +1-408-549-9883

30.3.   If a notice has been properly sent or delivered in accordance with the above, it will be deemed to have been received as follows:

   (a)   if delivered personally, at the time of delivery;

   (b)   if delivered by commercial courier, at the time of signature of the courier's delivery receipt;

   (c)   in the case of fax, at the time of transmission;

31

(d) in the case of pre-paid first class post or recorded delivery, five Business Days from the date of posting;

(e) in the case of reputable international overnight courier, ten Business Days from the date of posting; or

(f) if deemed receipt under the previous paragraphs of this clause is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is not a public holiday in the place of receipt), when business next starts in the place of deemed receipt.

30.4. To prove delivery, it is sufficient to prove that the notice was transmitted by fax to the fax number of the party or, in the case of post, that the envelope containing the notice was properly addressed and posted.

31. **LANGUAGE**

If this Agreement is translated into any language other than English, the English language text shall prevail.

32. **SEVERANCE**

32.1. If any provision of this Agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

32.2. If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted or modified, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

33. **FURTHER ASSURANCE**

Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Party may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

34. **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party had signed the same document.

35. **AGREEMENT SURVIVES CLOSING**

This Agreement (other than obligations that have been fully performed) remains in full force after Closing.

36.   **GOVERNING LAW AND JURISDICTION**

This Agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the laws of Hong Kong. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre ("**HKIAC**") under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The seat of arbitration shall be Hong Kong. The number of arbitrators shall be three. The arbitration proceedings shall be conducted in English.

This Agreement is duly executed in two original copies on the date stated at the beginning of this Agreement.

**Ms. Mabel Mak**                         **Mr. Parasurama Naidu Narra**

33

**Schedule 1**
**Core Intellectual Property**

- Trainer matching algorithm

- Trainer ranking algorithm

- Crowdfunding for fitness services

- Video library done exclusively for fitness services

- Photo morphing for fitness services

- Uber for fitness services

- Gamification utilizing "fitcoins"

- Fitness center recommendation using "gym location"

- List of "who's working out at a gym?"

- Scheduling logic of calendars for personal trainers

- Time based message expiration in chat

34

**Schedule 2**
**Reserved Matters**

1.   Issuing shares, debentures, convertible notes, options or other equity or debt securities of the JVC; adopting, implementing or varying any stock option plans for directors, employees or consultants; or changing the rights of the shares.

2.   Entering into an arrangement to sell, share or license Core Intellectual Property or a significant part of the Core Intellectual Property belonging to the JVC.

3.   Permitting the registration of any person as a member of the JVC other than the Parties in relation to their initial investment and any of their transferees in accordance with the terms of this Agreement.

4.   Altering the name of the JVC and any constitutional documents of the JVC including the Articles of Association or the rights attaching to any of the shares in the JVC.

5.   Adopting or amending the Business Plan for each Financial Year.

6.   Changing the nature of the JVC's Business or the commencement of any new business by the JVC which is not ancillary or incidental to the Business.

7.   Making any acquisition or disposal by the JVC of any material asset(s) otherwise than in the ordinary course of business.

8.   Creating or granting any Encumbrance over the whole or any part of the Business, undertaking or assets of the JVC or over any shares in the JVC or agreeing to do so.

9.   Commencing any proceedings for the dissolution, winding up, liquidation or reorganization of the JVC.

10.   Borrowing, or otherwise incurring any material indebtedness.

11.   Commencing, defending or compromising any material litigation or a similar procedure.

12.   Entering into an arrangement or incurring a liability which is not on an arm's length basis.

13.   Appointing or removing the chief executive officer and the chief technical officer, the chief financial officer and the chief operating officer (or the functional equivalent of such positions); approving the remuneration packages of such executives and subsequent variations to the remuneration packages in excess of budgeted amounts.

14.   Recommending or declaring an interim or a final dividend.

**Schedule 3**
**Mabel Mak's Contribution to the JVC**

1. To provide domain and industry expertise to the Business.

2. To provide professional support in the form of financial oversight, legal services and corporate finance and administrative services.

3. To register the Intellectual Property with the relevant authorities.

4. To provide initial funding of the Business up to a maximum amount of US$ 1,000,000 in the form of a loan.

36

**Schedule 4**
**Parasurama Naidu Narra's Contribution to the JVC**

1. To cause Praveen Kumar Narra to provide software development industry expertise in relation to the Product and Business.

2. To cause Praveen Kumar Narra to serve as chief technical officer of the JVC until such time as the Product is at Beta Version.

3. To cause Praveen Kumar Narra to lead the development of the Product to successfully achieve Beta Version.

4. To cause Indyzen Inc., a company established under the laws of United States of America with certificate of incorporation no. C2269314 issued by the California Secretary of State on 09 May 2000, to offer a discount of US$ 300,000 on its services to the JVC in relation to the Product and Business. This US$ 300,000 amount shall be treated as a loan of from PN to the JVC as part of the initial funding to the Business.