UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARKRIDGE LIMITED, ET AL.,<br><br>   Plaintiffs,<br><br>  v.<br><br>INDYZEN, INC., et al.,<br><br>   Defendants. | Case No. 4:16-cv-07387-KAW<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO STAY CASE AND COMPEL ARBITRATION**<br><br>Re: Dkt. Nos. 12 & 13 |

On March 8, 2017, Defendants Indyzen, Inc. and Praveen Narra Kumar filed concurrent motions pursuant to the arbitration provisions contained in the parties' Software Development and License Agreement: a motion to compel arbitration and a motion to stay the case and compel arbitration. (Def.'s Mot., Dkt. Nos. 12 & 13.[1])

Upon review of the moving papers, the Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), and, for the reasons set forth below, finds that the issue of arbitrability is delegated to the arbitrator and GRANTS Defendants' motion to compel arbitration, and STAYS the action pending the conclusion of arbitration.

### I. BACKGROUND

On December 29, 2016, Plaintiffs Parkridge Limited and Mabel Mak filed suit against Defendants Indyzen, Inc., and Praveen Narra, alleging breach of fiduciary duty, aiding and abetting, breach of contract, unjust enrichment, fraudulent misrepresentations, and fraudulent concealment in connection with the development of the Morfit App. (Compl., Dkt. No. 1.)

---

[1] The motions share a memorandum of points and authorities, so all references will be to Dkt. No. 12, and they will be treated as a single motion to stay the case and compel arbitration. (*See* Dkt. No. 13 at 1.)

1    Around 2013, Randy Dobson began working on developing an online personal training
2    platform that would connect personal trainers with clients by utilizing a personality matching
3    system, which was later known as Morfit (the "Morfit App"). (Compl. ¶ 7.)  Dobson spoke with a
4    group on business individuals, including Defendant Narra, about the idea, and communicated that
5    he had no technical expertise. (Compl. ¶¶ 8-10.)  Narra pitched his application and software
6    development expertise to assist with the technical side of the Morfit App, and stated that he owned
7    and was the Chief Executive Officer ("CEO") of a software development company known as
8    Indyzen. (Compl. ¶ 11.)

9    Parkridge was formed on August 23, 2013, with Dobson as CEO and Chairman, and Narra
10   as Chief Technology Officer ("CTO"). (Compl. ¶¶ 12, 14, 16.)  Dobson told Narra that they would
11   be relying on Narra's expertise in all technical matters. (Compl. ¶ 19.)  Dobson asked Narra to vet
12   a real-time software computing company known as The Information Bus Company Software Inc.
13   ("TIBCO") to determine if it was qualified to build the Morfit App. (Compl. ¶ 20.)  Dobson and
14   Narra communicated to TIBCO that the Morfit App is meant to be primarily a mobile platform,
15   and, based on Narra's recommendation, Parkridge hired TIBCO to develop the Morfit App on
16   November 13, 2013. (Compl. ¶¶ 21-22.)  Plaintiffs allege that Narra knew at the time that TIBCO
17   did not have mobile expertise. (Compl. ¶ 23.)  During the following year, Narra was in charge of
18   managing and overseeing TIBCO's progress with the Morfit App, but he failed to monitor
19   TIBCO's progress with the Morfit App. (Compl. ¶¶ 24-25.)  Ultimately, TIBCO delivered only a
20   desktop platform and failed to deliver the mobile platform, which was the type of platform
21   requested. (Compl. ¶¶ 26-27.)  Due to TIBCO's failure to deliver a mobile platform, Parkridge
22   stopped paying TIBCO. (Compl. ¶ 28.)

23   Subsequently, Narra recommended that his own software company, Indyzen, develop the
24   Morfit App. (Compl. ¶ 29.)  Narra and Indyzen promised an extensive set of characteristics for the
25   Morfit App, including, but not limited to: personality matching, open API, social media,
26   geolocation, augmented reality, and facial recognition aspects. (Compl. ¶ 30.)  As a result of these
27   discussions, all working relationships between Parkridge and TIBCO were terminated.  (Compl. ¶
28   31.)

