Mark R. Figueiredo, Esq. (SBN 178850)
Ethan G. Solove, Esq. (SBN 308026)
Gokalp Y. Gurer, Esq. (SBN 311919)
STRUCTURE LAW GROUP, LLP
1754 Technology Drive, Suite 135
San Jose, California 95110
Telephone: (408) 441-7500
Facsimile: (408) 441-7501

Attorneys for Defendants
INDYZEN, INC. and PRAVEEN NARRA KUMAR

SUPERIOR COURT OF THE STATE OF CALIFORNIA

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARKRIDGE LIMITED, a Hong Kong corporation, by Mabel Mak, and MABEL MAK, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> INDYZEN, INC., a California corporation, and PRAVEEN NARRA KUMAR, an individual, <br><br> Defendants. | CASE NO. 16-CV-07387-KAW <br><br> **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION FOR AN ORDER COMPELLING ARBITRATION PURSUANT TO 9 U.S.C. § 4** <br><br> Date: January 18, 2018 <br> Time: 11:00 AM <br> Dept.: TBD <br> Judge: Hon. Kandis A. Westmore |

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

I.  INTRODUCTION................................................................1

II.  STATEMENT OF FACTS......................................................2

III.  LEGAL AUTHORITY AND ANALYSIS......................................4

A.  The Court Should Compel Dobson and his Additional Sham Companies To Arbitration..4

1.  Alter Ego...............................................................5

2.  Equitable Estoppel.....................................................9

i.  Dobson and his Additional Sham Companies All Directly Benefitted from the Morfit Agreement................................................................9

ii.  Dobson and his Additional Sham Companies are all Inextricably Intertwined with the Morfit Agreement..............................................................11

3.  Agency................................................................11

4.  Third Party Beneficiary..............................................12

B.  The Court Should Provide Guidance that the Arbitrator Can Decide Whether to Bring in Additional Parties in the Future................................................13

IV.  CONCLUSION.............................................................14

# TABLE OF AUTHORITIES

## CASES

*American Builders Assoc. v. Au-Yang* (1990) 226 Cal.App.3d 170....................14

*Arthur Andersen, LLP v. Carlisle* (2009) 556 U.S. 624, 631-32.......................5

*Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547..................14

*Exigen Properties, Inc. v. Genesys Telecommunications Laboratories, Inc.* (2016) 2016 WL 520283, at *7-*9.........................................................9,10,11

*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938......................13

*Green Tree Fin. Corp. – Alabama v. Randolph* (2000) 531 U.S. 79, 91...............4

*Harris v. Sup. Ct.* (1986) 188 Cal.App.3d 475, 47..................................12

*Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79..........................13

*Kramer v. Toyota* (9th Cir. 2013) 705 F.3d 1122....................................13

- ii -

1   *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.* (460 U.S. 1, 24-25)......................4

2   *Mundi v. Union Sec. Life Ins. Co.* (2009) 555 F.3d 1042, 1045-46......................................9

3   *Neverkovec v. Fredricks* (1999) 74 Cal.App.4th 337, 348................................................12

4   *Prouty v. Gores Tech. Group* (2004) 121 Cal.App.4th 1225, 1233....................................12

5   *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 614..................................................12

6   *Simula, Inc. v. Autoliv. Inc.* (1999) 175 F.3d 716, 721..................................................4

7   *Webber v. Inland Empire Investment*, (1999) 74 Cal.App.4th 884, 900............................5,6

8   **STATUTES**

9   9 U.S.C. § 4.................................................................................................................4

10  Civil Code § 3528..........................................................................................................5

11  Cal. Civ. Code §§ 2299-2300.........................................................................................12

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

## I.   INTRODUCTION

On April 18, 2017, this Court ordered Plaintiffs Parkridge Limited ("Parkridge") and Mabel Mak ("Mak") to arbitration.  Parkridge and Mak had brought a complaint alleging violations of an agreement (the "Morfit Agreement") with Indyzen, Inc. ("Indyzen") and Praveen Narra Kumar ("Narra").  Under the Morfit Agreement, Indyzen was to design an app (the "Morfit App") for Parkridge in exchange for payment.  The Morfit Agreement has an arbitration clause, but neither Parkridge nor Mak would agree to arbitrate.  This Court ordered both to arbitration because Parkridge signed the Morfit Agreement and both had brought a lawsuit under its terms.

The person behind Parkridge and Mak is a man named Randy Dobson ("Dobson"). Dobson runs a growing fitness empire using a vast interconnected web of sham companies such as Parkridge.  Indeed, Parkridge does not have employees or a physical office location.  Further, Parkridge does not and has never followed basic corporate formalities like issuing shares or holding annual board or shareholder meetings.  For purposes of this business enterprise, Mak— Dobson's wife and the nominal majority shareholder of Parkridge—is just another one of Dobson's fronts set up to try to avoid obligations.  Dobson's other sham companies include California Management Group a/k/a CMG.Asia ("CMG"), California Fitness & Yoga Centers ("CFYC"), F8 Vietnam Company Limited ("F8 Company") and Boon Global Limited ("Boon") (These four companies are collectively referred to as Dobson's "Additional Sham Companies" throughout this brief.)

