# Exhibit A

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. ☐* <br> *There is no additional administrative fee for this service.* | |
|---|---|
| Name of Respondent <br> INDYZEN, INC. and PRAVEEN NARRA KUMAR | Name of Representative (if known) <br> Mark Figueiredo |
| Address <br> 2033 Gateway Place,  Ste. 500 | Name of Firm (if applicable) <br> Structure Law Group, LLP |
| | Representative's Address <br> 1754 Technology Drive, Suite 135 |

| City <br> San Jose | State <br> CA | Zip Code <br> 95110- | City <br> San Jose | State <br> CA | Zip Code <br> 95110- |
|---|---|---|---|---|---|
| Phone No. | Fax No. | | Phone No. <br> (408) 441-7500 | | Fax No. <br> (408) 228-8787 |
| Email Address: | | | Email Address: <br> mrf@structurelaw.com | | |

The named claimant, a party to an arbitration agreement dated  January 5, 2015                        , which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Please see attachment, attached herein. In summary, Defendants' breached fiduciary duties under California and Hong Kong law, aided and abetted breaches of fiduciary duties under California law, breached a contract, fraudulently misrepresented facts, and fraudulently concealed facts under California law.

| Dollar Amount of Claim  $2,800,000.00 | Other Relief Sought:  ☒ Attorneys Fees   ☒ Interest <br> ☒ Arbitration Costs  ☒ Punitive/ Exemplary  ☐ Other |
|---|---|

Amount Enclosed $ 7,000.00              In accordance with Fee Schedule:  ☐ Flexible Fee Schedule   ☒ Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Familiar with modern day app technology, and costs and resources associated with developing mobile phone applications.

Hearing locale_____  (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: <br> _____ hours or   10.00   days | Type of Business: Claimant ___Health Fitness App_____ <br> Respondent App Development Co. & CEO |
|---|---|

Is this a dispute between a business and a consumer? ☐ Yes ☒ No  Does this dispute arise out of an employment relationship? ☒ Yes ☐ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐ Less than $100,000 ☐ $100,000 - $250,000 ☒ Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)       Date: <br> s/ Adam Wolek                                6/8/17 | Name of Representative <br> Adam Wolek |
|---|---|
| Name of Claimant <br> Parkridge, Ltd. & Mabel Mak | Name of Firm (if applicable) <br> Wolek & Noack |
| Address (to be used in connection with this case) <br> Contact through attorney. | Representative's Address <br> 333 S. Wabash Ave., Ste. 2700 |

| City | State | Zip Code | City <br> Chicago | State <br> IL | Zip Code <br> 60607- |
|---|---|---|---|---|---|
| Phone No. | Fax No. | | Phone No. <br> 312-860-9006 | | Fax No. <br> 708.843.0509 |
| Email Address: | | | Email Address: <br> adamw@wonoip.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ  08043.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.

Adam Wolek
Brian Noack
Wolek & Noack
333 S. Wabash Avenue
Suite 2700
Chicago, IL 60604
P:312.860.9006
F: 708.843.0509
adamw@wonoip.com
briann@wonoip.com
*Attorneys for Claimants Parkridge Ltd.*
*and Mabel Mak*

# AMERICAN ARBITRATION ASSOCIATION

## CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| On Behalf of PARKRIDGE LIMITED, a Hong Kong corporation, by Mabel Mak, and MABEL MAK, an individual,<br><br>                    Plaintiffs,<br><br>          v.<br><br>INDYZEN, INC., a California corporation, and PRAVEEN NARRA KUMAR, an individual,<br><br>                    Defendants. | **DEMAND**<br><br><br>Case No.: |

## STATEMENT OF CLAIMS

Plaintiff Parkridge Limited was founded in 2013 to create a mobile software application combining health and fitness information with social media networking. Possessing limited technical expertise himself, Parkridge's CEO, Randy Dobson ("Dobson"), discussed a potential collaboration with Praveen Narra Kumar ("Narra"), due to Narra's self-proclaimed experience in software development. Following these discussions, Narra was appointed as Chief Technology Officer ("CTO") of Parkridge. Rather than providing Parkridge with its best option, Narra took advantage of his position, failed to fulfill his obligations as CTO of Parkridge, and used his own independent software company, Indyzen, Inc., to develop the mobile app to the disastrous detriment of Parkridge. Indyzen charged Parkridge exorbitant prices for developing a mobile app that not only did not work, but was grossly inferior to comparable apps in the industry. In short, Narra abused his position as CTO to siphon money from Parkridge to benefit himself and his company, Indyzen. Narra's and Indyzen's conduct constitutes breaches of fiduciary duties under California and Hong Kong law, aiding and abetting breach of fiduciary duties under California law, breach of contract, fraudulent misrepresentation, and fraudulent concealment under California law.

## PARTIES

1.     Plaintiff Parkridge Limited ("Parkridge") is a company established under the laws of Hong Kong, with its principle place of business at The Landmark 15 Queen's Rd. Central 8/F Gloucester Tower, Central Hong Kong, China.

2.     Plaintiff Mabel Mak ("Mak") is an individual with a passport issued by the Government of Hong Kong, and resides at 11A Bo Shek Mansion Block 1, 328 Sha Tsui Road, Tsuen Wan, Hong Kong.

STATEMENT OF CLAIMS                                         2

3.      Upon information and belief, Defendant Indyzen, Inc. ("Indyzen") is a company organized and existing under the laws of the State of California, with its principal place of business at 2033 Gateway Place, San Jose, California 95110, United States of America.

4.      Upon information and belief, Defendant Praveen Narra Kumar ("Narra") is an individual who resides at 2107 Ashley Ridge Court, San Jose, California 95138, United States of America.

## JURISDICTION AND VENUE

5.      The arbitrator is to rule as to the scope of arbitrable claims, and Parkridge *et al.* explicitly reserve all rights to take up and adjudicate any non-arbitrable claims in Federal Court after the stay is lifted.

6.      Venue is proper in San Jose, California and before the American Arbitration Association as Defendant Praveen Narra Kumar resides in this District, and Defendant Indyzen resides in and is do business there, and agree to jurisdiction therein via an arbitration agreement.

## FACTUAL BACKGROUND
### Formation of Parkridge

7.      Around 2013, Randy Dobson ("Dobson") began working on developing an online personal training platform that would connect personal trainers with clients by utilizing a personality matching system, which was later known as Morfit (the "Morfit App").

8.      In 2013, while at a 'Business Mastery Event' hosted by Tony Robbins, Dobson shared the idea for the Morfit App with Tony Robbins and a small group of business individuals, including Narra.

9.      Subsequently, Dobson discussed the Morfit App idea at length with Narra.

10.     Dobson also communicated to Narra, and Narra understood, that Dobson had no technical expertise.

STATEMENT OF CLAIMS                                    3

11.     Narra then pitched his services to assist with the technical side of the Morfit App, stating that his background and expertise are in application and software development, including founding companies, and that he owned and was the Chief Executive Officer ("CEO") of a software development company known as Indyzen.

12.     Parkridge was formed on August 23, 2013.

13.     Narra requested that his father, Parasurama Naidu Narra ("Naidu Narra") be listed as the shareholder in the shareholders' agreement for the new company, Parkridge. Mabel Mak ("Mak") and Naidu Narra (instead of Narra) executed the Shareholders Agreement ("SH Agreement") for Parkridge on January 1, 2015. Exh. A. The SH Agreement gave Mak 7000 shares, equivalent to 70% of the total shares, in exchange for her: (1) industry expertise in the business; (2) professional support; (3) a promise to register all of Parkridge's intellectual property; and, (4) initial funding of Parkridge up to a maximum amount of $1,000,000 in the form of a loan. Exh. A.

14.     The SH Agreement permitted Naidu Narra 3000 shares, equivalent to 30% of the total shares, in exchange for his promises to: (1) have his son, Narra, provide software development industry expertise to develop, operate, and maintain the Morfit app; (2) have Narra serve as CTO of Parkridge; (3) have Narra lead development of the Morfit App to successfully achieve Beta Version; and, (4) have Indyzen offer a $300,000 discount to develop the Morfit App. Exh. A.

15.     Mak appointed two individuals (including Dobson) as Directors of Parkridge, each with 35% voting power.

16.     Dobson is Parkridge's Director, Chairman, and Chief Executive Officer ("CEO").

17.     Naidu Narra appointed his son, Narra, as a Director of Parkridge, with 30% voting power.

18.     Dobson and Narra then entered into discussions in California to collaborate and use Parkridge to develop and implement the Morfit App. Narra would serve as Chief Technology

STATEMENT OF CLAIMS                                    4

Officer of Parkridge and oversee the development of the Morfit App, while Dobson would provide the conceptual and business expertise.

### Development of the Morfit App

19.     Dobson told Narra that they would be relying on Narra's expertise in all technical matters.

20.     Dobson asked Narra to vet a real-time software computing company known as TIBCO (The Information Bus Company) Software Inc. ("TIBCO") to determine if it was qualified to build the Morfit App.

21.     Dobson and Narra communicated to TIBCO that the Morfit App is meant to be primarily a mobile platform.

22.     Based on Narra's recommendation, Parkridge hired TIBCO to develop the Morfit App, memorialized in a work order dated November 13, 2013.

23.     However, Narra knew that TIBCO did not have mobile expertise.

24.     During the following year, Dobson flew out to California with Narra on a quarterly basis, with Narra being in charge of managing and overseeing TIBCO's progress with the Morfit App.

25.     Narra failed to monitor TIBCO's progress with the Morfit App, in particular, that it was developing a mobile platform.

26.     Under Narra's management as Chief Technology Officer of Parkridge, TIBCO delivered only a desktop platform and failed to deliver the Morfit App that Parkridge had requested.

27.     Even after many delays and chances to fix the app were given, the correct form of the Morfit app – the mobile platform – was never delivered.

28.     As a result of TIBCO's failure to deliver a mobile platform, Parkridge stopped paying TIBCO.

## INDYZEN

29.     Subsequently, Narra then recommended his own software company, Indyzen, to develop the Morfit App.

30.     Narra and Indyzen promised an extensive set of characteristics for the Morfit App, including, but not limited to: personality matching, open API, social media, geolocation, augmented reality, and facial recognition aspects.

31.     As a result of these discussions, all working relationships between Parkridge and TIBCO were terminated.  On January 5, 2015, Parkridge and Indyzen entered into a software development and licensing agreement.

32.     In April 2015, Indyzen delivered a version of the Morfit App ("Indyzen's App") to Parkridge. However, Indyzen's App's quality was grossly inferior to comparable apps in the industry, had only very basic functionality, a bad user interface, and was not ready to be marketed to the public.

33.     When concerns over the quality of Indyzen's App were raised to Narra, he attempted to shift the blame to Parkridge's lack of guidance, despite being Parkridge's CTO and source of guidance on all technical issues.

34.     Once again, further discussions were entered into between Indyzen and Parkridge to resolve the technical issues with, and complete development of, the Morfit App.

35.     A September 2015 launch date was planned for the Morfit App.

36.     However, Indyzen's delivered product was far below the industry standards and agreed-upon quality. Accordingly, Parkridge pushed the launch date back to December 2015.

STATEMENT OF CLAIMS                                6

37.     When the December 2015 launch date arrived, the Morfit App still failed to meet industry standards, let alone those agreed-upon by the parties. So the Morfit App still could not be released.

38.     At about the same time, Dobson appointed another Chief Technology Officer, Martin Papy ("Papy"), to a sister company of Parkridge, and gave him power to oversee all technological matters for the related group of companies.

39.     Papy quickly identified many issues with Indyzen's development of the Morfit App, and requested Indyzen's documentation for the development of the Morfit App.

40.     Despite Papy's requests, Indyzen and Narra refused to provide any documentation relating to the project.  Instead, they demanded payment-in-full from Parkridge and that 30% of the shares in Parkridge be transferred to Narra's father, Parasurama Naidu Narra, prior to allowing Parkridge to see any documents.

41.     Despite not receiving a functional app, and in a good faith effort to resolve the dispute, Parkridge paid Indyzen the amount it requested.

42.     Even after payment of the requested fee, neither Narra nor Indyzen delivered the requested documents or a functioning Morfit App.

**THE AGREEMENT BETWEEN PARKRIDGE & INDYZEN**

43.     Following the termination of the  relationship between Parkridge and TIBCO, Narra, as CTO of Parkridge and CEO of Indyzen, advised Dobson and Parkridge what resources, skills and design specifications would be needed in order to develop the Morfit App. Narra further promised an extensive set of characteristics that would be developed for the Morfit App, which included, but were not limited to, personality matching, open API, social media, geolocation, augmented reality, and facial recognition capabilities.

44.     Acting as both CEO of Indyzen and CTO of Parkridge, Narra proposed, developed, and negotiated the Agreement in the best interests of Indyzen, to the detriment of Parkridge.

45.     Narra had previously promised to give a 50% discount to Parkridge on the labor rate for the development of the Morfit App. However, it later turned out that Narra's and Indyzen's "discount" rate was actually the standard rate for developers from that region.

46.     On January 5, 2015, Parkridge executed the Software Development and Licensing Agreement ("Agreement") with Indyzen to develop the Morfit App.  Exh. B.

47.     Indyzen was to develop the Morfit App for Web, iOS and Android platforms, and the Morfit App was to meet various functional specifications, listed in greater detail in Exh. B at 9 and 10.

48.     Ultimately, the Morfit App, as described in the Agreement, was never delivered by Indyzen.

49.     During Phase I of development of the Morfit App, the total price for the above services was to be $420,000, but was discounted by $300,000, so the total due for Phase I by Parkridge was $120,000.

50.     Parkridge paid Indyzen $40,000 for Phase I on January 21, 2015, and $80,000 on May 19, 2015, for a total of $120,000.

51.     Phase II began on May 16, 2015, and as promised by Narra, and pursuant to the Agreement, Indyzen was to allocate a 24-person team of full-time personnel who would work an average of at least 40 hours per week to develop the application.

52.     Pursuant to "Schedule A" of the Agreement, Parkridge was to pay Indyzen any fees incurred in relation to the services in Phase II on a monthly basis, with 50% being paid by Parkridge within 14 business days of receiving an invoice, and 50% of the fee being treated as a loan made by Indyzen to Parkridge.  Exh. B.

STATEMENT OF CLAIMS                                      8

53.    However, Narra and Indyzen charged Parkridge a "loan" rate substantially higher than the industry average.

54.    Between August 2015 and December 2015, Parkridge paid Indyzen $300,000 during Phase II, with the payment schedule occurring as follows:

| Payment Date | Payment Amount |
|---|---|
| August 7, 2015 | $50,000 |
| August 7, 2015 | $50,000 |
| October 26, 2015 | $50,000 |
| October 26, 2015 | $50,000 |
| December 18, 2015 | $50,000 |
| December 18, 2015 | $50,000 |
| **Total Paid in Phase II** | **$300,000** |

55.    During Phase I and II of the Morfit App's development, Narra consulted for Parkridge, however, given his role as Indyzen's CEO and Parkridge's CTO, he had no oversight. In other words, Narra acted as the point of contact for both corporations, despite the apparent conflict of interest.

56.    Narra was able to do this because he knew Dobson relied on him for all technical matters, and that Narra would be guiding Dobson's acceptance and quality approval for the Morfit App during Phase I and Phase II with Indyzen.

57.    Additionally, pursuant to clause 3(c) of the Agreement, "Indyzen may not withhold delivery of any work product produced in accordance with Schedule 'A' and paid for by Parkridge..." Exh. B.

## INDYZEN & NARRA'S CONDUCT

58.     During Phase I, neither Narra nor Indyzen provided helpful consultations or presentations on the status of the Morfit App's platform and technical design decisions, despite being part of Narra's obligations as Parkridge's CTO.

59.     Because development was taking so long, Dobson sought a second opinion in January 2016 regarding development of the Morfit App. A number of industry experts and professionals advised that the price paid for Indyzen's services massively exceeded market standards and that, relative to the price, the quality of the Morfit App was extremely low.

60.     Some consultants in the field were so shocked that they said Parkridge was "substantially ripped off," and that it could have obtained the same "generic" application at "a fraction of the cost."

61.     They also said that there is "categorically no way that 24 qualified developers were working on this software for the last 9 months."

62.     Phase II came to a halt around February 2016 due to disagreement between Parkridge and Indyzen about the direction of the Morfit App.