On January 1, 2015, Parkridge's Shareholders Agreement was executed, and Defendant Narra's father, Parasurama Naidu Narra ("Naidu Narra"), and Plaintiff Mabel Mak were designated as the company's shareholders. (Compl. ¶ 13; Shareholders Agreement, Compl., Ex. A.)  The Shareholders Agreement gave Mak 7000 shares, equivalent to 70% of the total shares, in exchange for her industry expertise in the business, professional support, a promise to register all of Parkridge's intellectual property, and initial funding of Parkridge up to a maximum amount of $1,000,000 in the form of a loan. (Compl. ¶ 13; Shareholders Agreement §§ 3.3, 7(a), Schedule 3.) The Shareholders Agreement gave Naidu Narra 3000 shares, equivalent to 30% of the total shares, in exchange for his promises to have his son, Defendant Narra, provide software development industry expertise to develop, operate, and maintain the Morfit app, have Narra serve as Chief Technology Officer ("CTO") of Parkridge, have Narra lead development of the Morfit App to successfully achieve Beta Version, and have Indyzen offer a $300,000 discount to develop the Morfit App. (Compl. ¶ 14; Shareholders Agreement § 3.3, Schedule 4.)  The Shareholders Agreement called for a three-person board of directors, and Plaintiff Mak appointed CEO Dobson and Mark Charles Oakley, and Naidu Narra appointed his son Defendant Narra. (Compl. ¶¶ 15-17; Shareholders Agreement § 5.3.)

On January 5, 2015, Plaintiff Parkridge Limited ("Customer") entered into the Software License and Development Agreement ("Morfit Agreement") with Defendant Indyzen, Inc. ("Company"), which included an arbitration provision, which provided that:

> Except for any dispute arising out of payments due to Company, any dispute or disagreement arising between the Company and the Customer which is not resolved to the mutual satisfaction of the Company and the Customer within fifteen (15) Business Days (or such longer period as may be mutually agreed upon) from the date that either Party gives written notice that such dispute or disagreement exists, shall be referred to arbitration in San Jose, CA before one arbitrator in accordance with the Commercial Arbitration Rules (the "Arbitration Rules") of the America Arbitration Association (the "AAA"), in effect on the date that such written notice is given. Customer waives any and all rights it may have to a jury trial in connection with any proceedings concerning this agreement.

(Compl. ¶ 31; Morfit Agreement, Dkt. No. 1-2 § 11.)  Randy Dobson, Parkridge CEO, signed the agreement on behalf of Parkridge, and Praveen Narra, Indyzen CEO and Parkridge CTO, signed

1 on behalf of Indyzen. (Morfit Agreement at 15.)

2 In April 2015, Indyzen delivered a version of the Morfit App ("Indyzen's App") to
3 Parkridge, which Plaintiffs allege was grossly inferior to comparable apps in the industry, as it had
4 only very basic functionality, a bad user interface, and was not ready to be marketed to the public.
5 (Compl. ¶ 32.) Parkridge and Indyzen entered into discussion to resolve the technical issues with,
6 and complete the development of, the Morfit App, but, utlimately, the app was never launched.
7 (*See* Compl. ¶¶ 34-37.) Around December 2015, Dobson appointed another Chief Technology
8 Officer to a sister company, Martin Papy, and gave him power to oversee all technological matters
9 for the related group of companies. (Compl. ¶ 38.) Papy quickly identified several issues with
10 Indyzen's App, and requested Indyzen's documentation for the development of the Morfit App.
11 (Compl. ¶ 39.) Indyzen and Defendant Narra refused to provide any documentation relating to the
12 project, and, instead, demanded payment-in-full from Parkridge and that 30% of the shares in
13 Parkridge be transferred to Narra's father, Parasurama Naidu Narra, prior to allowing Parkridge to
14 see any documents. (Compl. ¶ 40.) In a good faith effort to resolve the dispute, and without
15 having received a functional app, Parkridge paid Indyzen the amount it requested. (Compl. ¶ 41.)
16 Neither Narra nor Indyzen delivered the requested documents or a functioning Morfit App after
17 having receiving payment. (Compl. ¶ 42.)

18 On December 29, 2016, Plaintiffs filed suit in federal court. On March 8, 2017,
19 Defendants filed a motion to stay the case and compel arbitration. (Defs.' Mot., Dkt. No. 12.) On
20 March 22, 2017, Plaintiffs filed an opposition. (Pls.' Opp'n, Dkt. No. 19.) On March 29, 2017,
21 Defendants filed a reply. (Defs.' Reply, Dkt. No. 12.)