Dobson has a history of using his sham companies to avoid litigation, and is well-versed in how to do it.  Additionally, Dobson has taunted Narra that he is willing to take action to evade litigation, even if that means opening additional companies as he deems necessary.  In this brief, Petitioners present extensive evidence on Dobson's scheming, including the vast network of connections between and among Parkridge, Dobson, and his Additional Sham Companies.

The Parties have been arbitrating this lawsuit since this Court's arbitration order.  During the course of the arbitration, Narra and Indyzen filed a counterclaim against Parkridge, Dobson, and his Additional Sham Companies relating to their theft of the Morfit App and its intellectual property.  The Arbitrator felt that he did not have authority to determine whether any additional

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

1  parties could be included in the arbitration, so he dismissed Dobson and his Additional Sham

2  Companies pending an order of this Court to determine the matter.  With this petition, Indyzen

3  seeks that order.

4      This Court should order that Dobson and his Additional Sham Companies appear in the

5  arbitration related to this case so that the Arbitrator can decide whether to proceed with Indyzen's

6  counterclaims against them.  To begin with, Dobson signed the Morfit Agreement as Parkridge's

7  CEO, so he is bound by it as Parkridge's agent.  Further, Dobson and his Additional Sham

8  Companies are all one and the same as Parkridge and Mak, who this Court has already ordered to

9  arbitration.  The law strongly favors arbitration and allows for nonsignatories to be bound by an

10  arbitration clause when applying any of a number of theories like alter ego, equitable estoppel,

11  agency, and third-party beneficiary.  They all apply here, and the Court should therefore order

12  Dobson and his Additional Sham Companies to arbitration.  Moreover, and in the event that other

13  sham companies of Dobson are discovered, the Court should also order that the Arbitrator should

14  determine whether those new parties can be added to the litigation in the future.  There is no

15  prejudice to anyone for the Court to make these orders, as the Court will have an opportunity to

16  review any arbitration award at the end of the arbitration before entering it as a judgment.

17  **II.    STATEMENT OF FACTS**

18      Defendant Narra is the founder and CEO of Defendant Indyzen.  (Narra Decl. at ¶ 1.)

19  Indyzen specializes in software, web, and mobile development for businesses.  (*Id.* at ¶ 2.)

20      In or around June 2013, Narra met Dobson at a professional development event.  (*Id.*)

21  Narra and Dobson discussed an idea for the Morfit App to connect personal fitness trainers with

22  clients through a personality matching system.  (*Id.* at ¶ 3.)  By August 23, 2013, Dobson had

23  formed Parkridge to contract to develop the Morfit App, listing his wife Mak as Parkridge's

24  owner.  (*Id.*)  However, Parkridge is just a shell company of Dobson's—it has no employees or

25  physical office space, and does not follow basic corporate formalities like issuing shares or

26  holding annual board or shareholder meetings.  (*Id.* at ¶ 4.)  It exists solely for Dobson to contract

27  to develop the Morfit App.  (*Id.*)

28      At first, Dobson contracted with a company called Tibco Software ("Tibco") to develop

1    the Morfit App.  (*Id.* at ¶ 5.)  Dobson initially negotiated the contract with Tibco using another

2    one of his sham companies, Mega Plus Management, but later switched to use Parkridge for the

3    contract.  (*Id.*)  Although Tibco was paid substantially, it soon became apparent that the work

4    they were developing was not satisfactory, and Dobson wanted out of the Tibco contract.  (*Id.*)

5    After Dobson got out of the Tibco contract, he then turned to Narra and Indyzen to develop the

6    Morfit App.  (*Id.*)

7         Indyzen and Parkridge entered into the Morfit Agreement on or around January 5, 2015.

8    (*Id.*; *see* **Exhibit B** to Compl., **Dkt. No. 1**, Page 1.)  Narra signed on behalf of Indyzen in his

9    capacity as CEO, and Dobson signed on behalf of Parkridge as its CEO.  (*Id.* at Page 8.)  The

10   Morfit Agreement has an arbitration clause stating that "any dispute or disagreement arising

11   between [Indyzen] and [Parkridge] . . . shall be referred to arbitration in San Jose, CA."  (*Id.* at

12   Page 6.)  Later that same month, Dobson emailed Narra telling Narra that payments to Indyzen

13   would be made by yet another sham company of Dobson's called R&R Fitness Holdings

14   ("R&R"), because Dobson "wanted to keep money flow directly out of Parkridge until we are

15   clear of any legal issues with Tibco.  Once we are certain no legal issues with Tibco, then R&R

16   will invoice Parkridge for the money."  (Narra Decl. at ¶ 8 and **Exhibit A** thereto.)