63.     Despite a 24-person team spending 9 months developing the Morfit App, Indyzen failed to meet many of the Agreement's functional specifications.

64.     For instance, under the Web portal segment, the registration and log-in features are nonfunctional, rendering the rest of the features under this segment obsolete.

65.     iOS users were not able to sign-in or register with Facebook, instead, the device went into a loop.

66.     Web users could not create or add information to their profile, while iOS, Android, and Web users could only partially edit profile info, including profile photo. Nor could iOS and Android users consistently see their profile page, followers, or friends.

67. For iOS, Android and Web users, the platform caps video uploaded at 8.5MB.

68. iOS, Android and Web users were unable to scroll their newsfeed, tap a notification to go to the corresponding post, load additional posts, or receive notifications for comments.

69. Indyzen failed to deliver the Morfit App or any other deliverables produced in accordance with Schedule A, Phase I, or Phase II, to Parkridge.

70. Accordingly, Parkridge could not verify whether iOS, Android or Web users could chat with friends via the Morfit App, or whether the Morfit App was built using third party and/or open source software modules.

71. Indyzen also refuses to provide Parkridge with the source or object code of the Morfit App.

72. Indyzen's ongoing delay has prevented Parkridge from launching the Morfit App on time, or at all.

73. Because of these delays, Parkridge has lost and is continuing to lose business, goodwill, customers, and is failing to fulfill promises to third parties.

74. Parkridge has repeatedly requested that Indyzen and/or Narra cease withholding delivery of its products.

75. Defendants, however, have rejected all of Plaintiff's reasonable requests to settle the matter amicably.

76. In order for Parkridge to authorize certain decisions, like commencing litigation, the directors who together represent at least 80% of Parkridge's total share capital have to unanimously agree to authorize the matter, but because Narra's father purports to be a shareholder, his consent would purportedly be required and given but for his relationship with his son.

# COUNT I
## BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

77.     Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-76 as if fully set forth herein.

78.     As Director, Vice Chairman and CTO of Parkridge, Narra owed fiduciary duties of good faith, care, and loyalty to Parkridge.

79.     As a Director and CTO at Parkridge, Narra had a duty to use the amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

80.     As a Director and CTO at Parkridge, Narra had a duty of loyalty to place Parkridge's interests above any interest he possessed that was not shared by Parkridge generally.

81.     As a Director and CTO of Parkridge, Narra had a duty of good faith not to intentionally fail to act where he has a known duty to act.

82.     Narra controlled and was founder and CEO of Indyzen, which entered into an Agreement with Parkridge on January 5, 2015, to build the Morfit App.  As a result, Narra had a competing interest in, and failed to act in an independent manner for the benefit of Parkridge with respect to, the Agreement between Indyzen and Parkridge.

83.     Also, because at least 80% of Parkridge's total share capital was required to consent to commencing litigation, and Narra's voting power would ostensibly equal 30%, any proposal by the other directors (as nominated by Mak) to commence litigation against Narra and Indyzen would have been futile.

84.     Narra proposed, led negotiations, and facilitated the Agreement between Parkridge and Indyzen, convincing Dobson that such proposals and negotiations were favorable to Parkridge.

85.     As CEO of Indyzen, Narra controlled Indyzen and accordingly, at the time he made the misrepresentations, he knew and/or had no reasonable ground to believe that Indyzen was the best possible value for software development services.

86.     Narra intended to induce Parkridge to contract with Indyzen so that he, as CEO of Indyzen, and Indyzen, his company, could profit from the Agreement with Parkridge, to the detriment of Parkridge.

87.     At the time that Narra misrepresented that Indyzen was the best value for software development, Narra intended to make a substantial profit by overcharging Parkridge for an inferior application.

88.     In other words, Narra acted in his own interests, and/or the interests of entities other than Parkridge, in facilitating the Agreement, even though he knew, or was recklessly or grossly negligent in not knowing, that it would result in harm to Parkridge.

89.     At a minimum, Narra was willfully blind to the foreseeable disastrous consequences of the Agreement, and acted with gross negligence and/or recklessness in advocating for and facilitating a transaction that would result in harm to Parkridge.

90.     Narra failed to exercise the necessary care, and breached his respective duties of good faith, care, and loyalty.

91.     Narra breached his duties by engaging in self-dealing by advocating for and facilitating execution of the Agreement with Indyzen even though it favored interests (including his own) other than those of Parkridge, which he was obligated, as its CTO, to serve.

92.     Narra also breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen had the skills and know-how to successfully develop the Morfit App, when it did not.

93.     Narra further breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that the price Indyzen offered was the best possible value for the Morfit App, despite knowing that the Morfit App could be built at a lower price.

94.     Furthermore, Narra breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen would make the Morfit App operational in time for Parkridge's planned launch, when he either knew Indyzen could not do so or he had no reasonable basis for believing Indyzen could do so.

95.     Additionally, Narra breached his duties by designing the Agreement to benefit himself and his company, and not in a genuine effort to advance the welfare of Parkridge.

96.     Narra also breached his duties by acting in bad faith and failing in his duty as Parkridge's CTO, to make a reasonable inquiry about other entities, aside from his own, that could have successfully built the Morfit App at a lower price.

97.     Narra breached his duties by neglecting to require Indyzen to provide Parkridge with presentations and updates during Phase I and Phase II development, which would have been in Parkridge's best interests.

98.     Narra further breached his duties by acting in bad faith and failing in his duty as Parkridge's CTO, to advise Dobson to perform acceptance testing during Phase I and Phase II of the Morfit App development, which would have been in Parkridge's best interests.

99.     Narra also breached his duties by acting against Parkridge's best interests by representing to Dobson that the Morfit App met the Agreement's specifications in order to induce Dobson to give quality and acceptance approval.

100.    Narra failed to act in the best interest of Parkridge, and instead acted in his own interest, as CEO of Indyzen, and in the interests of Indyzen.

101.   Narra knowingly and intentionally acted in the sole pursuit of his personal interest and for the purpose of furthering Indyzen's welfare.

102.   Narra did not act in order to achieve any benefit for Parkridge in either the short term or long term.

103.   Narra's actions were adverse to Parkridge's interests.

104.   Narra engaged in self-dealing, did not act in good faith, and failed to exercise a reasonable amount of prudence and care as CTO, and therefore Narra breached his respective fiduciary duties to Parkridge.

105.   Parkridge has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Narra.

106.   Accordingly, Plaintiff Parkridge is entitled to judgment against Narra in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement and the breach of fiduciary duties by Director and CTO Narra.

**COUNT II**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW**

107.   Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-106 as if fully set forth herein.

108.   Narra owed Parkridge fiduciary duties of good faith, care, and loyalty.

109.   As alleged above, Narra breached his respective duties of good faith, care, and loyalty.

110.   Narra was a founder, CEO, and member of Indyzen's board of directors at the time he was also Parkridge's CTO.

111.   There exists a unity of interest between Narra and Indyzen such that any individuality and separation between them has ceased to exist.

112.   Given this relationship, Indyzen knew or should have known of Narra's service as Parkridge's CTO and director in 2015 and 2016 and that Narra had the fiduciary duties alleged above.

113.   Given this relationship, Indyzen knew or should have known Narra was interested in, and/or lacked independence with respect to Parkridge.

114.   Given this relationship, Indyzen knew or should have known that Narra had a fiduciary duty to represent the interests of Parkridge to the exclusion of other interests, and that Narra separately had duties to Parkridge that were different from and inconsistent with Narra's duties to Indyzen.

115.   Indyzen knew or should have known that Narra had an interest in obtaining the highest Agreement price possible, and that this interest was inconsistent with Parkridge's interest.

116.   Indyzen knowingly exploited these conflicts of interest and substantially participated in the breaches of fiduciary duty.

117.   Indyzen participated in Narra's breaches by proposing terms for the Agreement, despite knowing it could not successfully meet those terms, or by negligently or recklessly representing that it could successfully meet those terms.

118.   Indyzen also participated in Narra's breaches by concealing its lack of qualifications and inability to meet the functional specifications and deadlines set by the Agreement and discussed by the parties.

119.   Indyzen further participated in Narra's breaches by proposing an inflated Agreement price that was detrimental to the interests of Parkridge.

120.   Furthermore, Indyzen participated in Narra's breaches by continuing its routine operations, which constituted substantial participation in Narra's breaches of fiduciary duties and acted to further Narra's breaches.

121.   Indyzen thereby aided and abetted the breaches of fiduciary duties by Narra, and was an active and knowing participant in those breaches of fiduciary duties.

122.   Parkridge has been substantially damaged as a direct and proximate result of the actions and operations of Indyzen in aiding and abetting the breaches of fiduciary duties set forth fully herein.

123.   Accordingly, Plaintiff Parkridge is entitled to judgment against Indyzen in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement, the breaches of fiduciary duties by Narra, and the aiding and abetting in those breaches by Indyzen.

**COUNT III**
**BREACH OF FIDUCIARY DUTY UNDER HONG KONG LAW**

124.   Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-123 as if fully set forth herein.

125.   Pursuant to Hong Kong Companies Ordinance Part 10, Division 2, § 465 (1)-(2), and as Director, Vice Chairman, and CTO of Parkridge, Narra received confidential information from Parkridge about development of the Morfit App, and thus owed Parkridge fiduciary duties of reasonable care, skill, and diligence while performing his functions and exercising his powers for Parkridge.

126.   Pursuant to Hong Kong Companies Ordinance, Part 11, Division 5, § 536(1), and as Director, Vice Chairman, and CTO of Parkridge, Narra owed Parkridge a duty to declare all material interests in a transaction, arrangement or contract or a proposed transaction, arrangement or contract with a company where the director's interest is material.

127. As a director and CTO at Parkridge, Narra had a duty of care to act in good faith in the interest of the company as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

128. As director and CTO of Parkridge, Narra had a duty of skill to exercise his powers for the proper purpose, as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

129. As director and CTO of Parkridge, Narra was obligated by his duty of diligence to avoid conflicts of duty and interest that he may possess that are not shared by Parkridge generally, as may reasonably be expected of a director carrying out the functions of a company with his unique general knowledge, skill, and experience.

130. Narra controlled and was founder and CEO of Indyzen, which entered into an Agreement with Parkridge on January 5, 2015, to build the Morfit App.

131. As a result, Narra was interested in, and failed to act independently with respect to, the Agreement between Indyzen and Parkridge.

132. Narra failed to exercise the necessary care, and breached his respective duties of reasonable care, skill, and diligence.

133. Narra breached his duties by engaging in self-dealing by advocating for and facilitating consummation of the Agreement with Indyzen even though it favored interests (including his own) other than those of Parkridge, which he was obligated as its CTO to serve.

134. Narra also breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen had the skills and know-how to successfully develop the Morfit App when it did not.

135. Narra additionally breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that the price Indyzen offered was the best

possible value for the Morfit App, despite knowing, as someone with Narra's technical skills, knowledge, and experience would know, that the Morfit app could be built at a lower price.

136.    Narra further breached his duties by engaging in self-dealing by representing to Parkridge, which he was obligated as its CTO to serve, that Indyzen would make the Morfit App operational in time for Parkridge's planned launch, when he either knew Indyzen could not do so or had no reasonable basis for believing Indyzen could do so.

137.    Additionally, Narra breached his duties by designing the Agreement to benefit himself and his company, and not in a genuine effort to advance the welfare of Parkridge.

138.    Furthermore, Narra breached his duties by acting in bad faith and failing in his duty, as Parkridge's CTO, to make a reasonable inquiry about other entities, aside from his own, that could successfully build the Morfit App at a lower price.

139.    Narra also breached his duties by neglecting to require Indyzen to provide Parkridge with presentations during Phase I and Phase II development, which would have been in Parkridge's best interests.

140.    Narra breached his duties by acting in bad faith and failing in his duty, as Parkridge's CTO, to advise Dobson to perform acceptance testing during Phase I and Phase II of the Morfit App development, which would have been in Parkridge's best interests.

141.    Narra also breached his duties by acting against Parkridge's best interests by representing to Dobson that the Morfit App met the Agreement's specifications in order to induce Dobson to give quality and acceptance approval.

142.    Narra breached his duty to declare his material interests in a transaction, arrangement or contract and/or proposed transaction, arrangement or contract when he failed to declare to Parkridge directors that he had a material interest in Parkridge's Agreement with Indyzen, and that he would benefit directly from such Agreement.

143.   Narra failed to act in the best interest of Parkridge, and instead acted in his own interest, as CEO of Indyzen, and in the interests of Indyzen.

144.   Narra knowingly and intentionally acted in the sole pursuit of his personal individual interest and for the purpose of furthering Indyzen's welfare.

145.   Narra did not act in order to achieve any benefit for Parkridge in either the short or long term.

146.   Narra abused his position and engaged in actions that did not confer any benefit upon Parkridge and that could never have conferred any benefit upon Parkridge.

147.   Narra's actions were adverse to Parkridge's interests and he acted in service of interests wholly separate and distinct from those of Parkridge, which he was obligated, as its CTO, to serve.

148.   Narra failed to act in the interests of Parkridge, failed to exercise his powers as CTO for the proper purpose, failed to avoid conflicts of duty and interest between Parkridge and Indyzen, and failed to declare his material interests in the Agreement to Parkridge directors; Narra therefore breached his respective fiduciary duties to Parkridge.

149.   Parkridge has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Narra.

150.   Accordingly, Plaintiff Parkridge is entitled to judgment against Director and CTO Narra in an amount to be determined at trial, including but not limited to the damages incurred by Parkridge as a result of the Agreement and the breaches of fiduciary duties by Narra.

**COUNT IV**
**BREACH OF CONTRACT, INCLUDING BREACH**
**OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

151.   Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-150 as if fully set forth herein.

152.   The parties negotiated and signed a contract for the development of the Morfit App in 2015.

153.   The Agreement, entered into between Parkridge and Indyzen on January 5, 2015, was and is a binding and enforceable agreement, supported by mutual assent and consideration.

154.   Parkridge performed and continues to perform all of its obligations under the Agreement, except as performance thereof has been excused by the acts, conduct and/or omissions of Indyzen.

155.   Indyzen breached the Agreement by failing to meet the functional specifications set in the Agreement.

156.   Indyzen further breached the Agreement by failing to provide the Morfit App in time for Parkridge's launch.

157.   Indyzen also breached the Agreement by withholding delivery of the Morfit App despite having been paid by Parkridge.

158.   These actions by Indyzen constitute a breach of the duty of good faith.

159.   Parkridge has been substantially damaged as a result of these breaches because Parkridge experienced damages for the delay in the released app and lost opportunity.

160.   Accordingly, Plaintiff Parkridge is entitled to recover damages from Indyzen in an amount to be determined at trial, and is entitled to reasonable sums for attorneys' fees in the discretion of the Court.

STATEMENT OF CLAIMS                    21

161.    Plaintiff Parkridge also requests relief in the form of enjoining Indyzen from distributing the Morfit App and/or Parkridge's wrongfully withheld deliverables to third parties.

## COUNT V
## UNJUST ENRICHMENT (IN THE ALTERNATIVE)

162.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-161 as if fully set forth herein.

163.    By virtue of receipt of payments from Parkridge and through Indyzen's failure to deliver the Morfit App on time with functions that meet the Agreement's functional specifications, Indyzen is therefore liable to Parkridge for unjust enrichment.

164.    Plaintiff Parkridge seeks restitution from Indyzen and an order from this Court disgorging all payments, transfers and other things of value obtained by Indyzen as a result of its wrongful conduct.

165.    By virtue of the above, Indyzen is liable to reimburse Parkridge for the amount of payments, transfers and other things of value it received in connection to the Agreement.

## COUNT VI
## FRAUDULENT MISREPRESENTATIONS

166.    Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-165 as if fully set forth herein.

167.    Narra, on behalf of Indyzen, knowingly and intentionally misrepresented Indyzen's skills, qualifications and pricing in an effort to induce Parkridge to execute the Agreement.  These misrepresentations were made on or about January 5, 2015, and are contained in the Agreement.

168.    In order to induce Parkridge into executing the Agreement with Indyzen and to create the illusion that Indyzen was offering Parkridge a special discount, Narra misrepresented that

STATEMENT OF CLAIMS                     22

the usual price of Phase I development was $420,000 and that $120,000 was the steeply discounted price he would offer Parkridge.

169.     In reality, Narra knew that even $120,000 for Phase I development was a "substantial rip off" and that the same generic application could be developed for a much lower price.