## II.   LEGAL STANDARD

23 Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, arbitration agreements
24 "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity
25 for the revocation of a contract." 9 U.S.C. § 2. "Once the court has determined that an arbitration
26 agreement relates to a transaction involving interstate commerce, thereby falling under the FAA,
27 the court's only role is to determine whether a valid arbitration agreement exists and whether the
28 scope of the dispute falls within that agreement." *Ramirez v. Cintas Corp.*, No. C 04-00281 JSW,

2005 WL 2894628, at *3 (N.D. Cal. Nov. 2, 2005) (citing 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

Generally, in deciding whether a dispute is subject to an arbitration agreement, the Court must determine two "gateway issues": "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). As such, the Court's role "is limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 479 (9th Cir. 1991).

Notwithstanding, these gateway issues can be expressly delegated to the arbitrator where "the parties clearly and unmistakably provide otherwise." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); see also *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so"). Indeed, the Ninth Circuit held that the "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). While *Brennan* involved "sophisticated parties," the Ninth Circuit explicitly stated that the holding should not be "interpreted to require that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent." *Id.*

"There are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability." *Galen v. Redfin Corp.*, No. 14-CV-05229-TEH, 2015 WL 7734137, at *5 (N.D. Cal. Dec. 1, 2015) (internal citations omitted) (quoting *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (2014)); see also *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68, 70 n.1 (2010).

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)

(internal citations omitted). A court must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," and "doubts should be resolved in favor of coverage." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. The action should be stayed "until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. In the alternative, due to the court's inherent right to control its docket, the court may dismiss the claims subject to mandatory arbitration pursuant to Federal Rule of Civil Procedure 12(b)(6). *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004) (citing *Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723–725 (9th Cir. 2000)).

### III.   DISCUSSION

In the instant motion, Defendants seek to compel arbitration consistent with the Morfit Agreement, while Plaintiffs argue that the arbitration clause excludes some of the current disputes from arbitration, and the others cannot be sent to arbitration because Plaintiff Mak was not a signatory to the Morfit Agreement.

#### A.   Delegation provision and threshold issue of arbitrability

A threshold issue is whether the Court should even decide the question of arbitrability, or, rather, whether the Morfit Agreement delegates the arbitrability determination to the arbitrator. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T v. Commc'ns Workers*, 475 U.S. at 649. "In other words, there is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability." *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013). "There are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. Second, the delegation must not be revocable under state

contract defenses such as fraud, duress, or unconscionability." *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (2014); *see also Rent-A-Center,* 561 U.S. at 68, 70 n.1 (2010); *Galen v. Redfin Corp.*, No. 14-CV-05229-TEH, 2015 WL 7734137, at *5 (N.D. Cal. Dec. 1, 2015).

### i. Delegation Language is Clear and Unmistakable

Generally, the incorporation of the AAA rules is "clear and unmistakable" evidence of the parties' intent to submit the arbitrability dispute to arbitration. *Brennan*, 796 F.3d at 1131. The American Arbitration Association recommends the following standard delegation language for inclusion in contracts:

> Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

AM. ARBITRATION ASSOC., A GUIDE TO COMMERCIAL MEDIATION AND ARBITRATION FOR BUSINESS PEOPLE 16 (2013), https://www.adr.org/aaa/ShowPDF?doc=ADRSTAGE2019455. The recommended language would delegate arbitrability of all claims and controversies to arbitration. *See id.*

Here, the language of the arbitration clause provides that virtually "any dispute or disagreement arising between the Company and Customer," rather than those disputes arising out of or relating to the Morfit Agreement, be sent to arbitration. (Morfit Agreement § 11.) Accordingly, the Court finds that the Morfit Agreement's language is broader than the language recommended by the AAA, and likely applies to all disputes between Parkridge and Indyzen, rather than only those related to the Agreement.