17        At all times during the Morfit App's development, Indyzen interacted with Dobson and

18   individuals at CMG and CFYC.  (*Id* at ¶ 9.)  Ultimately, Indyzen delivered the Morfit App to

19   Dobson but was never fully paid.  (*Id.* at ¶ 7.)  Dobson then used his Additional Sham Companies

20   to steal the Morfit App and its intellectual property by cloning it without authorization before

21   renaming it and selling it out to the world.  (*Id.*)  This is discussed at length in Section III(A)(1)

22   on alter ego liability below and is also explained further throughout the rest of this brief.

23        On December 29, 2016—around the time that Dobson was using Parkridge and his

24   Additional Sham Companies to rip off the Morfit App—Parkridge and Mak brought this lawsuit

25   against Narra and Indyzen alleging several causes of action arising out of the Morfit Agreement.

26   (*See* Compl., Page 1, Introduction Section, **Dkt. No. 1**. (summarizing the entire case as

27   allegations arising out of the Morfit Agreement.)  On March 8, 2017, Narra and Indyzen

28   petitioned this Court to order Parkridge and Mak to arbitration and also moved to stay the case

- 3 -

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

pending the outcome of arbitration.  (*See* Not. of Pet. to Compel Arbitration of Parkridge and Mak, **Dkt. Nos. 12 and 13**.)  On April 18, 2017, this Court granted all of Indyzen's and Narra's requests.  (Order Granting Motion to Stay and Compel Arbitration, **Dkt. No. 24**.)

On June 8, 2017, Parkridge and Mak submitted a demand for the arbitration which has been ongoing since.  (Request for Judicial Notice ("RJN"), ¶ 1 and **Exhibit A** thereto.)  On July 5, 2017, Indyzen and Narra filed counterclaims against Dobson and his Additional Sham Companies relating to their theft of the Morfit App and its intellectual property.  (*Id.* at ¶ 2 and **Exhibit B** thereto.)  On August 14, 2017, Parkridge and Mak filed a motion to dismiss the counterclaims.  (*Id.* at ¶ 3 and **Exhibit C** thereto.)  On November 6, 2017, the Arbitrator ruled that he did not believe that he had the power to bring any new parties into the arbitration, and that he believed that was a "matter for the courts" to decide.  (RJN at ¶ 4 and **Exhibit D** thereto, Page 11.)  As such, the Arbitrator dismissed Dobson and his Additional Sham Companies pending an order from the Court.  (*Id.*)

## III.   LEGAL AUTHORITY AND ANALYSIS

**A.   The Court Should Compel Dobson and his Additional Sham Companies To Arbitration.**

9 U.S.C. § 4 allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement to arbitration" to petition the United States District Court "for an order directed that such arbitration proceed in the manner provided for in such agreement."  When considering the applicability of arbitration clauses, "[e]very court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly."  (*Simula, Inc. v. Autoliv. Inc.* (1999) 175 F.3d 716, 721.)  Additionally, the allegations "need only 'touch matters' covered by the contract containing the arbitration clause, and all doubts are resolved in favor of arbitrability."  (*Id.*)  The burden of proof is on the parties "resisting arbitration" to show why the claims at issue should not be arbitrated.  (*Green Tree Fin. Corp. – Alabama v. Randolph* (2000) 531 U.S. 79, 91.)  Further, federal courts strongly favor arbitration, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  (*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*  (460 U.S. 1, 24-25.)

1    With respect to ordering nonsignatories to arbitration, federal law allows for litigants who

2    did not sign an arbitration agreement to be compelled to arbitration anyway if allowed under

3    relevant state contract law, such as through alter ego, equitable estoppel, agency, and/or third

4    party beneficiary theories.  (*Arthur Andersen, LLP v. Carlisle* (2009) 556 U.S. 624, 631-32.)  All

5    of these theories are applicable to the case at bar, as discussed below, and Dobson and his

6    Additional Sham Companies should therefore be ordered to arbitration.

7    **1.    Alter Ego**

8    As a first and separate reason to order that the Arbitrator can decide whether to add

9    additional parties to the arbitration, Dobson and his Additional Sham Companies are all alter egos

10   of each other and of Parkridge and Mak.  Nonsignatories to an arbitration agreement can be

11   compelled to arbitrate under an alter ego theory when they are really all just one and the same.

12   The law is "an equitable one, based on Civil Code section 3528: '[T]he law respects form less

13   than substance.'"  (*Webber v. Inland Empire Investment*, (1999) 74 Cal.App.4th 884, 900.)