170.     In order to further induce Parkridge into executing the Agreement with Indyzen, Narra also misrepresented that Indyzen could build the Morfit App to meet certain functional specifications desired by Parkridge, despite knowing that Indyzen did not have the skills, resources or know-how to do so.

171.     In order to induce Parkridge into executing the Agreement with Indyzen, Narra further represented that Indyzen could successfully develop the Morfit App in time for Parkridge's launch, when Narra knew it could not and had no reasonable basis for believing Indyzen could do so.

172.     In order to induce Parkridge into executing the Agreement with Indyzen, Narra further misrepresented that Indyzen was the best possible value for software development services, despite knowing it was not.

173.     Narra's and Indyzen's affirmative representations that it could and would build the Morfit App successfully at a lower price than other companies, in time for Parkridge's launch, and that Indyzen was the best possible value for software development services, were representations that Parkridge considered important in its choice of contractors.

174.     Because Parkridge relied substantially on Narra's misrepresentations in choosing to contract with Indyzen, Narra's misrepresentations were material.

175.     Narra's misrepresentations were false because Indyzen did not have the resources, skills, or know-how to develop the Morfit App in accordance with Parkridge's functional standards, time restraints, and/or specifications.

STATEMENT OF CLAIMS                                    23

176.   Narra's representations were also false because $120,000 was not a discount and/or was not lower than the usual cost of developing such an application.

177.   As CEO of Indyzen, Narra controlled Indyzen and accordingly, at the time he made the misrepresentations, he knew and/or had no reasonable ground to believe that Indyzen was the best possible value for software development services.

178.   Narra intended to induce Parkridge to contract with Indyzen so that he, as CEO of Indyzen, and Indyzen, his company, could profit from the Agreement with Parkridge, to the detriment of Parkridge.

179.   At the time that Narra misrepresented that Indyzen was the best value for software development, Narra intended to make a substantial profit by overcharging Parkridge for an inferior application.

180.   Parkridge was unaware Narra's representations were false, and justifiably relied upon Narra's assurances when it agreed to contract with Indyzen and subsequently signed the Agreement with Indyzen.

181.   Narra's fraudulent misrepresentations are the direct and proximate cause of Parkridge's injuries.

182.   Accordingly, Plaintiff Parkridge is entitled to judgment against Narra in an amount to be determined at trial, including but not limited to the amount of harm incurred by Parkridge as a result of the Agreement and Narra's fraudulent misrepresentations.

## COUNT VII
## FRAUDULENT CONCEALMENT

183.   Parkridge and Mak incorporate the allegations from the preceding paragraphs 1-182 as if fully set forth herein.

184.    By virtue of the fiduciary relationship that existed between Parkridge and Narra, and the fact that Narra had superior expertise and knowledge about the development of the Morfit App, that Narra planned the Agreement between Parkridge and Indyzen, and assisted in organizing the deal, and the relationship of trust and confidence that existed between Parkridge and Narra, and that Narra knew Parkridge was acting upon his guidance, Narra had an obligation to disclose to Parkridge all material information and all matters necessary to make his representations not misleading regarding the Agreement.

185.    Beginning on or about January 1, 2015, and January 5, 2015, Narra had communications with Parkridge concerning contracting with Indyzen for the Morfit App development.  Narra nevertheless failed to disclose material information to Parkridge about the deal and also failed to disclose matters necessary to make other representations he had made not misleading.

186.    Narra concealed that $120,000 was not a discount price for Phase I development of the Morfit App.

187.    Narra also concealed that an application similar to Parkridge's could be developed at a lower price than the one offered by Indyzen.

188.    Narra concealed that Indyzen did not have the skills, resources and know-how to build the Morfit App in line with Parkridge's time constraints and/or functional specifications.

189.    Narra further concealed that Indyzen was not the best possible value for software development services.

190.    Additionally, Narra concealed that he did not have a good faith basis for advising Parkridge to contract with Indyzen for development of the Morfit App.

191.    At the time that Narra concealed and/or failed to disclose the above-described facts to Parkridge, he knew that the facts existed and deliberately concealed them from Parkridge.

STATEMENT OF CLAIMS                                    25

192.   Narra knew that these facts were not known to Parkridge and were not reasonably discoverable by Parkridge because Parkridge did not have access to this information personally, but instead relied upon Narra, as its CTO, to relay such information to Parkridge.

193.   The suppression and concealment of the above-described facts misled Parkridge to enter into an Agreement with Indyzen for the development of the Morfit App.

194.   Parkridge, at the time these failures to disclose and suppression of facts occurred, and at the time Parkridge took the actions alleged above, was ignorant of the existence of the facts that Narra suppressed and failed to disclose.

195.   Had Parkridge been aware of the existence of the facts not disclosed by Narra, Parkridge would not have entered into the Agreement with Indyzen.

196.   As a direct and proximate result of the fraudulent conduct of Narra as alleged herein, Plaintiff was induced to pay $420,000 in the deal and thereafter lost that sum when Indyzen wrongfully withheld the deliverables for which Parkridge paid.

197.   Narra intentionally concealed the above material facts known to Narra and made the above mentioned misrepresentations with the intention of depriving Parkridge of its funds and the application, and Plaintiff Parkridge is therefore entitled to an award of punitive damages.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs Parkridge and Mak respectfully request that this Court:

1. Enter judgment in favor of Parkridge on each of its claims;

2. Award Parkridge damages, actual, special, compensatory, exemplary and/or punitive, in an amount of U.S. $2.8 million, or in such other amount as is proven at trial;

3. Enjoin Indyzen from distributing, releasing, or selling the Morfit App or Parkridge's Intellectual Property;

4. Order Indyzen to provide Parkridge the Morfit App and its Intellectual Property;

STATEMENT OF CLAIMS                                26

5. Award Parkridge all of its costs and reasonable attorneys' fees in this action as authorized by the Agreement and other applicable laws; and

6. Grant to Parkridge such other relief as may be just and warranted under the circumstances.

DATED: June 8, 2017

Respectfully submitted,

By: /s/ Adam Wolek
Adam Wolek
Brian Noack
Wolek & Noack
333 S. Wabash Avenue
Suite 2700
Chicago, IL 60604
P:312.860.9006
F: 708.843.0509
adamw@wonoip.com
briann@wonoip.com
***Attorneys for Claimants Parkridge Ltd. and Mabel Mak***

692106-v1/7065-04600

# EXHIBIT A

SHAREHOLDERS AGREEMENT

PARKRIDGE LIMITED

DATED

1 JANUARY 2015

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 4 |
| 2. | THE BUSINESS OF THE JVC | 7 |
| 3. | SHARE CAPITAL | 7 |
| 4. | MANAGEMENT STRUCTURE OF THE JVC | 8 |
| 5. | BOARD OF DIRECTORS | 8 |
| 6. | GENERAL MEETING OF SHAREHOLDERS | 10 |
| 7. | FINANCE FOR THE JVC | 11 |
| 8. | RESTRICTIONS ON THE PARTIES | 11 |
| 9. | THE BUSINESS PLAN | 13 |
| 10. | ACCOUNTING | 14 |
| 11. | DIVIDEND POLICY | 14 |
| 12. | INTELLECTUAL PROPERTY | 14 |
| 13. | TRANSFER OF SHARES/RIGHT OF FIRST REFUSAL | 15 |
| 14. | OBLIGATORY TRANSFER EVENT | 16 |
| 15. | PRE-EMPTION RIGHTS | 18 |
| 16. | DRAG-ALONG RIGHTS | 18 |
| 17. | TAG-ALONG RIGHTS | 19 |
| 18. | EXPERT | 21 |
| 19. | TERMINATION AND LIQUIDATION | 22 |
| 20. | TERMINATION FOLLOWING DEADLOCK | 26 |
| 21. | STATUS OF AGREEMENT | 26 |
| 22. | CONFIDENTIALITY | 27 |
| 23. | WARRANTY | 28 |
| 24. | WHOLE AGREEMENT | 29 |
| 25. | ASSIGNMENTS | 29 |
| 26. | VARIATION AND WAIVER | 30 |

2

27.   COSTS ................................................................................................... 30

28.   GOOD FAITH ......................................................................................... 30

29.   THIRD PARTY RIGHTS .......................................................................... 30

30.   NOTICE .................................................................................................. 31

31.   LANGUAGE ............................................................................................ 32

32.   SEVERANCE ............................................................................................ 32

33.   FURTHER ASSURANCE ........................................................................... 32

34.   COUNTERPARTS ..................................................................................... 32

35.   AGREEMENT SURVIVES CLOSING .......................................................... 32

36.   GOVERNING LAW AND JURISDICTION ................................................... 33

**THIS SHAREHOLDERS' AGREEMENT ("Agreement")** is entered into as of 1 January 2015 ("**Effective Date**"), by and between:

(1)     **Ms. Mabel Mak,** an individual with passport no. BA686615 issued by the Immigration Department, the Government of the Hong Kong Special Administrative Region with a residential address at 11A Bo Shek Mansion Block 1, 328 Sha Tsui Road, Tsuen Wan, Hong Kong ("**Mabel**"); and

(2)     **Mr. Parasurama Naidu Narra,** an individual with passport no. P3307180 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 19-9-11/2, Lakshmi Puram, Tiruchanoor Road, Tirupati, A.P - 517501, India ("**PN**").

Each party is referred to as "**Party**" and collectively referred to as "**Parties**".

**BACKGROUND**

This Agreement is entered into for the purpose of regulating the relationship between the Parties as the Shareholders of the JVC and setting out the rights and obligations of the Parties in respect of the JVC.

**AGREED TERMS**

1.      **INTERPRETATION**

1.1.     The definitions and rules of interpretation in this clause apply in this Agreement.

   **Articles of Association:** memorandum and articles of association of the JVC as may be amended or supplemented from time to time.

   **Beta Version:** a version of the Product that is made available for testing by a limited number of users outside the JVC before its general release.

   **Board:** board of directors of the JVC as constituted from time to time.

   **Business:** has the meaning given in clause 2.

   **Business Day:** a day (other than a Saturday or Sunday) when banks in Hong Kong are open for business.

   **Business Plan:** has the meaning given in clause 9.

   **Confidential Information:** has the meaning given in clause 22.

   **Control:** in relation to a body corporate, means the power of a person to secure that the affairs of the body corporate are conducted in accordance with the wishes of that person:

   (a)     by means of the holding of shares, or the possession of voting power, in or in relation to that or any other body corporate; or

4

(b)   by virtue of any powers conferred by the constitutional or corporate documents, or any other document, regulating that or any other body corporate,

and a **Change of Control** occurs if a person who controls any body corporate ceases to do so or if another person acquires control of it.

**Core Intellectual Property:** means all patents, patent applications, registered designs and applications thereof, copyright material, computer software, technical information, inventions, trademarks, trade secrets, and all applications and registrations thereof that relate to the fundamental essence of the Product or Business, which are set forth in Schedule 1.

**Directors:** directors from time to time of the JVC.

**Encumbrance:**   includes any mortgage, charge, pledge, lien, hypothecation, guarantee, trust, right of set-off or other third party right or interest including any assignment by way of security, reservation of title or other security interest of any kind, howsoever created or arising, or any other agreement or arrangement (including a sale and repurchase agreement) having similar effect.

**Expert:** a person appointed in accordance with clause 18 to resolve a matter under this Agreement.

**Fair Value:** the value of shares determined in accordance with clause 14.

**Financial Year:** in relation to the JVC, means a financial accounting period of 12 months ending on the date given in clause 4.7.

**JVC:** Parkridge Limited, a company established under the laws of Hong Kong with certificate of incorporation no. 1956916 issued by the Registrar of Companies of Hong Kong Special Administrative Region on 23 August 2013.

**Minority Shareholders:** Shareholders, individually or collectively holding less than five percent of the shares in the JVC.

**Notice of Obligatory Transfer Event:** has the meaning given in clause 14.2.

**Obligatory Transfer Event:** in relation to a Party, any event specified in clause 14.1 that happens to that Party.

**Praveen Narra Kumar:** Mr. Praveen Narra Kumar, an individual with passport no. Z1418789 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 2107 Ashley Ridge Ct, San Jose, CA 95138, United States of America.

**Product:** a piece of social media networking software to be developed by the JVC for the purposes of its Business.

**Product Development Period:** means the period commencing 1 January 2015 until the termination of this Agreement.

**Reserved Matters:** matters requiring the written approval of all Shareholders as set out in Schedule 2.

5

**Robin:** Ms. Robin Starbuck Farmanfamaian, an individual with passport no. 058264790 issued by Department of State of the United States of America with a residential address at 360 Forest Ave Apt 506, Palo Alto, CA 94301 United States of America.

**Shareholders:** the holders of the shares in the JVC.

1.2.   Clause, schedule and paragraph headings do not affect the interpretation of this Agreement.

1.3.   A reference to a clause or a schedule is a reference to a clause of, or a schedule to, this Agreement. A reference to a paragraph is to a paragraph of the relevant schedule.

1.4.   A **person** includes an individual, a corporation, partnership, limited liability company, association, trust, unincorporated organization, or other legal entity or organization, or a government body.

1.5.   Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.6.   Unless the context otherwise requires, a reference to one gender includes a reference to the other genders.

1.7.   All warranties, representations, agreements and obligations expressed to be given or entered into by more than one person are given or entered into jointly and severally by the persons making the warranties and representations or entering into the agreements or obligations.

1.8.   A reference to a law is a reference to it as it is in force from time to time taking account of any amendment, extension, application or re-enactment and, includes any subordinate legislation for the time being in force made under it, provided that, as between the parties, no such amendment, extension, application or re-enactment shall apply for the purposes of this Agreement to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any Party.

1.9.   **Writing** or **written** includes faxes but no other electronic form.

1.10.   Documents in **agreed form** are documents in the form agreed by the parties and initialled by them or on their behalf for identification.

1.11.   A reference in this Agreement to a document is a reference to the document whether in paper or electronic form.

1.12.   Where the words **include(s), including** or **in particular** are used in this Agreement, they are deemed to have the words "without limitation" following them and where the

6

context permits, the words **other** and **otherwise** are illustrative and shall not limit the sense of the words preceding them.

1.13.   Any obligation in this Agreement on a person not to do something includes an obligation not to agree, permit, allow, or acquiesce in that thing to be done.

**2.   THE BUSINESS OF THE JVC**

2.1.   The **Business** of the JVC is to operate and maintain the Product in the health and wellness sector.

2.2.   Each Party shall use its reasonable endeavours to promote, develop and protect the interests of the Business of the JVC to the best advantage of the JVC.

**3.   SHARE CAPITAL**

3.1.   All shares issued by the JVC are ordinary shares. The total authorized share capital of the JVC shall be HK$ 10,000 divided 10,000 shares of HK$ 1 par value each.

3.2.   Each Shareholder has the right to maintain the same percentage of share ownership in the JVC, until the JVC receives third party equity funding on terms acceptable to each Shareholder, or as otherwise agreed in writing between the Parties.

3.3.   The shareholding of the JVC is as set out below:

| No. | Shareholders | No. of Shares | Percentage (%) |
|-----|--------------|---------------|----------------|
| 1. | Mabel Mak | 7000 | 70% |
| 2. | Parasurama Naidu Narra | 3000 | 30% |
| Total | | 10,000 | 100% |

3.4.   Mabel shall subscribe and be issued by the JVC 7000 shares, equivalent to 70% of the total shares of the JVC ("**Mabel Shares**"). Mabel shall also be expected to contribute to the JVC in accordance with Schedule 3.

3.5.   PN shall subscribe and be issued by the JVC 3000 shares, equivalent to 30% of the total shares of the JVC ("**PN Shares**"). PN shall also be expected to contribute to the JVC in accordance with Schedule 4.

7

3.6.   Notwithstanding anything else in this Agreement, PN agrees that Mabel may, at her absolute discretion, transfer from the Mabel Shares to Robin 0.5208% of the total shares of the JVC (**"Robin Shares"**). Such shares shall only be transferred or issued to Robin in stages, within the period of May 2014 to September 2014.

3.7.   PN shall waive all pre-emption rights arising in connection with any transfer by Mabel of the Robin Shares to Robin.

3.8.   For the avoidance of doubt, PN shall not be expected to transfer any PN Shares to Robin.

3.9.   However and subject to clause 13, if additional shares beyond the Robin Shares are required to be transferred to Robin or to other future Shareholders, both Mabel and PN shall participate pari passu in such share transfer and their respective percentage of shareholding in the JVC shall be reduced accordingly.