Moreover, the only carve out is "any dispute arising out of payments **due** to Company." *Id.* (emphasis added). The complaint does not allege that any payment is due Indyzen. Rather, it alleges that payments were made to Indyzen, but the Morfit App, as described in the Agreement, was never delivered, resulting in Indyzen and Narra being unjustly enriched. (Compl. ¶¶ 48-54, 163.) Plaintiffs' argument that the unjust enrichment claim (Claim V) is excluded from arbitration because it arose from payments made to Indyzen is unavailing, because they are claiming that the payments were improperly made. (*See* Pls.' Opp'n at 10.) There is no allegation that Indyzen is

1  due any monies.  Notwithstanding, Parkridge waived its rights to have a jury trial in connection

2  with any proceedings concerning the Morfit Agreement. (Morfit Agreement § 11.)

### ii. Whether the arbitration provision applies to Plaintiff Mak and Defendant Narra

In opposition, Plaintiffs argue that the arbitration language is restrictive, because the "arising between the [parties]" means that it does not cover disputes between the individuals not a party to the contract—Mak and Narra. (Pls.' Opp'n at 8.)  As a result, the entire case cannot be sent to arbitration.

The Court disagrees, and is persuaded by Defendants' argument that Plaintiff Mak is equitably estopped from seeking the benefits of the Morfit Agreement while avoiding the arbitration provision. (Defs.' Reply at 6.)  Indeed, "'[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles.'" *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1178-88 (9th Cir. 1986).  Among these principles are "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Comer,* 436 F.3d at 1101 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).  Here, Plaintiff Mak's claims are based solely on her status as the majority shareholder of Parkridge.  Thus, the Court finds that Mak is bound by the arbitration provision based on agency principles, despite not being a signatory to the Morfit Agreement.

Furthermore, Narra was a signatory to the Morfit Agreement, because he signed on behalf of Indyzen.  While perhaps complicated due to his position as CTO of Parkridge, the breach of fiduciary duty causes of action (Counts I, II, and III) touch on the propriety of entering into the Morfit Agreement, and whether entering into that agreement was a breach of fiduciary duty on the grounds that Narra allegedly engaged in self-dealing. (*See* Compl. ¶¶ 94-100.)  The remaining causes of action for breach of contract (Count IV), unjust enrichment (Count V), fraudulent misrepresentation (Count VI), and fraudulent concealment (Count VII) concern the Morfit Agreement.  Since Narra's "allegedly wrongful acts related to [his] handling of [the Morfit Agreement]," both as Parkridge's CTO and the CEO of Indyzen, he is bound by the arbitration

provision. *See Letizia*, 802 F.2d at 1188.

Defendants further argue that Narra was an agent of Parkridge when he allegedly breached his fiduciary duties, and Parkridge is bound by the provision. (Defs.' Reply at 5-6.) For the reasons stated above, the Court agrees. Thus, Plaintiffs' attempt to plead around the Agreement itself does not change the fact that the entire case touches upon the breach of contract claim, because if Indyzen had delivered the mobile app as promised, this lawsuit may never have been filed. Indeed, the arbitrator is in a better position to determine whether all causes of action are arbitrable.

In light of the foregoing, the Court finds that "arising between the [parties]" must be broadly construed to include all claims relating to the Morfit Agreement. *See TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006). Thus, the Morfit Agreement clearly and unmistakably delegates arbitrability to the arbitrator, except for disputes that were not clearly excluded from the arbitration provision, of which there are none.

**B.    Stay**

Defendants moved to compel arbitration and stay the entire action pending binding arbitration. (Defs.' Mot. at 3, 8.) For the reasons set forth above, the undersigned agrees. Under the FAA:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in the proceeding with such arbitration.

9 U.S.C. § 3. Here, the Court finds that issue of arbitrability is delegated to the arbitrator pursuant to the Agreement, and that no claims are clearly excluded. *See* discussion *supra* Part III.A. Accordingly, this action is stayed pursuant to 9 U.S.C. § 3.

## IV.    CONCLUSION

In light of the foregoing, the Court GRANTS Defendants' motion to stay the case and compel arbitration as to all causes of action. Accordingly, the action is STAYED pending the

conclusion of binding arbitration. The parties shall file joint status reports every 90 days until arbitration is concluded. Should the arbitrator determine that certain claims or parties are excluded from arbitration under the Morfit Agreement, those claims will be resolved by the undersigned upon the conclusion of the arbitration proceedings.

IT IS SO ORDERED.

Dated: April 18, 2017

KANDIS A. WESTMORE
United States Magistrate Judge