14   There are two general requirements for applying alter ego doctrine: "(1) there [must be]

15   such a unity of interest and ownership between the corporation and the individual or organization

16   controlling it that their separate personalities no longer exist, and (2) failure to disregard the

17   corporate entity would sanction a fraud or promote injustice."  (*Id.*)  The question is not to

18   determine whether the corporate entity should be disregarded for all purposes, or even whether

19   the purpose of the set-up was to defraud.  (*Id.*)  Rather, the question is focused on "whether in a

20   particular case presented, justice and equity can best be accomplished and fraud and unfairness

21   defeated by disregarding the distinct entity of the corporate form."  (*Webber, supra,* at 900.)

22   There are many factors a Court can consider in determining alter ego liability, and none are

23   required or determinative.  (*Id.*)

24   Courts have found that alter-ego liability applies when one individual uses multiple

25   corporate entities as stand-ins for himself.  (*Id.* at 897.)  For instance, in *Webber*, the Court

26   affirmed the trial court's holding that a party was "both the individual center point of [a] circle of

27   corporations and he is also the agent of each of them in doing all these acts.  So I don't know how

28   you can come to any other conclusion but that they're all the alter egos of the others."  (*Id.*)

Here, the same reasoning of the trial court in *Webber* applies.  Dobson, his Additional Sham Companies, Parkridge, and Mak are all part of the same sham.  Dobson sits at the center of the sham, with all of the others circling him.  (*See generally* Narra Decl.)  Indeed, Dobson submitted an audio recording of himself to the arbitrator in this case on October 4, 2017 in which Dobson spoke on behalf of all of his alter ego companies—including Parkridge—and explained how he was running all of them.  (*See* RJN at ¶ 5 and **Exhibit E**, fn. 2 thereto; Decl. of Ethan G. Solove, Esq. ("Solove Decl.") at ¶ 2 and **Exhibit A** thereto.).  In that same recording, Dobson even referred to one of his other companies as "shell only."  (Solove Decl. at ¶ 2 and **Exhibit A** thereto.)  Further, in January 2015, Dobson emailed Narra telling Narra that payments for the Morfit Agreement would be made by yet another Dobson sham company called R&R because Dobson "wanted to keep money from directly out of Parkridge until we are clear of any legal issues with Tibco.  Once we are certain no legal issues with Tibco then R&R will invoice Parkridge for the money."  (Narra Decl. at ¶ 8 and **Exhibit A** thereto.)  Additionally, Dobson has taunted Narra that he is willing to take action to evade litigation, even if that means opening additional companies as he deems necessary.  (*See* Narra Decl. at ¶ 9.)  Dobson has also boasted to Narra about his ability to shield himself from American law enforcement through the use of offshore banking accounts and entities in the British Virgin Islands and Hong Kong.  (*Id.*)  Dobson has even stated that he would be willing to forfeit his United States citizenship to shield himself from American law enforcement.  (*Id.*)

Breaking it down further, Parkridge, CMG, and CFYC act as one and the same entity, and Dobson has used them all as fronts to work with Narra and Indyzen during the development of the Morfit App.[1]  (*Id.* at ¶ 10.)  Throughout CMG's own website, CMG and CFYC are used interchangeably.  (*Id.* at ¶ 10 and **Exhibit B** thereto.)  Page 13 of the Narra Decl., **Exhibit B**, shows CMG's own website describing the "origins of California Management Group" as being in

---

[1] In the arbitration, Dobson and his counsel argued that CMG is not an entity, but rather an affiliation of other companies.  This is at odds with the Hong Kong corporate filings of "CMG.Asia Limited", which list Dobson and Mak as directors, with a British Virgin Islands Address.  (RJN at ¶ 6 and **Exhibit F** thereto.)  Further, CMG has its own website that describes CMG as a "company" with a full board of directors of which Dobson is described as the chairman.  (Narra Decl. at ¶ 10 and **Exhibit B** thereto, p. 1-12.)  Further, as described above, Dobson and his employees routinely do business from CMG email addresses.  (*See, e.g., id.* at **Exhibits A, D,** and **E.**)

1  2007 when "California Fitness & Yoga became the first and largest international fitness company

2  to open in Vietnam", and continuing on that "CFYC has created a market where none existed

3  before." (emphasis added)  CMG's website also posts news articles that are titled as being about

4  CMG on the main news page, but which are actually explicitly about CFYC.  (*Id.* at Pages 14-22.)

5  Pages 14-20 of the Narra Decl., **Exhibit B**, show a link for an article titled "CMG.Asia Opens

6  First 5-Star Yoga Center in Vietnam" which opens up to an article about a CFYC yoga center

7  launch.  (emphasis added)  Pages 21-22 of the same **Exhibit B** show another about an expensive

8  Asian fitness center and opens up to an article about CFYC gyms, with "Welcome to California

9  Fitness & Yoga" written in bold at the top of the article.  (emphasis added)  Further, the "Careers"

10  tab of CMG's website describes CMG as being the "owner of California Fitness & Yoga" (see

11  *Id.*, Pages 2-3.), and asks potential job applicants, in big letters, "[a]re you ready to discover

12  career opportunities at California Fitness & Yoga and California Management Group?"  (*Id.* at p.