**4.   MANAGEMENT STRUCTURE OF THE JVC**

4.1.   The chairman and chief executive officer shall be Mr. Randy Gene Dobson.

4.2.   The vice chairman and chief technology officer shall be Mr. Praveen Kumar Narra.

4.3.   The company secretary shall be Secreco Limited with a head office is located at the 8th Floor, Gloucester Tower, the Landmark, 15 Queen's Road Central, Hong Kong.

4.4.   The auditors shall be _____.

4.5.   The bankers shall be Hong Kong and Shanghai Bank Corporation (Hong Kong).

4.6.   The Financial Year shall end on 31 December in each year.

**5.   BOARD OF DIRECTORS**

5.1.   The Board has responsibility for the supervision and overall management of the JVC and its Business, in a manner which is consistent with the then current Business Plan as approved by the Directors from time to time.

5.2.   The Board shall initially consist of three Directors and Mabel shall have the right to nominate two Directors for appointment and PN shall have the right to nominate one Director for appointment, provided that in the event PN's total shareholding in the JVC shall for any reason fall below 10%, his entitlement to nominate one Director shall cease. If the Shareholders unanimously agree, the number of Directors comprising the Board may be increased from time to time. Each Shareholder agrees to procure the appointment of the Directors nominated by the other Shareholder in the manner set out in this clause.

8

5.3.   For the purposes of clause 5.3, the following three Directors shall be appointed:

    (a)   Mabel shall appoint:

        (i)   Mr. Randy Dobson, an individual with passport no. 488442801 issued by Department of State of the United States of America with a residential address at EA2-7-1 Riverside Residence, Tan Phu Ward, District 7, Ho Chi Minh City, Vietnam; and

        (ii)   Mr. Mark Charles Oakley, an individual with passport no. 761331611 issued by the Identity & Passport Service of the United Kingdom of Great Britain and Northern Ireland with a residential address at B2-1106 City Garden Apartment, 59 Ngo Tat To Street, Ward 21, Binh Thanh District, Ho Chi Minh City, Vietnam.

    (b)   PN shall appoint:

        (i)   Mr. Praveen Kumar Narra, an individual with passport no. Z1418789 issued by Consular, Passport and Visa Division, Ministry of External Affairs, Government of India with a residential address at 2107 Ashley Ridge Ct, San Jose, CA 95138, United States of America.

5.4.   In the event that a seat on the Board becomes vacant, the Shareholder entitled to nominate the Director previously holding such seat shall have the right to fill such vacancy, and the Shareholders shall procure the appointment of such nominee. In the event that a Shareholder wishes to remove a Director previously nominated by it, it shall give notice to the other Shareholder to such effect whereupon the Shareholders shall procure such removal accordingly. In no case shall any Shareholder seek to remove a Director nominated by the other Shareholder unless the other Shareholder shall have so requested in writing.

5.5.   Subject to the provisions in this Agreement, the Directors shall have all the authority granted to the directors in the Articles of Association and, to the extent not expressly provided therein, under the laws of Hong Kong.

5.6.   The quorum of any Board meeting shall be three Directors, who may attend in person or by telephone or video conference. In the event all Directors have received proper notice of the meeting and a quorum is not present at the meeting, (i) the meeting may be adjourned for not less than ten Business Days and may be rescheduled with proper notice to all Directors of the new time and place for the meeting, and (ii) when the adjourned meeting resumes, a quorum for such meeting will be two Directors then comprising the Board, which shall include one Director nominated by Mabel and one Director nominated by PN.

5.7.   At any meeting of the Board, each Director shall have one vote with respect to each matter upon which action is to be taken. Subject to clause 6.2 and 6.9, all decisions involving Reserved Matters shall be passed by a unanimous vote of the Directors present at the meeting and all other decisions shall be by a majority vote of the Directors present at the meeting. The Board may also approve actions by unanimous written consent, which such written consent shall have the same force and effect as a resolution duly passed at a meeting of the Board.

9

5.8. All Directors shall serve without compensation, but shall be reimbursed by the JVC for all out of pocket travel, lodging, food and incidental expenses incurred in connection with their attendance at Board meetings and their other duties performed on behalf of the JVC. The Parties agree that they will cause the Board to meet at least once in each calendar quarter in such locations as the Board may from time to time determine.

6. **GENERAL MEETING OF SHAREHOLDERS**

6.1. The general meeting of shareholders ("**General Meeting of Shareholders**") shall be the highest authority of the JVC and shall pass decisions within its power and authority by way of voting at meetings (or passing written resolutions) with respect to such matters as may be agreed between the Parties and such other matters required under the laws of Hong Kong.

6.2. Any decision on any Reserved Matters requires the written consent and approval of Shareholders who together represent not less than 80% of the total share capital of the JVC.

6.3. General Meeting of Shareholders shall be held regularly at least once every year and shall be held upon request of the Chairman or request of a Shareholder that represents not less than 20% of the share capital of the JVC.

6.4. Each General Meeting of Shareholders shall, unless otherwise agreed by the Parties, be held at the registered address of the JVC or in such places as the General Meeting of Shareholders shall determine from time to time.

6.5. Meetings shall be held 30 Business Days from the date of the notice thereof, provided that the Shareholders may waive such notice by unanimous written consent. The Chairman shall be responsible for giving such notice and for convening and presiding over the meeting. No final decision shall be reached at a meeting of the General Meeting of Shareholders on any matter which has not been specified in the agenda contained in the notice convening such meeting unless each of the Shareholder represented on the General Meeting of Shareholders is present or so represented.

6.6. General Meeting of Shareholders shall be held when the number of participating Shareholders represents at least 80% of the share capital of the JVC.

6.7. If a Shareholder is unable to participate in a General Meeting of Shareholders, such Shareholder may issue an authorisation/power of attorney signed by such Shareholder and/or entrust a proxy to participate in the meeting or to sign a resolution on his behalf. The attorney-in-fact or proxy, who may, but is not required to be a Shareholder, shall have the same rights and powers as the absent Shareholder. If no representative is appointed by the absent Shareholder to attend a meeting or to sign a resolution of the General Meeting of Shareholders, the absent Shareholder shall be deemed to have waived his right to participate or vote in such resolution and decisions made at such meeting shall be binding upon him. No proxy shall be appointed who is, in the reasonable opinion of the General Meeting of Shareholders, associated with any company, organisation which it would be commercially inappropriate to allow to participate in the General Meeting of Shareholders.

10

6.8.   Each share in the JVC shall equal one vote. Each Shareholder shall be entitled to vote in accordance with their respective shareholding of the Party in the JVC for which he is authorised to represent.

6.9.   All resolutions by the General Meeting of Shareholders to be validly adopted must be signed affirmatively by the Shareholders present and voting pursuant to this clause 6. In lieu of a meeting of the General Meeting of Shareholders, a written resolution may be adopted by the General Meeting of Shareholders and shall be deemed to have been validly adopted by the General Meeting of Shareholders if such resolution is sent to all Shareholders and is approved by the Shareholders representing at least 80% of the share capital of the JVC for a Reserved Matter or 51% of the share capital of the JVC for all other matters.

6.10.  The minutes of a General Meeting of Shareholders shall be prepared in English and signed by every attending Shareholders or a proxy authorised to attend such a meeting. The original signed minutes shall be kept on file in the head office of the JVC or as otherwise agreed by the Parties and copies thereof shall be provided to each Shareholder upon request.

7.     **FINANCE FOR THE JVC**

The Parties envisage that for the Business and operation of the JVC shall be initially financed by the following ("**Initial Funding**"), further details of which are set out in Schedules 3 and 4:

   (a)   a loan from Mabel up to a maximum amount of US$ 1,000,000; and

   (b)   a loan from PN in the form of a discounted service fee arranged by PN with a value of US$ 300,000.

Subject to clause 3.2, the Parties acknowledge that the terms of the financing must be acceptable to all Shareholders.

Beyond the Initial Funding, if the JVC needs any additional funding for the operations and expansion of the JVC, the JVC may seek a loan from its principal bankers subject to written approvals from each of the Shareholders.

There is no obligation on the Parties to provide any further finance to the JVC but, if they do so, the Parties shall each provide the amount proportionate and equivalent to their respective shareholding in the JVC on the same terms unless they agree otherwise in writing.

8.     **RESTRICTIONS ON THE PARTIES**

8.1.   Neither Party may, unless otherwise agreed in writing by the other Party and the JVC, during the times specified below, carry on or be employed, engaged or interested in any business which would be in competition with any part of the Business of the JVC including any developments in the Business after the Effective Date. The times during which these restrictions apply are:

11

      (a)    any time when the Party in question is a Shareholder; and

      (b)    for a period of two years after the Party in question ceases to be a Shareholder.

8.2.    Neither Party may, during the times specified below, deal with or seek the custom of any person that is, or was within the previous twelve months, a client or customer of the JVC or, where the party is no longer a Shareholder, any person that was a client or customer of the JVC at any time during the period of twelve months immediately preceding the Party in question ceasing to be a Shareholder. The times during which these restrictions apply are:

      (a)    any time when the Party in question is a Shareholder; and

      (b)    for a period of two years after the party in question ceases to be a Shareholder.

8.3.    Neither Party may, during the times specified below, offer employment to, enter into a contract for the services of, or attempt to solicit or seek to entice away from the JVC any individual who is, at the time of the offer or attempt a director, officer or employee holding an executive or managerial position with the JVC, or procure or facilitate the making of any such offer or attempt by any other person. The times during which these restrictions apply are:

      (a)    any time when the party in question is a Shareholder; and

      (b)    for a period of two years after the Party in question ceases to be a Shareholder.

8.4.    Neither Party may, during the times specified below, solicit or endeavour to entice away from the JVC any supplier who supplies, or has supplied within the previous twelve months, goods AND/OR services to the JVC or, where the party is no longer a Shareholder, any supplier who has supplied goods AND/OR services to the JVC at any time during the period of twelve months immediately preceding the Party in question ceasing to be a Shareholder if that solicitation or enticement causes or would cause such supplier to cease supplying, or materially reduce its supply of, those goods AND/OR services to the JVC. The times during which these restrictions apply are:

      (a)    any time when the party in question is a Shareholder; and

      (b)    for a period of two years after the party in question ceases to be a Shareholder.

8.5.    The undertakings in this clause are given by each Party to the other and apply to actions carried out by each Party in any capacity and whether directly or indirectly, on the Party's own behalf, on behalf of any other person or jointly with any other person.

8.6.    Nothing in this clause prevents a Party:

12

(a)   from holding for investment purposes only any units of any authorised unit trust;

(b)   from holding for investment purposes only not more than 10 % of any class of shares or securities of any company whose shares are publicly listed; or

(c)   acquiring a holding of shares in a company or other undertaking engaged in a business that competes with the Business of the JVC if the competing business contributes less than five percent of the annual turnover of such company or undertaking.

8.7.   Each of the covenants in this clause is considered fair and reasonable by the Parties, but if any such restriction is found to be unenforceable but would be valid if any part of it were deleted or the period or area of application reduced, the restriction shall apply with such modifications as may be necessary to make it valid and effective.

9.     THE BUSINESS PLAN

9.1.   The **Business Plan** is an annual business plan for the JVC prepared by the JVC and it shall include in relation to the Financial Year to which it relates:

(a)   a cashflow statement giving:

(i)    an estimate of the working capital requirements; and

(ii)   an indication of the amount (if any) that it is considered prudent to retain, for the purpose of meeting those requirements, out of those profits of the previous Financial Year that are available under the laws of Hong Kong for distribution to Shareholders;

(b)   a monthly projected profit and loss account;

(c)   an operating budget (including capital expenditure requirements) and balance sheet forecast;

(d)   a management report giving business objectives for the Financial Year; and

(e)   a financial report which shall include an analysis of the estimated results of the JVC for the previous Financial Year compared with the Business Plan for that year, identifying variations in sales revenues, costs and other material items.

9.2.   The Business Plan for each Financial Year shall be:

(a)   prepared by the Board within 45 Business Days of the end of the preceding Financial Year (the first day being the first day of the Financial Year to which the plan relates); and

(b)   adopted and approved by the Parties in accordance with this Agreement as soon as possible after it has been prepared.

13

10. **ACCOUNTING**

10.1. The JVC shall at all times maintain accurate and complete accounting and other financial records in accordance with the requirements of all applicable laws and generally accepted accounting principles applicable in Hong Kong.

10.2. Each Party and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of the JVC.

10.3. The JVC shall supply each Party with the financial information necessary to keep the Parties informed about how effectively the Business of the JVC is performing.

11. **DIVIDEND POLICY**

11.1. Any profit retention shall be decided by the General Meeting of Shareholders. Any undistributed profits from previous Financial Year(s) may also be distributed with the profits of the current Financial Year. The after-tax net profit of the JVC shall, as and when the cash position of the JVC permits, be distributed to the Parties, in accordance with their respective shareholding in US$ or any other freely convertible currency subject to the Laws of Hong Kong.

11.2. Loss of the JVC shall be distributed between the Parties based on their respective shareholding at the time of loss distribution.

11.3. A distribution under this clause 11 in relation to any Financial Year shall be made within six months of the day to which the audited accounts for that Financial Year are made up.

12. **INTELLECTUAL PROPERTY**

12.1. If either Shareholder at any time during the Product Development Period generates Core Intellectual Property in relation to the Product or Business or engages or employs a person or persons who make or conceive such Core Intellectual Property, such Core Intellectual Property shall be solely owned by the JVC.

12.2. The Shareholders agree and acknowledge that any other intellectual property contributed to the JVC that is not identified a Core Intellectual Property, it will not be considered to be owned by the JVC. In such an instance, the JVC shall receive an irrevocable, royalty-free, non-exclusive license to use such other intellectual property.

12.3. Notwithstanding clauses 12.1 and 12.2, the Core Intellectual Property and such other intellectual property shall be made freely available to all the Parties solely for the purpose of research and development activities of the Business.

14

13.   TRANSFER OF SHARES/RIGHT OF FIRST REFUSAL

13.1.   No Party shall mortgage, pledge, charge or otherwise encumber or permit any third party's interest to subsist in respect of all or any part of its shares in the JVC without the prior written consent of the other Party and subject always to the Laws of Hong Kong.

13.2.   Subject to the terms and conditions of this Agreement, when a Party desires to transfer the whole or part of its shares in the JVC ("**Transferor**") to any third parties ("**Transferee**"), the procedures shall be as follows:

(a)   The Transferor shall deliver a written notice ("**Transfer Notice**") to the other Party and the JVC stating (i) his bona fide intention to sell all or any portion of its shares ("**First Offer Shares**"); (ii) the number of First Offer Shares; and (iii) the name of the Transferee; and (iv) the price and terms upon which he proposes to offer such First Offer Shares.

(b)   By written reply to the Transferor and the JVC within 30 Business Days after receipt of the Transfer Notice, the other Party may elect to purchase the First Offer Shares.

(c)   If the other Party does not elect to purchase the First Offer Shares in accordance with this clause 13.2, the Transferor shall, during the 60 day period following the expiration of the 30 day period set out above offer the First Offer Shares to the Transferee at a price not less than, and upon terms no more favourable to the Transferee than those specified in the Transfer Notice. The Transferor must give a copy of any agreement with the Transferee relating to the sale of the First Offer Shares to other Party within three Business Days after execution of the agreement. If the Transferor does not enter into an agreement for the sale of the First Offer Shares within the aforementioned 60 day period, then the right of the Transferor to sell the First Offer Shares to the Transferee shall terminate and shall be re-offered to the other Party in accordance with this clause 13.2.

(d)   No transfer or other disposal shall be effective until:

(i)   the Transferee agrees in writing that it will comply with every provision and condition of this Agreement and the Articles of Association;

(ii)   relevant approvals have been obtained for this share transfer; and

(iii)   the share transfer shall be registered with or approved by the relevant authority, if required by the Laws of Hong Kong.

13.3.   The Parties agree that the Transferor shall bear all share transfer tax in accordance with the Laws of Hong Kong except as otherwise agreed by the Parties.