13  24.) (emphasis added)  The hiring link then takes visitors to another page that begins by saying,

14  "California Management Group and California Fitness & Yoga are proud to offer you a wide

15  variety of exciting career opportunities", (*Id.* at p. 25-26.) and then goes on to list positions only

16  for CFYC.  (*Id.*) (emphasis added)  Indeed, CFYC is used interchangeably with CMG all

17  throughout CMG's website.

18      Additionally, Dobson and many of the same other officers and top employees run CMG

19  and CFYC companies in the same capacities.  (*Id.* at ¶ 10.)  CMG's website was registered by

20  CFYC.  (*Id.* and **Exhibit C** thereto.)  Dobson routinely conducts CFYC business from his CMG

21  email address and did this with Indyzen throughout the development of the Morfit App.  (*See e.g.,*

22  *id.* and **Exhibit D** thereto.)  At Dobson's direction, CFYC worked with Indyzen for several

23  months on the Morfit App.  (*Id.* and **Exhibit E** thereto.)  Dobson even went so far as to direct his

24  employees at CFYC to assist Indyzen personnel to get work visas so that they could travel to

25  Vietnam to work with CFYC employees on developing the Morfit App for him.  (*Id.*)  During that

26  visit to Vietnam, Indyzen employees worked to customize the Morfit App exclusively for

27  CFYC's needs, working with many CFYC employees on the ground at CFYC's offices.  (*See id.*

28  and **Exhibit D** thereto.)

1     All of these connections continue in many other forms.  On May 11, 2015, before this

2 litigation began, Dobson posted on his personal Facebook page that it was the "[o]fficial launch

3 day of our new Morfit platform at Cfyc [*sic*] Vietnam", and set the location for the post as

4 CFYC's headquarters.  (*Id.* and **Exhibit F** thereto.)  At Dobson's request, Narra went to CFYC's

5 headquarters to assist Dobson in presenting the official launch of the Morfit App to an audience

6 that consisted of mostly CFYC trainers.  (*Id.* and **Exhibit G** thereto.)  Then, in August 2017

7 during the throes of the current arbitration, CMG's Director of Human Resources sent an email

8 out to the entire staff at CFYC, as well as the Executive Vice President of Operations at CMG,

9 instructing them to "shred all documents containing confidential and sensitive information when

10 it is not used."  (*Id.* and **Exhibit H** thereto.)  As such, spoliation of evidence has also become a

11 concern in this case as a result of Dobson's alter ego scheme.  Indeed, Parkridge, CMG, and

12 CFYC operate as one in the same, and Dobson used them all as fronts to work on the Morfit App

13 development with Indyzen and Narra.

14     Likewise, F8 Fit and Boon are also part of Dobson's network of companies, such that

15 Dobson, Parkridge, CMG, and CFYC are one and the same as F8 Fit and Boon.  (*Id.* at ¶ 11.)  As

16 discussed below in Section III(A)(2)(i), F8 Fit is just a rip off of the Morfit App and its

17 intellectual property.  Just like CMG, the F8 Fit website was also registered by CFYC.  (*Id.* and

18 **Exhibit I** thereto.)  In April 2017, the Senior HR Operations & Recruitment Manager at CFYC

19 sent out an e-mail to all CFYC staff containing a list of CFYC job openings, with openings for F8

20 Fit included in the listings.  (*Id.* and **Exhibit J** thereto.)  And in August 2017, the Director of

21 Human Resources at CMG sent out an email out to all CFYC staff, and a F8 Fit employee,

22 announcing the official launch of the LEEP app, which is explicitly described as being "formerly

23 known as F8 Fit."  (*Id.* and **Exhibit K** thereto.)  The F8 Fit App was registered to online app

24 stores, such as Google Play and the iTunes Store, by Boon, and the only review was written by

25 Alfred Mak, who is Mabel Mak's brother.  (*Id.* and **Exhibit L** thereto.)  Furthermore, Boon is

26 listed as the current trademark owner for the F8 Fit name.  (*Id.* and **Exhibit M** thereto; RJN at ¶7

27 and **Exhibit G** thereto.)  Thus, all of Dobson's companies are one and the same.