13.4.   No Party may subcontract or delegate all or part of its obligations hereunder. Notwithstanding the right of first refusal of the Parties as set out here, PN is allowed to transfer or otherwise dispose of the whole or part of its shares of the JVC, provided

that PN shall first give Mabel the first right of refusal to acquire the whole or part of its equity interest at the purchase price offered to other third parties. If Mabel does not purchase such capital in whole or in part, or the Parties cannot agree on the terms and conditions of the share transfer, PN may transfer his shares in whole or in part to a third party(ies) on such terms and conditions which are not more favourable than those proposed to Mabel.

13.5.   The restriction set out in clause 13.4 shall not apply if the transfer of shares held by either Party is made to an immediate family member, or to an entity that is majority owned of at least 80% by the relevant Party. For the avoidance of doubt, such transfer of shares as set out in this clause 13.5 must not be a partial transfer and as such must be full transfer of the Party's shares and subject to consent of the other Party which shall not be unreasonably withheld.

## 14.   OBLIGATORY TRANSFER EVENT

14.1.   The occurrence of any of the following events shall be deemed as an **Obligatory Transfer Event:**

    (a)   if the Party is insolvent or unable to pay its debts within the meaning of the insolvency legislation applicable to that Party and has stopped paying its debts as they fall due.

    (b)   if a step has been taken to initiate any process by or under which:

        (i)   the ability of the creditors of the Party to take any action to enforce their debts is suspended, restricted or prevented;

        (ii)   some or all of the creditors of the Party accept, by agreement or in pursuance of a court order, an amount of less than the sums owing to them in satisfaction of those sums with a view to preventing the dissolution of the Party;

        (iii)   a person is appointed to manage the affairs, business and assets of the Party on behalf of the Party's creditors; or

        (iv)   the holder of a charge over assets of the Party is appointed to control the business and assets of the party.

    (c)   if a process has been instituted that could lead to the Party being dissolved and its assets being distributed among the Party's creditors, shareholders or other contributors.

    (d)   if there is a Change of Control of the Party, other than a permitted transfer pursuant to this Agreement.

    (e)   if a Party, being claimed dead or disabled by an order of the competent court, except for a transfer made pursuant to clause 13.5.

    (f)   if a Minority Shareholder decides to sell her shares in the JVC to an unrelated third party.

16

14.2.    Where an Obligatory Transfer Event occurs to a Party (in this clause the "**Seller**"), shall give notice of it to the other Party (in this clause the "**Buyer**") as soon as possible and, if it does not, it is deemed to have given notice of it on the date on which the Buyer becomes aware of such Obligatory Transfer Event ("**Notice of Obligatory Transfer Event**").

14.3.    As soon as practicable after service, or deemed service, of the Notice of Obligatory Transfer Event, the Parties shall appoint an Expert to determine the Fair Value of the Seller's shares in the JVC ("**Sale Shares**")

14.4.    The Buyer has the right, within 30 Business Days of receiving notification of the Fair Value determined by the Expert (the first day being the day after the Buyer receives the Fair Value notification), to serve a notice on the Seller to buy all of the Sale Shares at the Fair Value. In case the number of the Buyer is plural, each Buyer shall have the right of first refusal to purchase the amount of the Seller's shares which bears the same ratio to the total shares being purchased as such Buyer's shareholdings bear to the total amount of shares owned by all Shareholders exercising their right of first refusal.

14.5.    In this clause, the **Fair Value** of the Sale Shares shall be the value that the Expert certifies to be the fair market value in his opinion based on the following assumptions:

(a)    the value of the shares in question is that proportion of the fair market value of the entire issued share capital of the JVC that the Sale Shares bear to the then total issued share capital of the JVC (with no premium or discount for the size of the Seller's shareholding or for the rights or restrictions applying to the shares under this Agreement or the Articles of Association of the JVC);

(b)    the sale is between a willing buyer and a willing seller on the open market;

(c)    the sale is taking place on the date that the Obligatory Transfer Event occurred;

(d)    the JVC's businesses shall continue to be carried on as a going concern (unless the JVC is insolvent or unable to pay its debts within the meaning of the insolvency legislation applicable to the JVC);

(e)    the shares are sold free of all Encumbrances; and

(f)    to take account of any other factors that the Expert reasonably believes should be taken into account.

14.6.    The Expert shall be requested to determine the Fair Value of the Sale Shares within 20 Business Days of his appointment and to notify the Buyer and Seller in writing of his determination.

14.7.    The service of a notice to buy under this clause shall bind the Parties to buy and sell the shares.

17

14.8.   Notwithstanding anything contrary to this Agreement, if the Board so determines, only Mabel or an entity or person nominated by Mabel shall have the right to be transferred or to purchase the shares of the Minority Shareholder who chooses to sell her shares in the JVC to an unrelated third party as set out in clause 14.1(f), provided that the purchase price of such shares shall be at Fair Value.

## 15.   PRE-EMPTION RIGHTS

If the JVC proposes to issue additional shares (including without limitation any shares issued either pursuant to a capitalisation of the reserve fund (fund for reserve and supplementation of the share capital of the JVC), share surplus account or retained earnings or otherwise or pursuant to any similar issuance of shares without further payment by the Shareholders), or any other securities which may be converted into shares, whether convertible bonds, options, warrants or otherwise, the Parties shall have the right, but not the obligation, to be issued or to subscribe to, on a pro-rata basis, and on an equal basis, based on its fully-diluted shareholding percentage at the relevant time, the new shares or other securities being issued or offered, so as to maintain its shareholding at the same percentage as existed immediately before such issuance or offering. In addition, the JVC shall ensure that the Parties are always given adequate notice and opportunity to exercise their pre-emption rights to which they are entitled.

## 16.   DRAG-ALONG RIGHTS

16.1.   At any time after the revenue of the JVC reaches US $5 million provided that there is no initial public offering of shares of the JVC, a Shareholder holding more than 60% of the shares in the JVC ("**Selling Shareholder**") wishes to transfer or dispose of any of its shares to a proposed transferee, the Selling Shareholder shall have the option to require all other Shareholders ("**Called Shareholder**") to transfer a proportionate amount of its Shares to the proposed transferee within 20 Business Days after demand is made by the Selling Shareholder by written notice to that effect ("**Drag-along Notice**") to the Called Shareholder accompanied by copies of all documents required to be executed by the Called Shareholder to give effect to the required transfer.

16.2.   The transfer of the shares by the Called Shareholder must be on the same terms and conditions as shall have been agreed between the Selling Shareholder and the proposed transferee, save it being understood that, whether or not those terms and conditions between Selling Shareholder and proposed transferee include the giving of warranties, the Called Shareholder shall only be required to provide warranties to the proposed transferee as to title to its shares and its capacity to transfer them.

16.3.   Each Drag-along Notice must include details of:

(a)   the number and class of shares to be transferred by the Selling Shareholder and the Called Shareholder;

18

(b)   the identity of the proposed transferee;

(c)   the price to be paid for each Share by the proposed transferee (or any person acting in concert with the proposed transferee); and

(d)   the place, date ("**Transfer Date**") and time of completion of the proposed transfer by the Called Shareholder being a date not less than 30 Business Days after service of the Drag-along Notice.

16.4.   For the purposes of this clause, a "**proportionate amount**" of shares of a Called Shareholder shall mean the number of shares that is equal to the proportion of the shares (held by the Selling Shareholder) being transferred to the proposed transferee to the total number of shares held by the Selling Shareholder expressed as a percentage.

16.5.   If the Called Shareholder fails to transfer its Shares pursuant to this clause 16, the Selling Shareholder may take all necessary actions against the Called Shareholder as permitted by applicable law, including but not limited to requesting the Board to effect the transfer of the Called Shareholder's Shares on the Called Shareholder's behalf to the proposed transferee (or its nominee(s)) in accordance with this clause 16 as if the Shares were transferred by the Called Shareholder, and then authorise registration of the transfer. The Called Shareholder hereby authorises the Board to act on its behalf as provided for in this clause 16.5.

## 17.   TAG-ALONG RIGHTS

17.1.   In the event that a Shareholder in one or a series of transactions transfers more than 50% of its shares at the time of transfer ("**Transferring Shareholder**") to another party ("**Third Party Purchaser**"), such Transferring Shareholder shall not complete any of the proposed transfer of shares to the Third Party Purchaser unless:

(a)   such Transferring Shareholder procures that the Third Party Purchaser offers in writing to buy from the other Shareholders ("**Remaining Shareholders**") all of its shares on terms not less favourable than those applied to any purchase of shares of such Transferring Shareholder; the offer shall remain open for acceptance by the Remaining Shareholders for a period of at least 30 Business Days from the date the written offer is provided to the Remaining Shareholder ("**Third Party Offer**"); and

(b)   either (i) the Remaining Shareholders reject the Third Party Offer (or is deemed to have rejected it in accordance with this clause 17; or (ii) the Remaining Shareholders accept the Third Party Offer in accordance with the Third Party Offer.

17.2.   The Remaining Shareholders may accept or reject the Third Party Offer by notice in writing to the Third Party Purchaser and the Transferring Shareholder within the 30 Business Days offer period referred to in clause 17.1(a). If the Remaining Shareholders do not issue any written notice in response to the Third Party Offer

19

within the said 30 day offer period, the Remaining Shareholders shall be deemed to have rejected the Third Party Offer.

17.3.   If the Remaining Shareholders accept the Third Party Offer, the sale of the Remaining Shareholders' shares shall be conditional upon completion of the Transferring Shareholder's proposed sale of shares to the Third Party Purchaser, and the sale of the Transferring Shareholder's shares shall be conditional upon completion of the sale of the Remaining Shareholders' shares to the Third Party Purchaser in accordance with the Third Party Offer, and both sales shall be completed at the same time. If the Remaining Shareholders reject the Third Party Offer (or is deemed to have rejected it in accordance with clause 17.2), the proposed sale of the Transferring Shareholder's Shares to the Third Party Purchaser shall take place on the date falling no later than 30 Business Days from the date the Remaining Shareholders rejected the Third Party Offer.

18.     **EXPERT**

18.1.   An **Expert** is a person appointed in accordance with clause 14 to resolve a matter arising under this Agreement.

18.2.   The Parties shall endeavour to agree on the appointment of an independent Expert and to agree the terms of appointment with the Expert.

18.3.   If the Parties are unable to agree on the appointment of an Expert within 10 Business Days of either Party serving details of a suggested expert on the other, either Party shall then be entitled to request a big four accounting firm to appoint an Expert of repute with international experience in the valuation of social media platforms and agree on the Expert's terms of appointment.

18.4.   The Expert is required to prepare a written decision and give notice (including a copy) of the decision to the Parties within the time frame set forth in clause 14.6.

18.5.   If the Expert dies or becomes unwilling or incapable of acting, or does not deliver the decision within the time required by clause 14:

   (a)   either Party may apply to discharge the Expert and to appoint a replacement Expert with the required expertise; and

   (b)   clause 14 applies in relation to the new Expert as if he were the first Expert appointed.

18.6.   All matters under clause 14 shall be conducted, and the Expert's decision shall be written, in the English language.

18.7.   The Parties are entitled to make submissions to the Expert and shall provide (or procure that others including the JVC provide) the Expert with such assistance and documents as the Expert reasonably requires for the purpose of reaching a decision subject to the Expert agreeing to give such confidentiality undertakings as the Parties may reasonably require.

18.8.   To the extent not provided for by clause 14, the Expert may, in his reasonable discretion, determine such other procedures to assist with the conduct of the determination as he considers just or appropriate, including (to the extent he considers necessary) instructing professional advisers to assist him in reaching his determination.

18.9.   Each Party shall, with reasonable promptness, supply (and procure that others including the JVC supply) each other with all information and give each other access to all documentation and personnel as the other Party reasonably requires to make a submission.

21

18.10.   The Expert shall act as an expert and not as an arbitrator. The Expert's written decision on the matters referred to him shall be final and binding in the absence of manifest error or fraud.

18.11.   Each Party shall bear its own costs in relation to the reference to the Expert. The Expert's fees and any costs properly incurred by him in arriving at his determination (including any fees and costs of any advisers appointed by the Expert) shall be borne by the Parties equally or in such other proportions as the Expert shall direct.

## 19.   TERMINATION AND LIQUIDATION

19.1.   Except for the provisions which clause 19.2 states shall continue in full force after termination, any Party may give notice to the other Party of its intention to require this Agreement to be terminated on the occurrence of any of the following:

(a)   the mutual agreement of the Parties;

(b)   if a Party commits a material, voluntary, or persistent breach of this Agreement which if capable of remedy has not been so remedied within 30 Business Days of the other Party requiring in writing such remedy;

(c)   the General Meeting of Shareholders is deadlocked on any Reserved Matters requiring their approval and the deadlock cannot be resolved within 120 Business Days from the date the relevant decision is voted on; or

(d)   when a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that will lead to the JVC being dissolved and its assets being distributed among the JVC's creditors, Shareholders or other contributors.

19.2.   The following provisions of this Agreement remain in full force after termination:

(a)   Clause 1 (interpretation);

(b)   Clause 8 (restrictions on the parties);

(c)   Clause 19 (termination and liquidation);

(d)   Clause 21 (status of agreement);

(e)   Clause 22 (confidentiality);

(f)   Clause 23 (warranty);

(g)   Clause 24 (whole agreement);

(h)   Clause 26 (variation and waiver);

(i)   Clause 27 (costs);

(j)   Clause 30 (notice);

(k)   Clause 31 (language);

(l)   Clause 32 (severance); and

22

19.3.   Upon the notice of termination served under clause 19.1, the JVC shall be liquidated as provided hereinafter.

(a)   At the time of liquidation, the JVC is actively engaged in the Business and is unable to make profits under existing circumstances and/or with the existing assets, the General Meeting of Shareholders shall adopt a decision to dissolve the JVC and form a liquidation committee consisting of five members, of which three members are appointed by Mabel and two members are appointed by PN ("Committee") in accordance with the laws of Hong Kong. All decisions of the Committee will be made on the basis of the approval of at least 75% of the total number of members of the Committee. The Committee shall be under the direction of the General Meeting of Shareholders and shall assist the General Meeting of Shareholders in the liquidation of the JVC. The value of the JVC shall be established by the Committee which shall be entitled to delegate the valuation to qualified independent appraisers, appointed at the cost of the JVC. The appraisers may be qualified accountants or auditors. Such appraisers shall value the JVC on a going-concern basis with reference to the previous profitability of the JVC, the current market share of the JVC and the future prospects of the JVC. In making such valuation, the appraisers shall take into account the debts and liabilities of the JVC. The appraisers shall also take into account the existence of any continuing relevant agreements.

(b)   The Committee shall first offer the JVC as a going concern for purchase by the Parties. The Parties shall also have the right of first refusal for the purchase of such Assets at the fair market value of such Assets, taking into account the future use that may be made of them and any costs associated with their future use including but not limited to removal and transportation costs. The offer shall be made in writing and shall stipulate the value of the JVC as being the value ascertained by the appraisers. The offer shall be for a purchase in cash of the whole of the JVC. The offer shall remain open for acceptance for a period of 30 Business Days from the date of the offer.

(c)   If one of the Parties hereto shall within such 30 days period indicate in writing its acceptance of the offer and the terms upon which it is willing to accept the offer, it shall, have a further 30 Business Days within which to make payment. If both wish to purchase, they shall forthwith negotiate with the Committee in relation to the price they are willing to pay and the Committee, subject to the laws of Hong Kong will accept the higher bid and the period of 30 Business Days shall run from the date on which the bid is accepted.

(d)   Payment by the purchasing Party shall be made against the transfer to the purchasing party or to its nominee of the Assets and Business of the JVC as a going concern in such form as may be reasonably required by the purchasing Party and, in particular, shall include the benefit of any

24

agreements entered into by the JVC so far as the JVC may be entitled to transfer the same.

(e) The purchasing Party shall be entitled to offset against payment the amount of any debt owing to it by the JVC at the time when payment is to be made (if any). For the avoidance of doubt, it is hereby agreed that the purchasing Party shall only pay for that part of the JVC which it does not own, save where it shall receive an equivalent amount from the Committee representing the purchasing Party's interest in the JVC.

(f) If no offer to purchase is made or if the purchasing Party shall duly withdraw its acceptance, the Committee shall proceed to dispose of the Assets and Business of the JVC to complete the dissolution of the JVC in accordance with the laws of Hong Kong.

(g) If a third party buyer is found, the Parties shall have the right of first refusal on the same terms and conditions as agreed with the potential buyer.