28     Parkridge and each of Dobson's Additional Sham Companies play a role in Randy

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

1   Dobson's sham alter ego enterprise, and he used all of them to steal the Morfit App. Dobson used

2   Parkridge to get the Morfit App, and then used CMG and CFYC to assist in the unauthorized

3   cloning of the Morfit App. (*See generally* Narra Decl.) Then, using F8 Company and Boon as a

4   front, Dobson did the actual cloning of the Morfit App. (*See generally id.*) Dobson now uses all

5   of these companies to market and sell the stolen Morfit App across the world. (*See generally id.*)

6        In short, Dobson is Parkridge. He is CMG. He is CFYC, F8 Fit, and Boon, too. They are

7   all one and the same. As such, they are all bound by the Morfit Agreement and its arbitration

8   clause that Parkridge and Dobson signed.

9        **2.       Equitable Estoppel**

10       As a second and independent basis, this Court could grant this motion under equitable

11   estoppel principles. A nonsignatory may be bound to arbitrate under equitable estoppel in two

12   circumstances: (1) "where the nonsignatory knowingly exploits the agreement containing the

13   arbitration clause despite having never signed the agreement", and (2) where there is a "close

14   relationship between the entities involved, as well as the relationship of the alleged wrong to the

15   non-signatory's obligations and duties in the contract and the fact that the claims were intertwined

16   with the underlying contractual obligations." (*Mundi v. Union Sec. Life Ins. Co*. (2009) 555 F.3d

17   1042, 1045-46.) Here, both circumstances apply. Dobson and his Additional Sham Companies

18   are equitably estopped by direct benefits estoppel from exploiting and benefiting from the Morfit

19   Agreement and not arbitrating under it. Further, Dobson and his Additional Sham Companies are

20   all inextricably intertwined with the Morfit Agreement.

21       **i.       Dobson and his Additional Sham Companies All Directly Benefitted
                from the Morfit Agreement.**

22

23       Dobson and his Additional Sham Companies should be compelled to arbitrate the

24   counterclaims under the doctrine of direct benefits estoppel. Direct benefits estoppel is a type of

25   equitable estoppel that applies when a nonsignatory knows about a contract with the arbitration

26   clause and tries to exploit it without being bound by the arbitration clause. (*Exigen Properties,
     Inc. v. Genesys Telecommunications Laboratories, Inc.* (2016) 2016 WL 520283, at *7.) Direct

27   benefits estoppel is different from standard equitable estoppel in that it does not require that the

28

- 9 -

1   nonsignatory be seeking to enforce the terms of the contract or that the nonsignatory's claims are

2   inextricably intertwined with the contract.  (*Id.*)   All that is required is that the nonsignatory

3   knew about the contract, exploited it or received direct benefits from it, and has tried to avoid the

4   contract's arbitration requirement.  (*Id.*)  As the court in *Exigen* noted, there are so many different

5   situations where direct benefits might apply that "it would be difficult, if not impossible, to

6   fashion an all-purpose, comprehensive definition of what constitutes a direct benefit sufficient to

7   invoke the doctrine."  (*Id.*, at *8.)  Rather, the focus is on "whether the asserted benefit derives

8   directly from the terms of the contract or is simply a by-product or consequence of the contract's

9   performance."  (*Id.*)

10          Here, the Court should order that Dobson and his Additional Sham Companies appear in

11   the arbitration related to this case so that the Arbitrator can decide whether to proceed with

12   Indyzen's counterclaims against them, because they all knew about the Morfit Agreement,

13   exploited it and received direct benefits from it, and tried to avoid arbitration.  Indeed, the Morfit

14   Agreement was entered into so that Indyzen would create the Morfit App for Dobson under the

15   front of Parkridge.  (*See generally* Narra Decl.)  Dobson and his Additional Sham Companies all

16   knew about the Morfit Agreement since Dobson runs them all, and Dobson signed the Morfit

17   Agreement himself.  (*See generally id.*)  Dobson and his Additional Sham Companies have

18   exploited and received direct benefits from the Morfit Agreement.  (*See generally id.*)  They have

19   all worked together to clone the Morfit App that was delivered to Parkridge.  (*See generally id.*)

20   Then, they worked together to rename the cloned app to F8 Fit, and then again to LEEP.  (*See*

21   *generally id.*)  Parkridge, Dobson, and his Additional Sham Companies were only able to steal the

22   Morfit app because Indyzen had delivered the Morfit App to Dobson under the Morfit

23   Agreement.  (*See generally id.*)  Further, their misappropriation was not a mere by-product of the

24   Morfit Agreement's performance.  (*See generally id.*)  Rather, it was derived directly from the

25   terms of the Morfit Agreement itself, which laid out the specifications for the Morfit App.  (*See*

26   *generally id.*; Compl., **Dkt. No. 1**.)  As such, Dobson and his Additional Sham Companies