19.4. The Committee shall notify the relevant authorities of the date on which the decision of the General Meeting of Shareholders to dissolve the JVC was adopted. The Committee shall have a maximum period as prescribed by the laws of Hong Kong but may, with the approval of the relevant authorities, extend such period within which to complete its work.

(a) At the expiration of the period of time (as may be extended) provided for in this clause 19.4, the Committee shall cease its activity. Any dispute between the Parties shall be handled in accordance with the laws of Hong Kong.

(b) At the conclusion of its work, the Committee or the Parties shall make a liquidation report to the General Meeting of Shareholders who shall then submit it, to the relevant authorities in accordance with the laws of Hong Kong.

(c) Upon approval of the liquidation report, the relevant authorities shall proceed to delete the JVC from the business registration records. Thereupon, the Parties shall return the original certificate of incorporation of the JVC to the relevant authorities.

19.5. Termination of operation of the JVC shall be without prejudice to any rights and liabilities which have accrued under this Agreement including without limitation the right of any Party to damages (excluding indirect damages such as, but not limited to, loss of anticipated profits, business opportunities, corporate reputation) in respect of any default of the other Party with respect to wrongful termination or any other matter whatsoever. Further, any termination of operation of the JVC shall be without prejudice to any provisions expressly or impliedly intended by the Parties to survive such termination of operation.

19.6. Where the JVC is to be dissolved and its assets distributed, subject to the Articles of Association, the Parties shall agree a suitable basis for dealing with the interests and assets of the JVC and shall endeavour to ensure that:

25

(a)   all existing contracts of the JVC are performed to the extent that there are sufficient resources;

(b)   the JVC does not enter into any new contractual obligations;

(c)   the JVC is dissolved and its assets are distributed as soon as practicable; and

(d)   any other proprietary information or intellectual property rights belonging to or originating from a Party are returned to it by the other party or the JVC and all such proprietary information or intellectual property rights shall be erased from the computer systems (to the extent possible) of the JVC and the Party who is returning it.

19.7.   Where any Party is required by any law, regulation or governmental or regulatory authority to retain any proprietary information (or copies of such information) of the other Party or the JVC, it shall notify the other Party in writing of such retention giving details of the information that it has been required to retain.

**20.   TERMINATION FOLLOWING DEADLOCK**

20.1.   In no circumstances shall any of the Shareholders create an artificial deadlock, being a deadlock caused by any of the Shareholders voting or withholding consent in bad faith against an issue or proposal in any case where the passage or approval of the same is required to enable the Business properly and efficiently in accordance with the provisions of this Agreement.

20.2.   If the Shareholders are unable in good faith to decide on a course of action with respect to any Reserved Matters, either Shareholder may give notice in writing of such deadlock ("**Deadlock Notice**") to the other Shareholder. The Deadlock Notice shall specify in reasonable detail the nature of the issue giving rise thereto. Within 30 Business Days after the receipt by the other Shareholder of the Deadlock Notice, the Shareholders shall meet in person or have a conference by telephone for the purpose of amicably resolving such deadlock.

20.3.   If after good faith discussions the deadlock is not resolved within 60 Business Days (or such longer period as the Shareholders may agree) from the date the Deadlock Notice is given, either Shareholder shall have the right to terminate this Agreement upon at least 120 Business Days' prior written notice of termination to the other Shareholder, and the termination procedures set out in clause 19 shall apply.

**21.   STATUS OF AGREEMENT**

21.1.   Each Party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the JVC to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of this Agreement.

26

21.2.   If any provision in the constitutional documents of the JVC conflicts with any provision of this Agreement, this Agreement shall prevail.

21.3.   The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the constitutional documents to the extent necessary to permit the JVC and its business to be administered as set out in this Agreement.

## 22.   CONFIDENTIALITY

22.1.   In this clause, **Confidential Information** means any information which:

(a)   either Party may have or acquire (whether before or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs of the JVC;

(b)   either Party may have or acquire (whether before or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs of the other Party as a consequence of the negotiations relating to this Agreement or any other Agreement or document referred to in this Agreement or the performance of this Agreement or any other agreement or document referred to in this Agreement; or

(c)   relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement).

22.2.   Information is not Confidential Information if:

(a)   it is or becomes public knowledge other than as a direct or indirect result of the information being disclosed in breach of this Agreement;

(b)   either Party can establish to the reasonable satisfaction of the other Party that it found out the information from a source not connected with the other Party and that the source is not under any obligation of confidence in respect of the information;

(c)   either Party can establish to the reasonable satisfaction of the other Party that the information was known to the first Party before the date of this Agreement and that it was not under any obligation of confidence in respect of the information; or

(d)   the Parties agree in writing that it is not confidential.

22.3.   Each Party shall at all times use all reasonable endeavours to keep confidential (and to ensure that its employees, agents, and the JVC shall keep confidential) any Confidential Information and shall not use or disclose any Confidential Information except:

(a)   to a party's professional advisers where such disclosure is for a purpose related to the operation of this Agreement;

27

(b)    with the written consent of such of the JVC or the Party that the information relates to;

(c)    as may be required by law or by the rules of any recognised stock exchange, or governmental or other regulatory body, when the Party concerned shall, if practicable, supply a copy of the required disclosure to the other before it is disclosed and incorporate any amendments or additions reasonably required by the other and which would not thereby prevent the disclosing Party from complying with its legal obligations;

(d)    to any tax authority to the extent reasonably required for the purposes of the tax affairs of the Party concerned; or

(e)    if the information comes within the public domain (otherwise than as a result of the breach of this clause 22.3).

22.4.   Each Party shall inform (and shall use all reasonable endeavours to procure that the JVC shall inform) any officer, employee or agent or any professional adviser advising it in relation to the matters referred to in this Agreement, or to whom it provides Confidential Information, that such information is confidential and shall require them:

(a)    to keep it confidential; and

(b)    not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this Agreement).

22.5.   On termination of this Agreement, either Party may demand from the other and the JVC the return of any documents containing Confidential Information in relation to the first Party by notice in writing, whereupon the other Party shall (and shall use all reasonable endeavours to ensure that the JVC shall):

(a)    return such documents; and

(b)    destroy any copies of such documents and any other document or other record reproducing, containing or made from or with reference to the Confidential Information,

save, in each case, for any submission to or filings with governmental, tax or regulatory authorities. Such return or destruction shall take place as soon as practicable after the receipt of any such notice.

22.6.   The obligations of each of the Parties in this clause shall continue without limit in time and notwithstanding termination of this Agreement for any reason.

**23.   WARRANTY**

23.1.   From the Effective Date, each Party warrants with each other Party that:

28

(a)   neither the execution nor delivery of this Agreement or of any ancillary document nor the performance or observance of any of its obligations under this Agreement, does or will:

    (i)   (if applicable) conflict with or results in a breach of its Articles of Associations or other constitutional documents;

    (ii)   conflict with, or result in any breach or violation of, any judgment, order or decree, trust deed, mortgage, agreement or other instrument or arrangement by which it is bound; or

    (iii)   result in any breach of law, rule, regulation, ordinance, order, judgment or decree of or undertaking to any court, government body, statutory authority or regulatory, administrative or supervisory body to which it is a party or by which it or its assets are bound, whether in Hong Kong or elsewhere;

(b)   if required, all relevant statutory, governmental or other approvals for the transaction contemplated in this Agreement have been obtained;

(c)   it has full power and authority to execute and deliver this Agreement; and

(d)   the obligations expressed as being assumed by it under this Agreement constitutes its valid, legal and binding obligations enforceable against it in accordance with the terms of this Agreement.

**24.    WHOLE AGREEMENT**

24.1.   This Agreement, and any documents referred to in it or executed contemporaneously with it, constitute the whole agreement between the Parties and supersedes any previous arrangement, understanding or agreement between them relating to the subject matter they cover.

24.2.   Each Party acknowledges that, in entering into this Agreement and any documents referred to in it or executed contemporaneously with it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

24.3.   Nothing in this clause operates to limit or exclude any liability for fraud.

**25.    ASSIGNMENTS**

25.1.   Neither of the Parties may assign, or grant any Encumbrance over or deal in any way with, any of its rights and obligations under this Agreement or any document referred to in it without the prior written consent of the other Party (such consent not to be unreasonably conditioned, withheld or delayed).

25.2.   Each Party that has rights under this Agreement is acting on its own behalf.

**26. VARIATION AND WAIVER**

26.1. A variation of this Agreement shall be in writing and signed by or on behalf of all Parties.

26.2. A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

26.3. A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

26.4. No failure to exercise or delay in exercising any right or remedy provided under this Agreement or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part thereof.

26.5. No single or partial exercise of any right or remedy under this Agreement shall preclude or restrict the further exercise of any such right or remedy.

26.6. Unless specifically provided otherwise, rights arising under this Agreement are cumulative and do not exclude rights provided by law.

**27. COSTS**

Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement shall be borne by the Party that incurred the costs.

**28. GOOD FAITH**

28.1. All transactions entered into between either Party or any company Controlled by it and the JVC shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such Agreement, on an arm's length basis.

28.2. Each Party shall at all times act in good faith towards the other and shall use all reasonable endeavours to ensure that this Agreement is observed.

28.3. Each Party shall do all things necessary and desirable to give effect to the spirit and intention of this Agreement.

**29. THIRD PARTY RIGHTS**

29.1. This Agreement is made for the benefit of the Parties and their successors and permitted assignees and is not intended to benefit, or be enforceable by, anyone else.

30

29.2. The right of the Parties to terminate, rescind or agree any amendment, variation, waiver or settlement under this Agreement is not subject to the consent of any person that is not a party to this Agreement.

**30.** **NOTICE**

30.1. A notice given under this Agreement:

  (a) shall be in writing in the English language;

  (b) shall be sent for the attention of the person, and to the address, or fax number, given below (or such other address, fax number or person as the relevant party may notify to the other party); and

  (c) shall be:

   (i) delivered personally;

   (ii) delivered by commercial courier;

   (iii) sent by fax;

   (iv) sent by pre-paid first-class post, recorded delivery; or

   (v) (if the notice is to be served outside the country from which it is sent) sent by reputable international overnight courier.

30.2. The addresses for service of notice are:

  (a) **Ms. Mabel Mak**

  Address      : 11A Bo Shek Mansion Block 1.
  328 Sha Tsui Road,
  Tsuen Wan,
  Hong Kong.
  Fax number : (+848) 3943 5909

  (b) **Mr. Parasurama Naidu Narra**

  Address      : 19-9-11/2, Lakshmi Puram,
  Tiruchanoor Road,
  Tirupati, A.P - 517501,
  India.
  Fax number : +1-408-549-9883

30.3. If a notice has been properly sent or delivered in accordance with the above, it will be deemed to have been received as follows:

  (a) if delivered personally, at the time of delivery;

  (b) if delivered by commercial courier, at the time of signature of the courier's delivery receipt;

  (c) in the case of fax, at the time of transmission;

31

(d)     in the case of pre-paid first class post or recorded delivery, five Business Days from the date of posting;

(e)     in the case of reputable international overnight courier, ten Business Days from the date of posting; or

(f)     if deemed receipt under the previous paragraphs of this clause is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is not a public holiday in the place of receipt), when business next starts in the place of deemed receipt.

30.4.    To prove delivery, it is sufficient to prove that the notice was transmitted by fax to the fax number of the party or, in the case of post, that the envelope containing the notice was properly addressed and posted.

**31.**    **LANGUAGE**

If this Agreement is translated into any language other than English, the English language text shall prevail.

**32.**    **SEVERANCE**

32.1.    If any provision of this Agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

32.2.    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted or modified, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

**33.**    **FURTHER ASSURANCE**

Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Party may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

**34.**    **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party had signed the same document.

**35.**    **AGREEMENT SURVIVES CLOSING**

This Agreement (other than obligations that have been fully performed) remains in full force after Closing.

32

36.   **GOVERNING LAW AND JURISDICTION**

This Agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the laws of Hong Kong. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre ("**HKIAC**") under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The seat of arbitration shall be Hong Kong. The number of arbitrators shall be three. The arbitration proceedings shall be conducted in English.

This Agreement is duly executed in two original copies on the date stated at the beginning of this Agreement.

**Ms. Mabel Mak**                    **Mr. Parasurama Naidu Narra**

33

**Schedule 1**
**Core Intellectual Property**

- Trainer matching algorithm

- Trainer ranking algorithm

- Crowdfunding for fitness services

- Video library done exclusively for fitness services

- Photo morphing for fitness services

- Uber for fitness services

- Gamification utilizing "fitcoins"

- Fitness center recommendation using "gym location"

- List of "who's working out at a gym?"

- Scheduling logic of calendars for personal trainers

- Time based message expiration in chat

**Schedule 2**
**Reserved Matters**

1.  Issuing shares, debentures, convertible notes, options or other equity or debt securities of the JVC; adopting, implementing or varying any stock option plans for directors, employees or consultants; or changing the rights of the shares.

2.  Entering into an arrangement to sell, share or license Core Intellectual Property or a significant part of the Core Intellectual Property belonging to the JVC.

3.  Permitting the registration of any person as a member of the JVC other than the Parties in relation to their initial investment and any of their transferees in accordance with the terms of this Agreement.

4.  Altering the name of the JVC and any constitutional documents of the JVC including the Articles of Association or the rights attaching to any of the shares in the JVC.

5.  Adopting or amending the Business Plan for each Financial Year.

6.  Changing the nature of the JVC's Business or the commencement of any new business by the JVC which is not ancillary or incidental to the Business.

7.  Making any acquisition or disposal by the JVC of any material asset(s) otherwise than in the ordinary course of business.

8.  Creating or granting any Encumbrance over the whole or any part of the Business, undertaking or assets of the JVC or over any shares in the JVC or agreeing to do so.

9.  Commencing any proceedings for the dissolution, winding up, liquidation or reorganization of the JVC.

10. Borrowing, or otherwise incurring any material indebtedness.

11. Commencing, defending or compromising any material litigation or a similar procedure.

12. Entering into an arrangement or incurring a liability which is not on an arm's length basis.

13. Appointing or removing the chief executive officer and the chief technical officer, the chief financial officer and the chief operating officer (or the functional equivalent of such positions); approving the remuneration packages of such executives and subsequent variations to the remuneration packages in excess of budgeted amounts.

14. Recommending or declaring an interim or a final dividend.

### Schedule 3
### Mabel Mak's Contribution to the JVC

1. To provide domain and industry expertise to the Business.

2. To provide professional support in the form of financial oversight, legal services and corporate finance and administrative services.

3. To register the Intellectual Property with the relevant authorities.

4. To provide initial funding of the Business up to a maximum amount of US$ 1,000,000 in the form of a loan.

**Schedule 4**
**Parasurama Naidu Narra's Contribution to the JVC**

1. To cause Praveen Kumar Narra to provide software development industry expertise in relation to the Product and Business.

2. To cause Praveen Kumar Narra to serve as chief technical officer of the JVC until such time as the Product is at Beta Version.

3. To cause Praveen Kumar Narra to lead the development of the Product to successfully achieve Beta Version.

4. To cause Indyzen Inc., a company established under the laws of United States of America with certificate of incorporation no. C2269314 issued by the California Secretary of State on 09 May 2000, to offer a discount of US$ 300,000 on its services to the JVC in relation to the Product and Business. This US$ 300,000 amount shall be treated as a loan of from PN to the JVC as part of the initial funding to the Business.

# EXHIBIT B

# SOFTWARE DEVELOPMENT AND LICENSING AGREEMENT

This Software Development and License Agreement (the "Agreement") is effective 5 January 2015

**BETWEEN:**

**IndyzenInc**(the "Company"), a company organized and existing under the laws of the State of California, with its main business address at:2033 Gateway Pl San Jose. CA 95110

**AND:**

**Parkridge Limited** (the "Customer"). a company established under the laws of Hong Kong with certificate of incorporation no. 1956916 with main address at:The Landmark 15 Queen's Rd Central 8/F Gloucester Tower, Central Hong Kong, China

**WHEREAS:**

The Company is engaged in information technology consulting. software development marketing. licensing, global outsourcing and support of certain software and various other services by and through various employees, contractors and sub-contractors, vendors and / or offshore outsourcing partners.

Services that are subject to this Agreement shall be as set forth in Schedule "A"annexed hereto which shall describe the desired services in detail.

Company has agreed to undertake and to provide such Services to the Customer under the terms and conditions specified in this Agreement and for the charges specified in Schedule "A".