27   exploited the Morfit Agreement, received direct benefits from it, and tried to avoid arbitration as

28   required by the Morfit Agreement.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

As further support, the situation at bar is like that in *Exigen*, a California case in which the Court ordered parties to arbitrate under direct benefits estoppel. In *Exigen*, there was an entire network of parties who had not signed the contract containing the arbitration agreement. (*Exigen, supra,* at *8-9.*) However, this network was closely related to a signatory, as they were all part of the same web of affiliate companies who all shared information among each other. (*Id.*) The nonsignatories had all benefited from the contract because they had received from the other side the software that was the subject of the contract, and they all shared trade secrets about that software among each other. (*Id.*)

The logic of *Exigen* applies here. One participant in a network, Parkridge, is a party to a contract to get software from Indyzen. Other participants in the network—Dobson and his Additional Sham Companies—received the software and share the trade secrets of that software among each other freely. As such, Dobson and his Additional Sham Companies received direct benefits of the Morfit Agreement, and they should all be required to participate in the arbitration so that this matter can be resolved on its merits.

### ii. Dobson and his Additional Sham Companies are all Inextricably Intertwined with the Morfit Agreement.

The second "inextricably intertwined" circumstance of equitable estoppel also applies to this case. Parkridge, Mak, Dobson, and his Additional Sham Companies are all one and the same, and the counterclaims against them are inextricably intertwined with the Morfit Agreement. Parkridge, Mak, and Dobson all had obligations not to misappropriate the software under the Morfit Agreement. As closely related entities who are one and the same as Parkridge and Mak, Dobson and his Additional Sham Companies had this obligation as well. The counterclaims allege that Dobson and his Additional Sham Companies violated this obligation. As such, the counterclaims are bound up with the Morfit Agreement such that Dobson and his Additional Sham Companies should be ordered to defend them in arbitration.

### 3. Agency

As a third independent basis, Dobson and his Additional Sham Companies should be ordered to arbitrate under agency principle, as they were all agents of Parkridge and Mak. An

- 11 -

1  agent can be held bound to an arbitration agreement entered into by its principal.  (*Harris v. Sup.*

2  *Ct.* (1986) 188 Cal.App.3d 475, 478; *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 614.)  An

3  actual agency relationship exists when the agent is "really employed by the principal." (Cal.

4  Civ. Code § 2299.)  An ostensible agency relationship exists when the principal "intentionally,

5  or by want of ordinary care, causes a third person to believe another to be his agent who is not

6  really employed by him." (*Id.* at § 2300.)

7      Here, Randy Dobson was an actual agent of signatory Parkridge, as he was Parkridge's

8  CEO and signed the Morfit Agreement in that capacity.  As such, this Court should order that the

9  Arbitrator decide whether to add him to the arbitration.  Further, Dobson's Additional Sham

10  Companies are all ostensible agents of Parkridge and Mak.  They all were involved in the

11  development of the Morfit App and worked together to steal it, as discussed above in Section

12  III(A)(2)(i).  As such, the Court should order that the Arbitrator decide whether to add them to

13  the arbitration, as well.

14      **4.    Third Party Beneficiary**

15      Lastly, and as yet another independent basis, Dobson and his Additional Sham Companies

16  should also be compelled to arbitration because they were third-party beneficiaries of the Morfit

17  Agreement.  In order for a third-party beneficiary relationship to exist, the contracting parties

18  "must have intended to confer a benefit on the third party." (*Neverkovec v. Fredricks* (1999) 74

19  Cal.App.4th 337, 348.)  Further, it is not necessary that the third-party beneficiary be named as an

20  individual. (*Prouty v. Gores Tech. Group* (2004) 121 Cal.App.4th 1225, 1233.)  It is sufficient if

21  the third-party beneficiary is a member of the class that the contract was intended to benefit. (*Id.*)

22      Here, all of the signatories always intended that the Morfit Agreement benefit Dobson and

23  his Additional Sham Companies, especially CFYC and CMG, which were the main operating

24  companies.  At Dobson's request, Indyzen worked with CFYC to tailor the development of the

25  Morfit App to CFYC's needs, and included CFYC trainers on the Morfit App. (Narra Decl. at ¶

26  10 and **Exhibit D** thereto.)  This is just one of the many ways that Dobson and his Additional

27  Sham Companies were intended to and did in fact benefit from the Morfit Agreement, as

28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION

1  discussed further in Section III(A)(2)(i) above.  As such, the Court should order that the

2  Arbitrator should decide whether to add them to the arbitration.

3  **B.      The Court Should Order that the Arbitrator Can Decide Whether to Bring in
           Additional Parties in the Future.**

4

5          The Court should also order that the Arbitrator can decide whether additional parties can

6  be added to the arbitration in the future to prevent Dobson from continuing to use other currently

7  unknown or not-yet-created sham companies to avoid this litigation.  In his order dismissing the

8  counterclaims pending this Court's guidance, the Arbitrator cited to several cases in support of his

9  ruling that he did not have the power to add new parties to the action.  (*See* RJN at ¶ 4 and

10 **Exhibit D** throughout.)  All of these cases are distinguishable from the situation at bar, and the

11 Court should provide guidance that the Arbitrator does in fact have the power to add new parties

12 to this case.  Of course, the Court will still have the opportunity to review any decision made by

   the Arbitrator before entering it as a judgment.