IN CONSIDERATION of the premises and mutual covenants herein set forth and provided for the parties covenant and agree as follows

## 1.   DEFINITIONS

The following words and terms shall have the following meanings when used herein and such definitions shall apply to both the singular and plural forms of any such words and terms

"Agreement"means this agreement including all schedules.

"Business Day"means each of Monday, Tuesday, Wednesday, Thursday and Friday except where any such day occurs on any federal or provincial statutory holiday observed in the state of California.

"Charges"means the consulting fee, software development fee. license fee, commissions. and other compensation to be paid by Customer to Company as set out in Schedule "A"together with reimbursement to Company of all out-of-pocket expenses approved in advance in writing by the Customer (including but not limited to. travel, accommodation. long distance, courier, facsimile. hardware. software and other material charges) plus any and all applicable federal. state, local. international. import. export and municipal taxes presently or hereafter imposed upon any and all such amounts

"Commencement Date"means the date of execution of this Agreement by the Parties.

"Functional Specifications"has the meaning given in clause 1.

"Hardware' means the central processing unit or device and accompanying operating system set out in Schedule "A"and which is to be utilized by Customer for operation of the Software

"Materials"means the Functional Specifications, the Software and the System Documentation

"The Software"means those software programs, web applications and mobile applications that have been or to be developed by Company and delivered or licensed to Customer pursuant to the terms and conditions of this Agreement

"CoreIntellectualProperty"means all patents, patent applications, registered designs and applications thereof, copyright material, computer software, technical information, inventions, trademarks, trade secrets, and all applications and registrations thereof that relate to the fundamental essence of the Product or Business, which are set forth in Schedule B

"Party"or "Parties"means either Company or Customer if used in the singular and both Company and Customer if used in the plural

"Services" mean the services to be provided by the Company to the Customer as set out in Schedule "A".

"System Documentation"means all documents, wireframes, flowcharts, printout specifications, file specifications, test data and screen layouts which collectively contain a complete description and definition of all operating conditions of The Software.

"Users"means Customer's clients or potential users who install, use, or otherwise interact with any of The Software or Materials.

1.    DEVELOPMENT OF FUNCTIONAL SPECIFICATIONS

   (a)    Company and Customer shall work together in preparation of the Software functional specifications and acceptance test criteria as set out in Phase 1 of Schedule "A"(the "Functional Specifications")

   (b)    Customer shall have 14 Business Days to disapprove any of the Functional Specifications, or to request specific clarifications, additions or modifications to the Functional Specifications Such disapproval or request shall be given in writing within the time period aforesaid, and if not so given, the Customer shall be deemed to have accepted the Functional Specifications.

   (c)    If the Functional Specifications are rejected in whole or in part by the Customer, or if the Customer requests specific clarification, additions or modifications to the Functional Specifications then Company and Customer shall cooperate in good faith to work together and come up with a mutually agreeable Functional Specifications.

2.    DEVELOPMENT OF THE SOFTWARE

   (a)    Company shall code and debug The Software and develop the System Documentation, all in accordance with the services and work described in Schedule A.

   (b)    The Software will be coded in technologies as considered appropriate by Company using such techniques, standards and conventions as have been developed by Company. If there is a conflict between such techniques, standards and conventions and the Functional Specifications, the Functional Specifications will prevail

3.    CHARGES FOR DEVELOPMENT OF THE SOFTWARE

   (a)    Charges. Schedule "A"shall establish the pricing methodology for the project and the manner of payment of all such compensation and fees. Notwithstanding, it is acknowledged by the parties that any changes in services and/or features described in Schedule "A"shall have an impact on the pricing and upon agreement as to changes the parties shall in good faith adjust

the pricing where appropriate. If Customer disputes a part of any invoice, Customer must pay the amount not in dispute by due date or be subject to interest at a rate of one and one-half percent (1-1/2%) per month late fees and penalties on any undisputed amounts. The amount of fees, interests and penalties Company charges will be lesser of the amounts stated, or the State's legally enforceable maximum, whichever is the lesser. Company also reserves the right to withhold Services, including denying access to the deliverables, while there are any outstanding fees which are not in dispute or if Customer is in breach of this agreement following all applicable cure periods. Customer shall not have any license or right to the deliverables for which dues are not paid in full to the Company, even if Company delivers such deliverables to the Customer.

(b)     Verification Records: For projects involving full-time or part-time personnel, time is usually maintained through timesheets filled by personnel working for such projects. Any questions or disapprovals of timesheets should be received in writing by Company within 30 (thirty) Business Days of receiving such timesheets. If Company does not receive any such disapprovals within 14 BusinessDays of sending timesheets to the Customer, all such timesheets will be deemed approved by the Customer. If any additional verification is required, Customer shall inform Company before finalizing Schedule "A", and incorporate such special verification methods as part of Schedule "A".

(c)     Invoicing: The Company shall provide written invoices of any amounts due in accordance to Schedule "A". All payments shall be due within 14 Business Days of receipt of such invoice(s) at Company's office address provided in this agreement. Customer shall be in default under this Agreement if payment is not received within 30 (thirty)BusinessDays following receipt of any invoice unless the Customer disputes the invoice in good faith, and in writing within 14 BusinessDays of receipt of an invoice.  If no written notice of dispute is received in writing within 14 BusinessDays of receipt of an invoice, such invoice shall be deemed to be correct, and payable in full. For any disputed invoice, Customer shall clearly provide to Company in writing the reason for such dispute. Customer shall make payment on the non-disputed portion of such disputed invoice without delay and the Parties shall investigate and attempt to resolve such dispute in an amicable and prompt manner. Upon default in payment, Company is authorized to suspend work under Schedule A in its sole discretion until the default is cured by payment in full. In the event that such default is not cured within 30 (thirty) BusinessDays following invoice, the Company in its sole discretion, may terminate the work described in Schedule "A"by written notice to the Customer. Upon such termination, Company shall have no further obligations under Schedule "A", but all payments due through the date of such termination shall remain due and payable and Company may take any and all actions necessary to collect the same, provided, that Company may not withhold delivery of any work product produced in accordance with Schedule "A"and paid for by Customer .

4.   ACCEPTANCE TESTING

(a)     If Customer requires any specific acceptance testing procedures, Customer shall provide all such acceptance criteria to Company within the first 14 BusinessDaysof the Commencement Date or a mutually agreed time. Upon each delivery of Materials, The Software, Systems Documentation or other deliverable(s) (referred to as 'Deliverables'from now on), the Customer shall perform such acceptance testing procedures in good faith. The Customer will not unreasonably withhold or delay such acceptance. In no event shall the acceptance testing process last more than 14 BusinessDays following each partial or complete delivery. In the event the Deliverables are non-conforming, Customer shall detail the reasons for such non-conformity in the written notice to Company to resolve such non-conforming issues. Additionally, the Customer shall identify with specificity the portions of the acceptance tests that form the basis for the non-conformity. In the event that such written notice is not provided within 14 Business Days following delivery, Customer shall be deemed to have accepted the Deliverables. Customer is responsible to pay for all conforming portions of the deliverables. If

non-conformity is reported in writing as described above. Customer shall pay for the non-conforming portions of the deliverables after they are modified to conform to the specifications. Due to the customized nature of the software, no refunds are allowed, and Customer is responsible to pay full amount agreed for in Schedule A

(b)   The Acceptance Date shall be deemed to have occurred upon the earlier of expiration of the 14 Business Days and that date upon which Customer provides written notice to Company of successful acceptance testing

(c)   Customer shall at its sole expense be responsible for providing all Hardware and peripheral devices required to complete the acceptance testing procedures

5.   **TERM AND TERMINATION**

(a)   Term.  This Agreement shall be effective upon execution hereof by both parties and shall remain in full force in effect for a minimum contract period of 3 (three) years from the Commencement Date. At the expiration of 3 years, this Agreement shall continue to renew automatically for 1 year terms each unless either party gives a 30 Business Days prior written notice of termination to the other party

(b)   Termination of this Agreement·  The Company may terminate this Agreement, with or without cause, by giving 30 (thirty) Business Days prior written notice of termination to the other party. If Customer wishes to terminate the services described in Schedule A up through the date of termination, Customer shall be liable to pay fees agreed in Schedule A. Company may also terminate this agreement if Customer becomes insolvent, go into liquidation or unable to pay its debts as they fall due, or if Customer is in breach of one of its obligations and fails to cure within thirty (30) Business Days following written notice to Customer.

(c)   Survival of Certain Provisions:  In the event of any termination, the following provisions shall continue in full force and effect· (i) the obligation of the Customer to make payments due hereunder to the Company, (ii) confidentiality provisions, (iii) Software License, (iv) Proprietary & Trade Secret Information, (v) Warranties, Exclusions and Limitations and (vi) Settlement of Disputes.

6.   **INTELLECTUAL PROPERTY**

(a)   CoreIntellectualProperty:Upon payment in full of all amounts due to the Company, the Core Intellectual Property generated by the Company under this Agreement in relation to the Product or Business or by a person or persons employed by the Company who make or conceive such Core Intellectual Property, such Core Intellectual Property shall be solely owned by the Customer. Upon payment in full of all amounts due to the Company, (i) the Customer shall be deemed to be the owner of all proprietary rights, including but not limited to copyrights, related to such Core Intellectual Property, (ii) Customer shall be deemed the owner of such Core Intellectual Property and all copyrights thereunder, and (iii) Company shall execute any and all assignments, certificates of ownership, confirmations of copyright ownership, copyright applications, and other items reasonably requested by the Customer to secure and confirm the Customer's ownership of such Core Intellectual Property. Notwithstanding the above, the Company shall continue developing intellectual property in the course of the business with the Customer and if such intellectual property falls under Core Intellectual Property, as agreed between the parties, the same shall form part of Schedule B and solely owned by the Customer If there is a dispute concerning the categorization of such developing intellectual property, the parties agree that an independent intellectual property expert nominated by the parties, shall resolve the matter. For the avoidance of doubt, the parties agree that the Customer shall have a non-exclusive right to use on a royalty-free basis, all non-Core intellectual Property in perpetuity.

(b)   **Third party, Open Source or pre-existing works.** Unless otherwise agreed in writing. Company may use third party modules, open source software or pre-existing works to reduce project pricing and/or time. In the event that the Deliverables include any pre-existing works created by the Company, the Company hereby grants, a perpetual, irrevocable, royalty free license to use such pre-existing works in connection with the Deliverables. Company owns and keeps copyrights and all intellectual property rights to such pre-existing works, and the right to continue using such works. In the event that the Deliverables include any pre-existing works or components including, but not limited to any modules, tools, open source components source code, any stock images or other graphics, created by a third party, licensing terms of such third party items will be in full force for such deliverables, and Customer is required to, and hereby agrees to comply by such third party licensing terms & requirements. The parties agree and acknowledge that any other intellectual property contributed to the Customer that is not identified a Core Intellectual Property, will not be considered to be owned by the Customer. In such an instance, the Customer shall receive an irrevocable, royalty-free, non-exclusive license to use such other intellectual property.

(c)   Notwithstanding clauses 6(a) and 6(b), the Core Intellectual Property and such other intellectual property shall be made freely available to all the Parties solely for the purpose of research and development activities of the Customer.

7.   **PROPRIETARY AND TRADE SECRET INFORMATION**

The obligations of Customer under this section shall survive termination or expiration of this Agreement.

8.   **TRAINING**

Company shall provide to the Customer, at no additional cost up to 10 hours of remote instruction in respect of the use and support of The Software using telephone, GotoMeeting, or other communication tools. The Customer may designate any number of its personnel to attend such training. Those sessions at which training is to be provided shall be scheduled at times mutually agreed upon by Company and the Customer and shall be conducted remotely via telephone or Internet. The Customer shall ensure that all persons designated by it for training are available at the times scheduled for training sessions.

9.   **WARRANTIES, EXCLUSIONS AND LIMITATIONS**

(a)   **Warranty Disclaimers.** Other than as specifically set forth in this Agreement, THE MATERIALS, THE SOFTWARE, SYSTEMS DOCUMENTATION, PRODUCTS, SERVICES, DELIVERABLES OR ANY COMPONENTS THEREOF ARE PROVIDED / DELIVERED TO CUSTOMER ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, QUALITY, PERFORMANCE OR NONINFRINGEMENT UPON THE RIGHTS OF ANY OTHER PARTY. COMPANY MAKES NO WARRANTY THAT THE DELIVERABLES WILL MEET CUSTOMER'S SPECIFIC OBJECTIVES OR NEEDS OR THAT THE DELIVERABLES WILL BE FREE FROM ERRORS OR BUGS. COMPANY MAKES NO WARRANTY THAT THERE WILL BE UNINTERRUPTED OPERATION OF THE DELIVERABLES. CUSTOMER ACKNOWLEDGES AND AGREES THAT THE FOREGOING EXCLUSIONS AND DISCLAIMERS OF WARRANTIES ARE AN ESSENTIAL PART OF THIS AGREEMENT AND FORMED THE BASIS FOR DETERMINING THE PRICE CHARGED FOR THE PRODUCTS / SERVICES / DELIVERABLES.

(b)   **Limitation of Liability:** The remedies of Customer set forth herein are exclusive and the liability of Company with respect to any of the Services, Completed Products, Customized Products, or Components covered by or furnished under or in connection with this Agreement. Under no

circumstances will damages assessed against Company exceed the license fee (exclusive of Company's costs and expenses) actually paid to the Company in the most recent two calendar months for the specific SCHEDULE OF THE AGREEMENT out of which potential damages arose. IN NO EVENT SHALL THE COMPANY BE LIABLE FOR DIRECT. INDIRECT SPECIAL. COLLATERAL EXEMPLARY. PUNITIVE, INCIDENTAL. OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO AND WITHOUT LIMITATION. LOSS OF GOODWILL LOSS OF REPUTATION. LOSS OF PROFITS OR REVENUES. LOSS OF SAVINGS LOSS OF USE. INTERRUPTION OF BUSINESS. AND CLAIMS OF CUSTOMERS. OR RELATED OR UNRELATED THIRD PARTIES). WHETHER SUCH DAMAGES OCCUR PRIOR OR SUBSEQUENT TO, OR ARE ALLEGED AS A RESULT OF. TORTIOUS CONDUCT OR BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT, EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c)   Third Party Claims:  Company shall not be liable for claims made against the Customer or the Company arising out of Customer's and Customer's users'use, inability-to-use. possession or ownership of The Software, Materials and/or Systems Documentation and Customer hereby indemnifies and holds the Company harmless from and against any and all claims. fines and regulatory fees. of every nature or type that may be brought or asserted by any other party unless that such claims are a result of the Company infringing other people's intellectual property rights

## 10.  RELEVANT GOVERNING LAW

In interpreting the terms of this Agreement. the parties agree that the laws of the State of California shall be applicable All suits permitted to be brought in any court shall be venued in Santa Clara County. State of California

## 11.  SETTLEMENT OF DISPUTES

Customer shall provide Company. detailed information regarding any dispute, and shall agree to cooperate with Company in investigating of disputed matters Except for any dispute arising out of payments due to Company. any dispute or disagreement arising between the Company and the Customer which is not resolved to the mutual satisfaction of the Company and the Customer within fifteen (15) Business Days (or such longer period as may be mutually agreed upon) from the date that either Party gives written notice that such dispute or disagreement exists shall be referred to arbitration in San Jose, CA before one arbitrator in accordance with the Commercial Arbitration Rules (the "Arbitration Rules") of the American Arbitration Association (the "AAA"). in effect on the date that such written notice is given Customer waives any and all rights it may have to a jury trial in connection with any proceedings concerning this agreement.

## 12.  ATTORNEYS'FEES

Should any litigation or arbitration (collectively "Proceeding") commence between the parties hereto arising out of this Agreement or the rights and duties of either thereto. whether it be an action for damages. tort, equitable or declaratory relief. the prevailing party in such Proceeding will be entitled. as an element of such party's costs of suit in addition to other relief as may be granted by the court, to reasonable sums for attorneys'fees in the discretion of the court or arbitrator, and such prevailing party may recover such attorneys'fees in a separate action brought for that purpose

## 13.  PARTIES TO ACT REASONABLY

The parties agree to act reasonably in exercising any discretion, judgment, approval or extension of time which may be required to effect the purpose and intent of this Agreement.