13

14         The relevant distinguishable cases cited by the arbitrator in his order are taken up here in

15 turn.  *Kramer v. Toyota* (9th Cir. 2013) 705 F.3d 1122 is not applicable to this case.  In *Kramer*,

16 the appeals court affirmed the district's court ruling that a party that did not sign an arbitration

17 agreement could not compel one who did sign to arbitrate because none of the non-signatory

18 theories applied.  (*Kramer, supra*, 705 F.3d 1122.)  The Court did not address the question of

   whether an arbitrator can add new parties to a counterclaim.  (*Id.*)

19

20         In *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, the Supreme Court did

21 not rule that an arbitrator cannot decide whether to bring additional parties into a case.  (*Supra*, at

22 514 U.S. at 944.)  Rather, *Kaplan* was about the standard of review that courts should apply when

23 reviewing an arbitrator's decision on the same issue.  (*Id.*)  In fact, the central focus in *Kaplan*

24 gives guidance that arbitrators can make these types of rulings, and that courts may review those

   rulings after the fact before confirming the arbitration award.

25

26         Lastly, in *Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79, the Supreme Court

27 stated that an arbitrator can decide whether to bring a party into an arbitration when the parties

28 have agreed to submit to the arbitration.  (537 U.S. 79 at 83-84.)  Here, Dobson and his

- 13 -

1    Additional Sham Companies have agreed to the arbitration, for all the reasons described above in

2    this brief.[2]

3        This additional ruling is requested because, if Dobson tries to use other currently unknown

4    or not-yet-created sham companies to avoid litigation, Defendants should not have to come back

5    to Court each time to have them ordered to arbitration.  As such, the Court should include

6    guidance to the Arbitrator that he can in fact make a determination, which, as the United States

7    Supreme Court has made clear, would of course be subject to judicial review.

8                    **IV.    CONCLUSION**

9        This Court has already ordered Parkridge and Mak to arbitration in this case.  It should

10   also order that Dobson and his Additional Sham Companies appear in the arbitration so that the

11   Arbitrator can decide whether to proceed with Indyzen's counterclaims against them.  Indyzen's

12   counterclaims relate to Dobson and his Additional Sham Companies' theft of the Morfit App

13   under the terms of the Morfit Agreement.  Dobson and his Additional Sham Companies are all

14   one and the same as Parkridge and Mak, so alter ego principles apply.  As other independent

15   bases, Dobson and his Additional Sham Companies all benefited under the Morfit Agreement, so

16   they are equitably estopped from avoiding the arbitration, and should also be included in the

17   arbitration under third-party beneficiary principles.  As yet another independent basis, Dobson

18   signed the Morfit Agreement as Parkridge's CEO, so he should be compelled to arbitration as

19   Parkridge's actual agent, and Dobson's Additional Sham Companies are all also ostensible agents

20   of Parkridge and Mak, and should also be compelled to arbitration.

21   ///

22   ///

23   ///

24   ///

25   ///

26   [2] *American Builders Assoc. v. Au-Yang* (1990) 226 Cal.App.3d 170 and *Dream Theater, Inc. v.*

27   *Dream Theater* (2004) 124 Cal.App.4th 547 are California cases that are not applicable to this
current federal lawsuit.  In any event, they both explain that if the parties have agreed to submit a

28   case to arbitration, the arbitrator can decide the case against them.  (226 Cal.App.3d 170; 124
Cal.App.4th 547.)

- 14 -

1    For the foregoing reasons, Petitioner respectfully requests that this Court order that

2  Dobson and his Additional Sham Companies appear in the arbitration so that the Arbitrator can

3  decide whether to proceed with Indyzen's counterclaims against them.  Defendants also

4  respectfully request that this Court order that the Arbitrator can add other parties to the lawsuit as

5  necessary, without future court approval, to prevent Dobson from continuing to use sham

6  companies to avoid litigation.

7

8    Dated: December 14, 2017                    STRUCTURE LAW GROUP, LLP

9

10                                   By: /s/ Ethan G. Solove
                                         _____
11                                       Ethan G. Solove, Esq.
                                         Attorneys for Defendants
12                                       INDYZEN, INC., and PRAVEEN NARRA
                                         KUMAR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28