## 14.  PREVIOUS AGREEMENT

This Agreement shall be deemed to supersede any prior or collateral undertakings, warranties or Agreements, whether oral or written

## 15.  NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing and given by: (1) hand delivery; (2) registered or certified mail, return receipt requested; or (3) reputable overnight courier, to:

If to Company:
IndyzenInc- 2033 Gateway Place, Suite 500, San Jose, CA 95110

If to Customer:
Parkridge Limited - The Landmark 15 Queen's Rd Central 8/F Gloucester Tower, Central Hong Kong, China

or to such other address as any party may designate by notice complying with the terms of this Section. Each such notice shall be deemed delivered (a) on the date delivered if by personal delivery or overnight courier, and (b) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed

## 16.  NON-ASSIGNMENT

Company may not assign its rights or obligations hereunder without the prior written consent of Customer. Customer may not assign its rights and obligations hereunder without the consent of Company.

## 17.  HEADINGS

The headings in this Agreement have been inserted for convenience only, and are not to affect the interpretation of this Agreement

## 18.  SEVERABILITY

If any provision of this Agreement is held invalid under an applicable statute or rule of law, such invalidity shall not affect other provisions of this Agreement, which can be given effect without the invalid provisions, and to this end the provisions of this Agreement are declared to be severable Notwithstanding the above, such invalid provision shall be construed, to the extent possible, in accordance with the original intent of the Parties.

## 19. EMPLOYEES AND CONTRACTORS

During the term of this Agreement, and for a period of five years following the termination of this Agreement, Customer may not directly or indirectly solicit, contract or hire Company's employees or independent contractors for the purpose of having them perform work for Customer similar to the services being performed by Company for Customer, unless mutually agreed otherwise in writing

## 20. NON-WAIVER

Failure by either Party to enforce any term of this Agreement shall not be deemed a waiver of enforcement of that term or any other term

## 21. SUCCESSORS AND ASSIGNS

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective

successors and assigns.

**22. CURRENCY OF CONTRACT**

All payments and amounts referred to in this Agreement shall be in United States of America currency USD.

**23. ENTIRE AGREEMENT**

This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes and replaces all prior discussions, agreements, proposals, understandings, whether orally or in writing, between the parties related to the subject matter of this Agreement. This Agreement may be changed, modified or amended only in a written agreement that is duly executed by authorized representatives of the parties. If any provision(s) hereof is deemed to be illegal or unenforceable by a court of competent jurisdiction, the enforceability and effectiveness of the remainder of the Agreement shall not be affected and this Agreement shall be enforceable without reference to the unenforceable provision. No party's waiver of any breach or accommodation to the other party shall be deemed to be a waiver of any subsequent breach, or in any way to affect the validity of this Agreement.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed on the date indicated above.

For Customer:

_Park Ridge Ltd_

Name: _Randy Gene Dobson_

Title: _CEO_

For Company:

_Indyzen Inc_

Name: _Praveen Narra_

Title: _CEO_

# Schedule A

Customer:Parkridge Limited
Company:IndyzenInc

**Description of Services:**

Company shall provide services to Customer in two phases. Phase 1 and Phase 2 as described below.

Phase 1:

In Phase 1. Company shall develop Social Networking Software (from now on, called Morfit) using open source platform ELGG. The deliverables will include the following:

Software will be developed for 3 different platforms: Web. iOS. and Android platforms.

Company shall create two different graphical user interfaces. one for Web. and another for iOS and Android Mobile Apps. Company shall create mockup designs. and consult with the client and get client approval before moving on to the development of the platform

The main features will include the following:

- User Registration - Users will be able to register into the platform by providing their First Name Last Name, Email Address and a Password.
- Facebook Login - Users will be able to register / login to Morfit website or mobile app using their existing Facebook account.
- Profile Information - If a user signs in using Facebook, the following information, if publicly posted. will be collected and filled into Morfit    . First Name, Last Name. Email Address and Profile picture (if available).
- User Profile: User will be able to create his profile by adding additional information into his profile including: User's interests, gender. About Me, Facebook URL, Twitter URL, Website, etc.
- User will be able to Edit Profile information or change his profile picture if necessary.
- Profile Page. User will be able to create his profile page with his profile information, and be able to upload a cover photo to his user profile page.
- Profile page shall show how many other Users are following him/her and how many Friends he/she have. and how many people he/she is following. Users will be able to click on these links. and see who are the other users following / followed by this user.
- User's Wall - Users will is a screen where all posts created by a user are displayed depending on the privacy set by the user.
- User will be able to post on to his wall text. picture(s) and videos (up to 1 video per post)
- User will be able to set privacy to his posts. The different privacy options available are:
- Private - Posts are visible only to himself/herself
- Friends - Posts are visible to the user's Friends on Morfit
- Public - Posts are visible to everyone
- Users will be able to click on a thumbs up icon to specify that they "Like" a post. picture or video.
- Users will be able to comment on a post. picture or video
- Users will be able to share a post of another user on their own wall (if they can see that post)
- Users will be able to upload multiple pictures into a single post.
- Users will be able to tap on a picture to see it in full screen
- Users will be able to double tap on the picture to zoom it
- Users will be able to use a pinch gesture on a picture to zoom in and zoom out.
- User will be able to upload a video of up to 100 megabytes (depending on user's Internet

Page 9 of 16

Bandwidth) Allowed video formats are mp4 are mov
- User will be able to like a video, comment on a video or share a video on his wall.
- User will be able to play, pause and stop a video.
- News Feed: News Feed is a screen where posts created by the user and his friends (based on privacy settings) will be visible
- User will be able to like, comment on or share posts on his/her News feed
- User will be able to scroll his News Feed page to load more posts (if available)
- Notifications: If another user likes or comments on a user's post, user shall receive a notification. The notifications may be visible within the app and/or outside the app, if the app is closed depending on user's phone preferences.
- If there are unread notifications, user shall see a red "bubble" with a number inside that shows the number of unread notifications.
- User will be able to tap on a notification to go to the corresponding post.
- Chat: User will be able to text chat with his friends. The chat functionality will be provided using XAMPP chat server
- Messages: When a user misses a chat message, the message is shown in Messages screen
- Invitations: Users will be able to invite other friends to become their friends.
- User will be able to see the names of other Morfit users and/or friends who are working out at the gym, if their privacy settings allow visibility
- User will be able to provide search criteria to find a trainer based on their needs, and the search criteria will include location, age & gender preference, expertise of the trainer, and will take into consideration trainer's activity score on the platform
- User will be able to rate other trainers on a scale of 1 to 5 stars
- Software will be built using third party and/or open source software modules, and restrictions time constraints and limitations of those third party modules will apply to this software

**Price:**

The total price for the above services shall be US$420,000 (four hundred twenty thousand United States Dollars). However, the parties agreed that the total price shall be discounted by US$300,000 (three hundred thousand United States Dollars), which shall be treated as an initial funding loan made by Mr Parasurama Naidu Narra to the Customer. As a result, the total price payable by the Customer to the Company for the above services shall be US$120,000 (one hundred and twenty thousand United States Dollars).

<u>Phase 2:</u>

Phase 2 of Company's services shall start effective May 16th, 2015 and are as described below

- Company shall allocate a team of full-time personnel as listed below based in India to develop software for the Customer. Full-time personnel shall work for an average of 40 hours per week

> One Project Manager
> Three Team Leaders
> Five iOS Programmers
> Five Android Programmers
> Four Web Developers
> Three Quality Assurance Engineers
> Two Graphics Designers
> One Business Analyst

- Services described in Phase 2 of Schedule A shall renew automatically on a monthly basis until terminated by either party with a 30 day advanced written notice

- Regular Development Fee for the above team of personnel is $60 per person per hour. However, discounted service fee offered to Customer is US$45 per person per hour (Forty Five USD per person per hour). Customer shall be invoiced in advance, usually every two weeks. Customer shall pay 50% of this Discounted Fee within 14 Business Days of invoice, and 50% of this fee will be provided by the Company to Customer as a loan with terms as set out below and described in Schedule C. Overtime hours, if any, shall be billed at 50% above the discounted service fee. However, Customer shall have the right to unauthorize overtime hours in advance

- The Parties agree that any fee incurred in relation to the Services under Phase 2 shall be capped at $200,000 per month unless agreed otherwise by the Parties in writing. For the avoidance of doubt, this $200,000 shall be accounted as follows:

    $100,000 per month to be paid by the Customer by way of cash; and
    $100,000 shall be treated as a loan made by IndyzenInc (at a simple interest rate of 10% as set out in Schedule C).

    Any changes to the capped fee of $200,000 must be agreed between the Parties with at least 30 Business Days notification from intended date of change

- Customer may request additional services from Company. Cost for such additional services shall be as follows for each personnel

    USA Based Resource: $120/hr to $150/hr
    Global Offshore Resource: $45/hr to $60/hr
    Praveen Narra: $500 to $1,000/hr (Not charged unless previously agreed in writing)

- Company is responsible to provide the following for each personnel at no additional cost

    Office Space
    Salary and Benefits
    Internet connection
    Laptop or Desktop Computer
    PHP, MySQL, Cocoa, XCode, Java, or Android Studio
    Snacks & Beverages

- Customer shall be responsible for all travel costs and charges, including, without limitation, airfare, accommodation, transportation, food & beverage, shipping charges, hardware, additional devices and any other material charges. However, such charges must be pre-authorized by Customer

## Methodology:

- Developers shall utilize the Agile (SCRUM) methodology to develop software. Customer shall have freedom to make changes to the requirements, change priorities of features / tasks with understanding that customer and company will co-operate in good faith to estimate such features / tasks. Customer shall have 14 Business Days for acceptance testing of the deliverables after each sprint according to the Software Development and License Agreement

    2 week sprints unless otherwise agreed differently
    Desired functionality as described by Customer or Customer's Authorized Agent(s)

- o   Sprint kickoff, story grooming, scoping and assignments are done bi-weekly or as otherwise agreed by both parties.

- The software requirements are subject to change and re-prioritization based on the Agile process.

**App Submission:**

- Company shall assist Customer in submitting the App(s) to Apple's App Store / Google Play Store.
- Company shall be responsible to create App icons, App Screenshots that are needed to submit the app to App Store, unless Customer prefers to do it by themselves.
- The deliverables shall include Apps, App icons, Design screenshots, as well as documentation on how the app's functionalities work.

**Hardware / Testing:**

- Company shall test the iOS App(s) in the following test equipment: iPhone 5 and iPhone 6 running iOS 7, and iOS 8 operating systems respectively.
- Company shall test the Android App in the following test equipment: Samsung Galaxy S5, Samsung Galaxy Note 3, HTC Explorer A310e, Google Nexus 7. Android Operating systems: Android 4.2.2, Android 4.4 and Android 5.0. Customer may purchase testing in additional devices at additional cost.

**For Customer:**

_Parkridge Ltd_

Name: _Randy Gene Dobson_

Title: _CEO_

**For Company:**

_Indyzen Inc_

Name: _Praveen Narra_

Title: _C.E.O_

# Schedule B
# CoreIntellectualProperty

- Trainer matching algorithm
- Trainer ranking algorithm
- Crowdfunding for fitness services
- Video library done exclusively for fitness services (does not include technology developed by Byji Inc.)
- Photo morphing for fitness services
- Uber for fitness services
- Gamification utilizing "fitcoins"
- Fitness center recommendation using "gym location"
- List of "who's working out at a gym?"
- Scheduling logic of calendars for personal trainers
- Time based message expiration in chat

# SCHEDULE C
# Secured Promissory Note

CUSTOMER (MAKER):        Parkridge Limited
HOLDER:                  Indyzen Inc.
PRINCIPAL:               See Exhibit A
INTEREST RATE            10% per annum
EFFECTIVE DATE:          May 16, 2015
DUE DATE:                May 16, 2020

1.     Obligation.  FOR VALUE RECEIVED, Parkridge Limited, a company established under the laws of Hong Kong (the "Customer") promises to pay to the order of IndyzenInc, a company organized and existing under the laws of the State of California ("Holder") the principal balance to be listed under Exhibit A (the "Principal"), attached herein, together with interest thereon a 10% per annum on the terms set forth in this Secured Promissory Note (the "Note")

2      Calculation of Principal   The parties subject to this Note have entered into a separate Software Development and License Agreement (the "Agreement").  Per the Agreement, Holder will put together a team of twenty-four (24) full-time personnel to develop software for Customer at a discounted development       fee      of      $45      per      person      per      hour      (the "Development Fee")   Holder will invoice Customer biweekly for the Development Fee and additional services from the Holder.   Customer will pay one-half of the Development Fee within fourteen (14) Business Days of receiving the invoice from Holder, and the full amount of any other fees due to Holder The remaining one-half of the Development Fee will be added to the Aggregate Total listed under Exhibit A of this Note.

3      Payment   Customer will make interest only payments once a year upon the yearly anniversary of the Effective Date of this Note.  The outstanding Principal and unpaid interest shall be due and payable on the fifth anniversary of the Effective Date of this Note, or, upon a fifteen-Business Days (15) notice of demand by Holder which may not be made within the first three (3) years of the Effective Date of this Note  This Note is payable at the Holder's address or such other place as the Holder may designate in writing.

4      Fixed Interest Rate.  The interest rate on this Note shall be fixed at the simple rate of ten percent (10%) per annum

5      Default  Customer will be in default under this Note if Customer fails to make any payment required by this Note when due.  Upon any default by Customer under this Note, Holder may pursue all legal and equitable remedies and shall be entitled to recover from Customer reasonable attorneys' fees and costs of collection

6.     Usury,  In no event will the interest rate hereunder exceed that permitted by applicable law.  If any interest or other charge is finally determined by a court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted by law, and Holder may credit any excess amount previously collected against the balance due or refund the amount to Customer

7      Security   As security for the prompt and complete payment and performance in full by Customer of all outstanding amounts owed under this Note (the "Obligation"), Holder will retain possession of the source code for all Intellectual Property developed by Holder pursuant to the Agreement (the "Collateral")

8.   Continuing Security Interest.   This Note creates a continuing security interest in the Collateral and shall remain in full force and effect until performance in full of the Obligation.  Once the Obligation has been satisfied, this document shall automatically be null and void and shall have no further force and effect without any action on the part of either party.

9.   Perfection of Security Interest.   Customer authorizes Holder to file such financing statements pursuant to the Uniform Commercial Code or similar filings from time to time or other notices appropriate under applicable law.  Customer also agrees to take any and all other actions as Holder may determine to be necessary or useful for the attachment, perfection, and establishing priority of, and establishing or maintaining the ability of Holder to enforce, its security interest in the Collateral.

10.   Further Assurances.   Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Note and the transactions contemplated hereby.

11.   Force Majeure.   Neither party shall be liable for any breach of this Note or delay in performance resulting from a strike, lockout, or other labor dispute; fire, earthquake, flood, act of God, or other natural disaster; civil commotion, war, riot, criminal act of a third party; casualty or accident; or other cause beyond the reasonable control of or occurring without the fault of such party ("force majeure").  Any deadline or time within which a party must perform under this Note shall automatically be extended upon the occurrence of any such force majeure for a period equal to the time lost because of such event.

12.   Governing Law.   This Note is governed by and construed in accordance with the laws of the State of California, excluding its conflict of law rules and principles.

13.   Amendment.   This Note may be amended or modified only by an instrument in writing which by its express terms refers to this Note and which is duly executed by the party sought to be bound.

14.   Successors and Assigns.   This Note will be binding upon and inure to the benefit of the parties and their respective heirs, successors, and assigns.

15.   Severability.   If any provision or any word, term, clause, or other part of any provision of this Note shall be invalid for any reason, the same shall be ineffective but the remainder of this Note and any of its provisions shall not be affected and shall remain in full force and effect.

Parkridge Limited

By: _Randy Gene Dobson_

Title: _CEO_

IndyzenInc

By: _Praveen Narra_

Title: _CEO_

**Exhibit A**

**Principal Balance**

**(to be updated by the Parties at the end of every calendar month)**

| Date | Amount Loaned | Aggregate Total | |
|---|---|---|---|
| 31 May 2015 | $50,000 | $50,000 | |
| 30 June 2015 | $100,000 | $150,000 | |
| 31 July 2015 | $100,000 | $250,000 | |
| 31 August 2015 | $100,000 | $350,000 | |
| 30 September 2015 | $100,000 | $450,000 | |
| 31 October 2015 | $100,000 | $550,000 | |