# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION**

| | |
|---|---|
| PARKRIDGE LIMITED, a Hong Kong corporation, by Mable Mak, and MABEL MAK, an individual Claimants, | AAA Case No.: 01-17-0003-4918 |
| v. | |
| INDYZEN, INC., a California corporation, and PRAVEEN NARRA KIJMAR, an individual, Respondents. | |

## CLAIMANTS' MOTION TO DISMISS RESPONDENTS' COUNTERCLAIMS AND FIVE NON-SIGNATORIES

Respondents filed Counterclaims against Claimants seemingly asserting (a) breach of contract and (b) intellectual property misappropriation. Exhibit A. They further asserted the Counterclaims against five parties who are not signatories to any agreements with Respondents: Boon Global Limited ("Boon"), F8 Vietnam Company Limited ("F8"), California Fitness & Yoga Centers ("California Fitness"), California Management Group ("California Management") and Randy Dobson ("Dobson") (collectively, the "Non-Signatories"). Respondents allege that Claimants and the Non-Signatories (collectively the "Counter-Respondents") purportedly breached a software development agreement between Indyzen, Inc. and Parkridge Ltd. ("the Morfit Agreement") by insufficiently paying Indyzen, and "misappropriated intellectual property rights" "to benefit entities that they have set up which exclude Narra despite their promises otherwise." Exh. A at 3. For the reasons addressed below, the Counterclaims should be dismissed because (1) this tribunal lacks jurisdiction over the counterclaims because they fall outside the arbitration provision, and because it lacks jurisdiction over the Non-Signatories because they did not agree to arbitrate any claims with Respondents; (2) they fail to provide sufficient notice of the claims that Respondents are asserting, and (3) the asserted causes of action are not recognized by California law, and nevertheless would be preempted by federal law.

1

# I.  BACKGROUND

Parkridge Limited was founded in 2013 to create a mobile software application that combines health and fitness information with social media networking. Possessing limited technical expertise internally, Parkridge sought to hire a Chief Technology Officer (CTO) to lead its mobile app development. Through introductions at seminars, employees of Parkridge were introduced to Respondent Praveen Narra Kumar ("Narra"), who held himself out as experienced in software development. Following these discussions, Narra was hired as Parkridge's CTO. After he began work at Parkridge, Narra hired his own software company, Indyzen, Inc., to develop the mobile app. Narra then helped negotiate a contract with Indyzen, including providing the specifications for the mobile app, and directing Parkridge about what terms and aspects were needed. Parkridge signed a contract for Indyzen the mobile app on January 5, 2015 (the "Morfit Agreement").

The result was disastrous for Parkridge. The mobile app did not work, was grossly inferior to comparable apps in the industry, and Indyzen charged Parkridge exorbitant development prices. In short, Narra abused his position as Parkridge's CTO to siphon money from Parkridge to benefit himself and his company, Indyzen.

# II.  PROCEDURAL HISTORY

Parkridge filed suit in the Northern District of California on December 29, 2016 against Narra and Indyzen for breaches of fiduciary duties under California and Hong Kong law, aiding and abetting breach of fiduciary duties under California law, breach of contract, fraudulent misrepresentation, and fraudulent concealment under California law. *Parkridge, Ltd. et al. v. Indyzen, Inc. et al.*, No. 16-cv-07387 (N.D. Cal. filed Dec. 29, 2016). On March 8, 2017, Respondents moved to compel arbitration for both defendants and to stay the case pending

arbitration. *Id.*, dkts. 12 & 13. Claimants opposed arbitration, particularly against Narra, as the Morfit Agreement that contained the arbitration provision was only between Parkridge and Indyzen, and not individuals. The magistrate judge ruled that the dispute may have related to Narra's role under the Morfit Agreement, and that the arbitrator could determine his jurisdiction thereto so stayed the case. Claimants filed the pending arbitration on June 8, 2017. Respondents submitted their affirmative defenses on July 5, 2017, and filed counterclaims which also named five additional entities, none of which were parties to the Morfit Agreement.

### III.  ARGUMENT

**A.  Jurisdiction is Improper Because the Counterclaims are Outside the Scope of the Arbitration Provision, and the Non-Signatories are Not Parties to the Morfit Agreement**

"[A]rbitration is a matter of contract and a party ***cannot*** be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) (emphasis added). Because the language of the contract "defines the scope of disputes subject to arbitration," a court cannot "compel arbitration of any issues, or by any parties, that are not already in the agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). "[A] party can be compelled to submit a dispute to arbitration ***only*** where he has agreed in writing to do so."  *Marsch v. Williams*, 23 Cal. App. 4th 250, 254-55 (1994) (emphasis added).

**1.  The Arbitration Provision Does Not Cover the Dispute Alleged by Respondents**

Respondents' allegations fall outside the scope of the arbitration provision in the Morfit Agreement, which is solely directed to Indyzen developing a mobile app for Parkridge. Respondents appear to allege two causes of action in their counterclaim: (1) dispute over payments made to Indyzen, and (2) "intellectual property misappropriation," which purportedly relates to a

different software app developed by another company.

Respondents' allegation that the Morfit Agreement was breached by lack of or insufficient payment is explicitly outside and excluded from the arbitration provision, thus this tribunal does not have jurisdiction over it. Indeed, it states: "***Except for any dispute arising out of payments due to Company***, any dispute or disagreement arising between the Company and the Customer… shall be referred to arbitration…" Exh. B, at 6, ¶ 11 (emphasis added). Here, Respondents sole contention for its breach of contract counterclaim seems to be a dispute arising from payments that it contends are due to it from Parkridge. *Waffle House, Inc*., 534 U.S. at 289 (disputes explicitly excluded from an arbitration clause cannot be forced into arbitration). But as noted above, payment disputes are explicitly excluded from the arbitration provision, so this tribunal thus does not have jurisdiction over this dispute.

Furthermore, Respondents' second claim that Parkridge or one of the Non-Signatories somehow "misappropriated" Respondents' intellectual property is also not encompassed by the arbitration provision. The Morfit Agreement is for ***Indyzen's*** development of a mobile app for Parkridge. Simply put, the Morfit Agreement purpose and language is limited to Indyzen developing the Morfit app, and the terms of that app's development. Everything outside of that is not a part of the agreement. Thus, the development of an independent mobile app by different companies would be outside of the Morfit Agreement's scope, and is accordingly outside the scope of the contract's arbitration provision.

In sum, this tribunal does not have jurisdiction over Respondents' counterclaims because they are outside of the arbitration provision. Moreover, it is well-established that courts decide

whether parties agreed to arbitrate certain disputes, and whether they can be forced to arbitrate.[1]

### 2.  The Non-Signatories Have Not Consented to Arbitrate

Jurisdiction against the Non-Signatories is further improper before this tribunal because they have never consented to arbitrate this dispute, and accordingly should be dismissed. *Marsch*, 23 Cal. App. 4th at 254-55 (parties cannot be forced into arbitration absent agreeing in writing to a contract to arbitrate). The software development agreement to develop the Morfit app ("Morfit Agreement") was between two parties: Indyzen, Inc. and Parkridge Ltd. The Non-Signatories are not parties to the Morfit Agreement, which ostensibly was the basis of Respondents' claim for jurisdiction over Non-Signatories. Indeed, they are not parties to any agreements with Respondents, nor have Respondents alleged or attached any contracts to their counterclaims with any of the Non-Signatories. *AT&T Tech. v Commc'n Workers*, 475 U.S. 643, 649 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation and citation omitted)). As such, the Non-Signatories did not agree to arbitrate Respondents' counterclaims and cannot be required to submit to arbitration. *See id.* (concluding that it is for a court, not an arbitrator, to decide whether parties agreed to arbitrate, and whether they can be forced to arbitrate); *Carpenters 46 No. Cal. Counties Conference Bd. v. Zcon Builders*, 96 F. 3d 410, 414-15 (9th Cir. 1996) (same). And while courts at times make some rare exceptions to this rule, they do not apply here for the reasons discussed below.

---

[1] The Supreme Court mandates that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Technologies, Inc. v Commc'n Workers*, 475 U.S. 643, 649 (1986).  The Ninth Circuit, among many other courts, held that the court must decide whether a non-signatory is bound by an obligation to arbitrate.  *Carpenters 46 No. Calif. Counties Conference Bd. v. Zcon Builders*, 96 F. 3d 410, 414-15 (9th Cir. 1996).

To be sure, no tribunal in Northern California has personal jurisdiction over the Non-Signatories because they are located in Asia, have no offices, employees or agents in California, have not directed their activities towards California, nor have agreed to litigate or arbitrate in California.

### 3. No exceptions to signing an arbitration agreement apply that bind the Non-Signatories to the arbitration clause.

Entities and persons cannot be forced into arbitration absent agreeing to a contract to arbitrate. *Marsch*, 23 Cal. App. 4th at 254-55.  In the Ninth Circuit, an arbitration agreement may only be enforced against non-signatories under certain specific principles of agency and contract law. *Comer v. Micor, Inc*. 436 F.3d. 1098, 1101 (9th Cir. 2006). These principles include "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id*. Not one of these principles applies here to the Non-Signatories.

### a.   The Non-Signatories did not agree to arbitrate in any collateral documents which are incorporated by reference in the Morfit Agreement.

An agreement to arbitrate could, under circumstances, "be contained in a collateral document which is incorporated by reference." *Marsh*, 23 Cal. App. 4th at 255. Here, there is no collateral document containing an arbitration clause signed by the Non-Signatories that was ever incorporated in the Morfit Agreement, nor does one exist. Nor have Respondents alleged otherwise. As such, the Non-Signatories cannot be bound to arbitrate based upon incorporation by reference.

### b.   There was no Assumption by the Non-Signatories

Under certain circumstances, "[i]n the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F. 3d 773, 777 (2nd Cir. 1995).   The

Respondents have not alleged, nor could they, that the Non-Signatories displayed conduct, of any kind, that would indicate that they were voluntarily assuming the arbitration agreement. Simply put, the Non-Signatories cannot be bound by arbitration based upon assumption, nor has it been alleged otherwise.

> **c.  The Non-Signatories do not have a principal or agency relationship with the Claimants that would bind them to the arbitration.**

In California, a nonsignatory to an agreement only may be compelled to arbitrate if an agency relationship between the nonsignatory <u>and</u> one of the parties to the arbitration agreement "mak[es] it compel the nonsignatory to also be bound to arbitrate his or her claim." *County of Contra Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242 (1996). To establish the existence of agency, an essential element which must be factually present is that the alleged principal maintains control over the alleged agent. *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013).  However, the law is clear: even signing an arbitration agreement as an agent for a disclosed principal does not bind the agent to arbitrate claims brought against him personally. *Benasra v. Marciano* 92 Cal. App. 4th 987, 992 (2001); *Flink v Carlson*, 856 F.2d 44, 46 (8th Cir. 1988); *McCarthy v. Azure*, 22 F. 3d 351 (1st Cir. 1994). "The distinction between individual capacity and representative capacity portends a meaningful legal difference." *Benasra,* 92 Cal. App. 4th at 992.

Here, the Non-Signatories do not have, and never have had, an agency relationship with Parkridge that would bind them to arbitration. To begin with, Respondents have not alleged an agency-principal relationship between Parkridge and F8, California Fitness and/or California Management. As such, they cannot be bound to the arbitration clause in the Morfit Agreement.

While the Respondents seem to allege that Dobson was an agent for Parkridge, it still would not subject him to the arbitration personally. As previously stated, it is well settled that signing an

agreement in a representative capacity does not bind an individually personally. *Id.* For example, in *Benasra v. Marciano* 92 Cal. App. 4th 987 (2002), the court there refused to compel the president of a corporation to arbitrate when he was not a party to any agreement containing an arbitration clause because "he unambiguously signed both agreements as a corporate officer and only as a corporate officer, not in his individual capacity." *Id.* at 990. Similarly, Dobson did not sign the Morfit Agreement personally, nor have the Respondents claimed that he did. In fact, his signature in the Morfit Agreement is clear and unambiguous:  he was signed only in his capacity as CEO of Parkside.

> **d.    The Respondents have failed to pierce the corporate veil against the Non-Signatory Counter-Respondents.**

A corporation is a legal entity with its own distinct liabilities and obligations that is separate and distinct from its stockholders, officers and directors. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). A corporate identity only may be disregarded resulting in the piercing of the corporate veil where an abuse of corporate privilege justifies holding the equitable ownership of a corporation liable for the corporation's acts. *Id.* The following two conditions **must** be met *before* invoke the alter ego doctrine: (i) there is such a unity of interest that the separate personalities of the entity and the shareholder, or other related person or entity, no longer exist; and (ii) fraud or injustice would result if the acts are treated those of the corporation alone. *Johnson v. Serenity Transportation, Inc*., 141 F. Supp. 3d 974, 984 (N.D. Cal. 2015).

Under California law, "plaintiff must allege specifically *both* of the elements of alter ego liability, as well as facts supporting each." *Nielson v. Union Bank of Cal., N.A.,* 290 F. Supp. 2d 1101, 1115 (C.D. Cal. 2003) (emphasis added); *Hokama v. E.F. Hutton & Co.,* 566 F. Supp. 636, 646 (C.D. Cal. 1983) (recognizing that conclusory allegations of alter ego are insufficient). Neither unity of interest, nor fraud, was alleged, so Respondents' counterclaim fails against the

non-signatories.

Respondents also fail to allege what, if any, injustice or fraud would result if the alter ego doctrine is not invoked here, as required under California law. *Nielson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) ("alter ego will not be applied absent evidence that an injustice would result…"); *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1469 (2014) (fraud is required to be pled with particularity). This ends the analysis.

However, even assuming, *arguendo*, that Respondents did allege this in the Counterclaim, which they do not, they still fail to adequately allege alter ego liability, and only list a conclusory statement. For instance, Respondents state: "Dobson has commingled assets of the companies, and operated them with a unity of interest." Exh. A at 3. These allegations are mere legal conclusions (and are untrue). Indeed, Respondents do not allege any facts to this effect: not how Dobson commingled assets, and not how he operated the companies with a unity of interest. Because these allegations do not allege *both* of the elements of alter ego liability, nor any facts supporting each, the Counterclaim should be dismissed for failing to state a claim against the Non-Signatories.

> **e.      Estoppel does not bind the Non-Signatories to this arbitration**.

Under circumstances, which are not met here, estoppel may at times also preclude a party from claiming the benefits of a contract while, at the same time, attempting to avoid the burdens that the contract imposes. *Burgoon v. Narconon of N. Cal.*, 125 F. Supp. 3d 974, 992 (N.D. Cal. 2015). In order to bind a non-signatory to an arbitration clause under the theory of estoppel, it must be demonstrated that the non-signatory "knowingly exploit[ed] the agreement containing the arbitration clause despite having never signed the agreement." *Comer v. Micor, Inc*. 436 F.3d. at 1101.

Here, it has not been alleged, nor could it be alleged, that the Non-Signatories have

knowingly exploited the Morfit Agreement. In addition, the Non-Signatories are not enjoying the benefits of the Morfit Agreement. They have not brought claims, or sought to enforce their rights, under the Morfit Agreement, nor will the Non-Signatories receive any benefit from the outcome of the arbitration. Nor was this alleged. Thus, estoppel does not bind the Non-Signatory Counter-Respondents to the arbitration provision in the Morfit Agreement.

**B.  The Counterclaims Should be Dismissed Because They Fail to Provide Notice of What Claims are Asserted, What was Breached or Misappropriated, and How**

The counterclaims fail to give Counter-Respondents proper notice of what they claim. Namely, the counterclaims state that Claimants and Non-Signatories "breached the Morfit Agreement and have further misappropriated intellectual property rights" in a conclusory fashion, without providing any facts in support of those claims. While not clear which causes of action were asserted and against which entity, Counter-Respondents move to dismiss as if Respondents counterclaimed (1) breach of contract, and (2) intellectual property misappropriation.

*First*, other than disputing sufficient payments, the breach of contract counterclaim fails to allege facts to give sufficient notice about how the Morfit Agreement was breached, which clause was breached, when it was breached, or what conduct caused the breach. *See Levy v. State Farm Mut. Auto Ins. Co.*, 150 Cal. App. 4th 1, 5-6 (2007) ("Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity."). The asserted count should further be dismissed against the Non-Signatories because it does not allege any facts of how those particular entities or the individual breached the contract. *Peralta v. Cal. Franchise Tax Bd.*, 124 F.Supp.3d 993, 1003 (N.D. Cal. 2015), *aff'd* 673 Fed.Appx. 975 (Fed. Cir. 2016) (dismissing the contract claim "because she has pleaded no facts from which [to] infer that the defendants breached the contract in their individual capacities.").

*Second*, the "intellectual property misappropriation" counterclaim also fails because it does

not give notice of what "intellectual property right" the claim relates to, or how it was "misappropriated." For instance, what was the intellectual property that Respondents claim to own? *See Peralta v. Cal. Franchise Tax Bd.*, 124 F.Supp.3d at 1001 ("infringement claim also fails because she has not put defendants on notice of the alleged infringement in any meaningful detail."). Was it patent rights? No patent is disclosed, or which claims are asserted. Without knowing which patent is claimed, or the claims asserted, Parkridge cannot assess whether the claims were infringed, cannot determine whether the patent is valid, cannot ascertain proper ownership, nor could it search for prior art to defend itself against the patent.

If respondents claim that the intellectual property Parkridge "misappropriated" or infringed was a trademark: what was the mark? Without alleging any facts as to which mark Respondents claim, Parkridge cannot determine whether it is even a valid trademark, that it is indeed owned by Respondents, or whether there was a likelihood of confusion between Parkridge's and Respondents' use.

Was the intellectual property related to a copyright? Was it for content, software code or designs? Did Respondents fix the alleged copyrighted material onto a tangible medium? Without proper notice and sufficient facts in the pleadings, Parkridge cannot assess its systems if not notified of what to look for, nor can it assess its potential defenses, and thus cannot defend against such claims.

Or are Respondents claiming that a trade secret was misappropriated? Respondents allude to a mobile app allegedly developed by apart from Respondents, but do not indicate what aspects they claim they own. *Wistron Corp. v. Phillip M. Adams & Assoc., LLC*, 10–cv–4458 EMC, 2011 WL 4079231, at *4 (N.D.Cal. Sept. 12, 2011) (generic descriptions of accused product, i.e., "computer chips, motherboards, computers" were insufficient to state infringement claim). Do

Respondents claims rights to the whole mobile app, and if only certain elements, which elements? Simply put, because the allegations are at best generic descriptions of a product, Parkridge cannot know the scope of IP rights Respondents claim they own, nor *what* their IP is.

Nor do Respondents allege how the "intellectual property" was misappropriated. Do Respondents assert that Parkridge hacked into their system and copied their software app? Or did they physically enter the space and make copies?

Finally, Respondents fail to allege how any Non-Signatories infringed any rights or misappropriated any IP. *See Peralta v. Cal. Franchise Tax Bd.*, at 1000 (dismissing individuals because plaintiff had "not alleged a sufficient nexus between them and the alleged infringement.").

Because Respondents fail to allege what the intellectual property was, the scope of its rights, how and in which way those rights were misappropriated, and who misappropriated the IP, they fail to give Cross-Respondents sufficient notice of the allegations and make it impossible to defend against.

### C.    Intellectual Property Misappropriation is Not a Proper Claim and is Preempted by Federal Law

In addition to being outside the scope of the Morfit Agreement and being insufficiently pled, "intellectual property misappropriation" is not a cause of action under California law, and even it was, it would be preempted by the Federal Patent Act, the Copyright Act, the Lanham Act or California law. To the extent the arbitrator has jurisdiction over the dispute, the jurisdiction would be premised on the Morfit Agreement between Parkridge and Indyzen, which sets California law in its choice of law provision. Exh. B. at 6 ¶ 10.  However, "misappropriation of *intellectual property*" is not a cause of action under either California law, nor under federal law.

Furthermore, even if "intellectual property misappropriation" was a cause of action under California or federal law, it would be preempted by patent, copyright, trademark and/or trade secret

law. *See, e.g.*, 17 U.S.C. § 301(a) (The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright."); *Jardin v. DATAllegro, Inc.*, No. 10–CV–2552, 2011 WL 3300152, at *2 (S.D. Cal. July 29, 2011) ("[California's Uniform Trade Secrets Act] preempts all claims resting on allegations of the misappropriation of confidential information."); *Mattel, Inc. v. MGA Entertainment, Inc.*, --- F.Supp.2d ---, 2011 WL 1114250, at *44 (C.D.Cal. Jan.5, 2011) (same).

Accordingly, because "intellectual property misappropriation" is not a claim under California or federal law, and because even if it were it would be preempted, this counterclaim should be dismissed.

## V.  CONCLUSION

For all of the foregoing reasons, the Counterclaims should be dismissed, and Claimants Parkridge Limited and Mabel Mak, respectfully request that their Motion to Dismiss be granted, for the attorney's fees in the preparation of this motion as permitted under the rules and by the Morfit Agreement, and grant them any other further relief that is deemed just and fair.

Yours Truly:


By:  s/ Adam Wolek
Adam Wolek
awolek@taftlaw.com
Jillian S. Cole
jcole@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois  60601
(312) 836-4063
*Attorneys for Claimants Parkridge Ltd. & Mabel Mak, and Non-Signatory Counter-Respondents*

# EXHIBIT A

1     Mark R. Figueiredo, Esq. (SBN 178850)
      Ethan G. Solove, Esq. (SBN 308026)
2     STRUCTURE LAW GROUP, LLP
      1754 Technology Drive, Suite 135
3     San Jose, California  95110
      Telephone: (408) 441-7500
4     Facsimile:  (408) 441-7501

5     Attorneys for Respondents
      INDYZEN, INC. and PRAVEEN NARRA KUMAR

6

7

8                **AMERICAN ARBITRATION ASSOCIATION**

9                    **COMMERCIAL ARBITRATION**

| | |
|---|---|
| 10   PARKRIDGE LIMITED, a Hong Kong corporation, by Mabel Mak, and MABEL MAK, an individual, | AAA Case No.: 01-17-0003-4918 |
| 11 | (N.D. Cal. Case No.: 4:16-cv-07387-KAW) |
| 12            Claimants, | **RESPONDENTS' COUNTERCLAIM** |
| 13          v. | (Answering Statement submitted concurrently) |
| 14   INDYZEN, INC., a California corporation, and PRAVEEN NARRA KUMAR, an individual, | |
| 15 | |
| 16           Respondents. | |
| 17   INDYZEN, INC., a California corporation, and PRAVEEN NARRA KUMAR, an individual,, | |
| 18 | |
| 19           Counter-Claimants, | |
| 20          v. | |
| 21   PARKRIDGE LIMITED, a Hong Kong corporation, BOON GLOBAL LIMITED, a | |
| 22   Hong Kong corporation, F8 VIETNAM COMPANY LIMITED, a Vietnam company, | |
| 23   CALIFORNIA FITNESS & YOGA CENTERS, an entity of unknown form, | |
| 24   CALIFORNIA MANAGEMENT GROUP, an entity of unknown form, and RANDY DOBSON, an individual, | |
| 25 | |
| 26           Counter-Respondents. | |

27     ///

28     ///

                                    - 1 -

Pursuant to R-5 of the AAA Commercial Arbitration Rules, Counter-Claimants Indyzen, Inc. ("Indyzen") and Praveen Narra Kumar ("Narra" and collectively with Indyzen, "Counter-Claimants") submit the following Counterclaim to the Demand for Arbitration and Statement of Claims filed by Claimants Parkridge Limited and Mabel Mak (collectively, "Claimants").

In or around 2013, Narra and Counter-Respondent Randy Dobson ("Dobson") entered into discussions to do business together.  Counter-Claimants are informed and believe that Dobson owned and operated California Fitness & Yoga Centers (see www.cfyc.com.vn) ("CFYC") at several locations in Vietnam; and that Dobson also owned and operated California Management Group ("CMG") in and around Vietnam.  Each of CFYC and CMG are headquartered in Ho Chi Minh City, Vietnam.

In 2013, Dobson caused Parkridge Limited ("Parkridge") to be formed as a Hong Kong corporation for the purpose of developing and monetizing an online personal training platform that would connect personal trainers with clients (the "Morfit App").  Parkridge hired third-party Tibco Software ("Tibco") to develop the Morfit App.  Tibco is a large, internationally-recognized software development firm that was subsequently acquired for $4.3 billion.

Dobson knew Narra as owner of Indyzen, a software development company.  Dobson viewed Narra as having technical experience and abilities that would be beneficial to his businesses.  Dobson requested that Narra advise and assist him on the software development that Tibco was undertaking pursuant to the contract with Tibco.  Dobson and Narra soon came to the conclusion that Tibco was not developing the software satisfactorily and it was lacking the desired mobile functionality.  Dobson and Narra also came to the conclusion that Tibco's hourly rates up to $230 in addition to annual software licensing fees of up to $1,825,000 were high.

Toward the end of 2014 it became clear that Tibco would not be able to develop the Morfit App.  At that time, Dobson and Narra agreed to set up a crowd funding platform. Specifically, Dobson promised and Narra agreed to form Boon Global Limited as the crowd funding company, with each of Narra and Dobson's wife, Mabel Mak, listed as founding directors and 50% owners of the company.  In and around November 2014, Narra coordinated with Dobson's team members Rowell Tan, Hieu Pham, and Mark Oakley regarding the formation of

- 2 -

Boon Global Limited.  Narra further completed and returned forms to the foregoing, which listed Narra as a 50% owner of Boon Global Limited with the expectation that they would be processed and filed accordingly.  Only recently did Narra discover that the forms he completed and returned were not filed and instead the filed forms for Boon Global Limited list only Mabel Mak as the sole shareholder, and list Mabel Mak and Dobson as the directors.

In early 2015, Dobson as CEO of Parkridge and Narra as CEO of Indyzen executed an agreement between Parkridge and Indyzen whereby Indyzen would, in summary, develop the Morfit App for Parkridge in exchange for payment from Parkridge to Indyzen.  Said agreement is hereinafter referred to as the Morfit Agreement.  Per the Morfit Agreement, Indyzen proceeded to develop the Morfit App.  Parkridge made payments totaling $420,000 to Indyzen.  Parkridge further executed a promissory note for the payment of $550,000 together with 10% interest per annum, payable on or before May 16, 2020.  But Parkridge failed and refused to pay the remaining $860,777 owed to Indyzen per the Morfit Agreement.  Parkridge has further denied its obligations pursuant to the written promissory note.

Further the Morfit Agreement expressly provides that Parkridge, as the customer, would only take ownership of the Morfit App following payment in full of all amounts due to Indyzen.  Unbeknownst to Counter-Claimants at the time, Counter-Respondents have launched a F8Fit App as the unauthorized clone of the Morfit App.  Counter-Claimants are informed and believe that Counter-Respondents set up Boon Global Limited to be owned 100% by Mabel Mak; that Boon Global Limited owns in whole or in part F8 Vietnam Company Limited which offers the F8Fit App using intellectual property developed by Counter-Claimants under the Morfit Agreement, the rights to which do not belong to Counter-Respondents.  In effect, Counter-Respondents have breached the Morfit Agreement and have further misappropriated intellectual property rights to benefit entities that they have set up which exclude Narra despite their promises otherwise.

Dobson has controlled and operated Parkridge, CFYC, CMG, Boon Global Limited, and F8 Vietnam Company Limited as agents and/or joint venturers of each other.  Dobson has commingled assets and resources of the companies, and operated them with a unity of interest, such that they cannot and should not be deemed to be separate entities with respect to the

- 3 -

1  allegations stated herein.  Further, each of the foregoing entities has conspired and collaborated

2  with each other and with Dobson to commit the wrongs described herein.

3         For the foregoing reasons, Counter-Claimants seek recovery of compensatory,

4  consequential, incidental, and punitive damages in excess of $5,300,000, together with costs, fees,

5  and attorney's fees as provided for in the Morfit Agreement, jointly and severally against all

6  Counter-Respondents.  In addition, Counter-Claimants seek a declaration of their rights under the

7  Morfit Agreement.

8

9  Date: July 5, 2017                                     STRUCTURE LAW GROUP, LLP

10

11                                                       By: _____

12                                                            Mark R. Figueiredo, Esq.
                                                             Attorneys for Respondents
13                                                            INDYZEN, INC. and
                                                             PRAVEEN NARRA KUMAR

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

# EXHIBIT B

# SOFTWARE DEVELOPMENT AND LICENSING AGREEMENT

This Software Development and License Agreement (the "Agreement") is effective 5 January 2015.

BETWEEN:

**IndyzenInc**(the "Company"), a company organized and existing under the laws of the State of California, with its main business address at:2033 Gateway Pl San Jose, CA 95110

AND:

**Parkridge Limited** (the "Customer"), a company established under the laws of Hong Kong with certificate of incorporation no. 1956916 with main address at:The Landmark 15 Queen's Rd Central 8/F Gloucester Tower, Central Hong Kong, China

WHEREAS:

The Company is engaged in information technology consulting, software development, marketing, licensing, global outsourcing and support of certain software and various other services by and through various employees, contractors and sub-contractors, vendors and / or offshore outsourcing partners.

Services that are subject to this Agreement shall be as set forth in Schedule "A"annexed hereto which shall describe the desired services in detail.

Company has agreed to undertake and to provide such Services to the Customer under the terms and conditions specified in this Agreement and for the charges specified in Schedule "A";

IN CONSIDERATION of the premises and mutual covenants herein set forth and provided for the parties covenant and agree as follows:

## 1.   DEFINITIONS

The following words and terms shall have the following meanings when used herein and such definitions shall apply to both the singular and plural forms of any such words and terms:

"Agreement"means this agreement including all schedules.

"Business Day"means each of Monday, Tuesday, Wednesday, Thursday and Friday except where any such day occurs on any federal or provincial statutory holiday observed in the state of California.

"Charges"means the consulting fee, software development fee, license fee, commissions, and other compensation to be paid by Customer to Company as set out in Schedule "A"together with reimbursement to Company of all out-of-pocket expenses approved in advance in writing by the Customer (including, but not limited to,  travel, accommodation, long distance, courier, facsimile, hardware, software and other material charges) plus any and all applicable federal, state, local, international, import, export and municipal taxes presently or hereafter imposed upon any and all such amounts.

"Commencement Date"means the date of execution of this Agreement by the Parties.

"Functional Specifications"has the meaning given in clause 1.

"Hardware"means the central processing unit or device and accompanying operating system set out in Schedule "A"and which is to be utilized by Customer for operation of the Software.

"Materials"means the Functional Specifications, the Software and the System Documentation.

"The Software"means those software programs, web applications and mobile applications that have been or to be developed by Company and delivered or licensed to Customer pursuant to the terms and conditions of this Agreement.

"CoreIntellectualProperty"means all patents, patent applications, registered designs and applications thereof, copyright material, computer software, technical information, inventions, trademarks, trade secrets, and all applications and registrations thereof that relate to the fundamental essence of the Product or Business, which are set forth in Schedule B

"Party"or "Parties"means either Company or Customer if used in the singular and both Company and Customer if used in the plural.

"Services" mean the services to be provided by the Company to the Customer as set out in Schedule "A".

"System Documentation"means all documents, wireframes, flowcharts, printout specifications, file specifications, test data, and screen layouts which collectively contain a complete description and definition of all operating conditions of The Software.

"Users"means Customer's clients or potential users who install, use, or otherwise interact with any of The Software or Materials.

1. **DEVELOPMENT OF FUNCTIONAL SPECIFICATIONS**

   (a) Company and Customer shall work together in preparation of the Software functional specifications and acceptance test criteria as set out in Phase 1 of Schedule "A"(the "Functional Specifications").

   (b) Customer shall have 14 Business Days to disapprove any of the Functional Specifications, or to request specific clarifications, additions or modifications to the Functional Specifications. Such disapproval or request shall be given in writing within the time period aforesaid, and if not so given, the Customer shall be deemed to have accepted the Functional Specifications.

   (c) If the Functional Specifications are rejected in whole or in part by the Customer, or if the Customer requests specific clarification, additions or modifications to the Functional Specifications, then Company and Customer shall cooperate in good faith to work together and come up with a mutually agreeable Functional Specifications.

2. **DEVELOPMENT OF THE SOFTWARE**

   (a) Company shall code and debug The Software and develop the System Documentation, all in accordance with the services and work described in Schedule A.

   (b) The Software will be coded in technologies as considered appropriate by Company using such techniques, standards and conventions as have been developed by Company. If there is a conflict between such techniques, standards and conventions and the Functional Specifications, the Functional Specifications will prevail.

3. **CHARGES FOR DEVELOPMENT OF THE SOFTWARE**

   (a) Charges: Schedule "A"shall establish the pricing methodology for the project and the manner of payment of all such compensation and fees. Notwithstanding, it is acknowledged by the parties that any changes in services and/or features described in Schedule "A"shall have an impact on the pricing and upon agreement as to changes the parties shall in good faith adjust

the pricing where appropriate.. If Customer disputes a part of any invoice, Customer must pay the amount not in dispute by due date or be subject to interest at a rate of one and one-half percent (1-1/2%) per month, late fees and penalties on any undisputed amounts. The amount of fees, interests and penalties Company charges will be lesser of the amounts stated, or the State's legally enforceable maximum, whichever is the lesser.Company also reserves the right to withhold Services, including denying access to the deliverables, while there are any outstanding fees which are not in dispute or if Customer is in breach of this agreement following all applicable cure periods. Customer shall not have any license or right to the deliverables for which dues are not paid in full to the Company, even if Company delivers such deliverables to the Customer.

(b)    Verification Records: For projects involving full-time or part-time personnel, time is usually maintained through timesheets filled by personnel working for such projects. Any questions or disapprovals of timesheets should be received in writing by Company within 30 (thirty) Business Days of receiving such timesheets. If Company does not receive any such disapprovals within 14 BusinessDays of sending timesheets to the Customer, all such timesheets will be deemed approved by the Customer. If any additional verification is required, Customer shall inform Company before finalizing Schedule "A", and incorporate such special verification methods as part of Schedule "A".

(c)    Invoicing: The Company shall provide written invoices of any amounts due in accordance to Schedule "A". All payments shall be due within 14 Business Days of receipt of such invoice(s) at Company's office address provided in this agreement. Customer shall be in default under this Agreement if payment is not received within 30 (thirty)BusinessDays following receipt of any invoice unless the Customer disputes the invoice in good faith, and in writing within 14 BusinessDays of receipt of an invoice.  If no written notice of dispute is received in writing within 14 BusinessDays of receipt of an invoice, such invoice shall be deemed to be correct, and payable in full. For any disputed invoice, Customer shall clearly provide to Company in writing the reason for such dispute. Customer shall make payment on the non-disputed portion of such disputed invoice without delay and the Parties shall investigate and attempt to resolve such dispute in an amicable and prompt manner. Upon default in payment, Company is authorized to suspend work under Schedule A in its sole discretion until the default is cured by payment in full. In the event that such default is not cured within 30 (thirty) BusinessDays following invoice, the Company in its sole discretion, may terminate the work described in Schedule "A"by written notice to the Customer.  Upon such termination, Company shall have no further obligations under Schedule "A", but all payments due through the date of such termination shall remain due and payable and Company may take any and all actions necessary to collect the same, provided, that Company may not withhold delivery of any work product produced in accordance with Schedule "A"and paid for by Customer..

## 4.   ACCEPTANCE TESTING

(a)    If Customer requires any specific acceptance testing procedures, Customer shall provide all such acceptance criteria to Company within the first 14 BusinessDaysof the Commencement Date or a mutually agreed time. Upon each delivery of Materials, The Software, Systems Documentation or other deliverable(s) (referred to as 'Deliverables'from now on), the Customer shall perform such acceptance testing procedures in good faith. The Customer will not unreasonably withhold or delay such acceptance. In no event shall the acceptance testing process last more than 14 BusinessDays following each partial or complete delivery. In the event the Deliverables are non-conforming, Customer shall detail the reasons for such non-conformity in the written notice to Company to resolve such non-conforming issues. Additionally, the Customer shall identify with specificity the portions of the acceptance tests that form the basis for the non-conformity. In the event that such written notice is not provided within 14 Business Days following delivery, Customer shall be deemed to have accepted the Deliverables.  Customer is responsible to pay for all conforming portions of the deliverables. If

non-conformity is reported in writing as described above, Customer shall pay for the non-conforming portions of the deliverables after they are modified to conform to the specifications. Due to the customized nature of the software, no refunds are allowed, and Customer is responsible to pay full amount agreed for in Schedule A.

(b) The Acceptance Date shall be deemed to have occurred upon the earlier of expiration of the 14 Business Days and that date upon which Customer provides written notice to Company of successful acceptance testing.

(c) Customer shall at its sole expense be responsible for providing all Hardware and peripheral devices required to complete the acceptance testing procedures.

## 5. TERM AND TERMINATION

(a) Term: This Agreement shall be effective upon execution hereof by both parties and shall remain in full force in effect for a minimum contract period of 3 (three) years from the Commencement Date. At the expiration of 3 years, this Agreement shall continue to renew automatically for 1 year terms each unless either party gives a 30 Business Days prior written notice of termination to the other party.

(b) Termination of this Agreement: The Company may terminate this Agreement, with or without cause, by giving 30 (thirty) Business Days prior written notice of termination to the other party. If Customer wishes to terminate the services described in Schedule A up through the date of termination, Customer shall be liable to pay fees agreed in Schedule A. Company may also terminate this agreement if Customer becomes insolvent, go into liquidation, or unable to pay its debts as they fall due, or if Customer is in breach of one of its obligations and fails to cure within thirty (30) Business Days following written notice to Customer.

(c) Survival of Certain Provisions: In the event of any termination, the following provisions shall continue in full force and effect: (i) the obligation of the Customer to make payments due hereunder to the Company, (ii) confidentiality provisions, (iii) Software License, (iv) Proprietary & Trade Secret Information, (v) Warranties, Exclusions and Limitations and (vi) Settlement of Disputes.

## 6. INTELLECTUAL PROPERTY

(a) CoreIntellectualProperty:Upon payment in full of all amounts due to the Company, the Core Intellectual Property generated by the Company under this Agreement in relation to the Product or Business or by a person or persons employed by the Company who make or conceive such Core Intellectual Property, such Core Intellectual Property shall be solely owned by the Customer. Upon payment in full of all amounts due to the Company, (i) the Customer shall be deemed to be the owner of all proprietary rights, including but not limited to copyrights, related to such Core Intellectual Property, (ii) Customer shall be deemed the owner of such Core Intellectual Property and all copyrights thereunder, and (iii) Company shall execute any and all assignments, certificates of ownership, confirmations of copyright ownership, copyright applications, and other items reasonably requested by the Customer to secure and confirm the Customer's ownership of such Core Intellectual Property. Notwithstanding the above, the Company shall continue developing intellectual property in the course of the business with the Customer, and if such intellectual property falls under Core Intellectual Property, as agreed between the parties, the same shall form part of Schedule B and solely owned by the Customer. If there is a dispute concerning the categorization of such developing intellectual property, the parties agree that an independent intellectual property expert, nominated by the parties, shall resolve the matter. For the avoidance of doubt, the parties agree that the Customer shall have a non-exclusive right to use on a royalty-free basis, all non-Core intellectual Property in perpetuity.

(b)    Third party, Open Source or pre-existing works: Unless otherwise agreed in writing, Company may use third party modules, open source software or pre-existing works to reduce project pricing and/or time. In the event that the Deliverables include any pre-existing works created by the Company, the Company hereby grants, a perpetual, irrevocable, royalty free license to use such pre-existing works in connection with the Deliverables. Company owns and keeps copyrights and all intellectual property rights to such pre-existing works, and the right to continue using such works. In the event that the Deliverables include any pre-existing works or components, including, but not limited to any modules, tools, open source components, source code, any stock images or other graphics, created by a third party, licensing terms of such third party items will be in full force for such deliverables, and Customer is required to, and hereby agrees to comply by such third party licensing terms & requirements. The parties agree and acknowledge that any other intellectual property contributed to the Customer that is not identified a Core Intellectual Property, will not be considered to be owned by the Customer. In such an instance, the Customer shall receive an irrevocable, royalty-free, non-exclusive license to use such other intellectual property.

(c)    Notwithstanding clauses 6(a) and 6(b), the Core Intellectual Property and such other intellectual property shall be made freely available to all the Parties solely for the purpose of research and development activities of the Customer.

## 7.  PROPRIETARY AND TRADE SECRET INFORMATION

The obligations of Customer under this section shall survive termination or expiration of this Agreement.

## 8.  TRAINING

Company shall provide to the Customer, at no additional cost, up to 10 hours of remote instruction in respect of the use and support of The Software using telephone, GotoMeeting, or other communication tools. The Customer may designate any number of its personnel to attend such training. Those sessions at which training is to be provided shall be scheduled at times mutually agreed upon by Company and the Customer and shall be conducted remotely via telephone or Internet. The Customer shall ensure that all persons designated by it for training are available at the times scheduled for training sessions.

## 9.  WARRANTIES, EXCLUSIONS AND LIMITATIONS

(a)    Warranty Disclaimers: Other than as specifically set forth in this Agreement, THE MATERIALS, THE SOFTWARE, SYSTEMS DOCUMENTATION, PRODUCTS, SERVICES, DELIVERABLES OR ANY COMPONENTS THEREOF ARE PROVIDED / DELIVERED TO CUSTOMER ON AN "AS IS" BASIS, WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, QUALITY, PERFORMANCE OR NONINFRINGEMENT UPON THE RIGHTS OF ANY OTHER PARTY. COMPANY MAKES NO WARRANTY THAT THE DELIVERABLES WILL MEET CUSTOMER'S SPECIFIC OBJECTIVES OR NEEDS OR THAT THE DELIVERABLES WILL BE FREE FROM ERRORS OR BUGS. COMPANY MAKES NO WARRANTY THAT THERE WILL BE UNINTERUPTED OPERATION OF THE DELIVERABLES. CUSTOMER ACKNOWLEDGES AND AGREES THAT THE FOREGOING EXCLUSIONS AND DISCLAIMERS OF WARRANTIES ARE AN ESSENTIAL PART OF THIS AGREEMENT AND FORMED THE BASIS FOR DETERMINING THE PRICE CHARGED FOR THE PRODUCTS / SERVICES / DELIVERABLES.

(b)    Limitation of Liability: The remedies of Customer set forth herein are exclusive and the liability of Company with respect to any of the Services, Completed Products, Customized Products, or Components covered by or furnished under or in connection with this Agreement. Under no

circumstances will damages assessed against Company exceed the license fee (exclusive of Company's costs and expenses) actually paid to the Company in the most recent two calendar months for the specific SCHEDULE OF THE AGREEMENT out of which potential damages arose. IN NO EVENT SHALL THE COMPANY BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, COLLATERAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO AND WITHOUT LIMITATION, LOSS OF GOODWILL, LOSS OF REPUTATION, LOSS OF PROFITS OR REVENUES, LOSS OF SAVINGS, LOSS OF USE, INTERRUPTION OF BUSINESS, AND CLAIMS OF CUSTOMERS, OR RELATED OR UNRELATED THIRD PARTIES), WHETHER SUCH DAMAGES OCCUR PRIOR OR SUBSEQUENT TO, OR ARE ALLEGED AS A RESULT OF, TORTIOUS CONDUCT OR BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT, EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c) Third Party Claims: Company shall not be liable for claims made against the Customer or the Company arising out of Customer's and Customer's users'use, inability-to-use, possession or ownership of The Software, Materials and/or Systems Documentation and Customer hereby indemnifies and holds the Company harmless from and against any and all claims, fines and regulatory fees, of every nature or type that may be brought or asserted by any other party, unless that such claims are a result of the Company infringing other people's intellectual property rights.

## 10. RELEVANT GOVERNING LAW

In interpreting the terms of this Agreement, the parties agree that the laws of the State of California shall be applicable. All suits permitted to be brought in any court shall be venued in Santa Clara County, State of California.

## 11. SETTLEMENT OF DISPUTES

Customer shall provide Company, detailed information regarding any dispute, and shall agree to cooperate with Company in investigating of disputed matters. Except for any dispute arising out of payments due to Company, any dispute or disagreement arising between the Company and the Customer which is not resolved to the mutual satisfaction of the Company and the Customer within fifteen (15) Business Days (or such longer period as may be mutually agreed upon) from the date that either Party gives written notice that such dispute or disagreement exists, shall be referred to arbitration in San Jose, CA before one arbitrator in accordance with the Commercial Arbitration Rules (the "Arbitration Rules") of the American Arbitration Association (the "AAA"), in effect on the date that such written notice is given. Customer waives any and all rights it may have to a jury trial in connection with any proceedings concerning this agreement.

## 12. ATTORNEYS'FEES

Should any litigation or arbitration (collectively "Proceeding") commence between the parties hereto arising out of this Agreement or the rights and duties of either thereto, whether it be an action for damages, tort, equitable or declaratory relief, the prevailing party in such Proceeding will be entitled, as an element of such party's costs of suit in addition to other relief as may be granted by the court, to reasonable sums for attorneys'fees in the discretion of the court or arbitrator, and such prevailing party may recover such attorneys'fees in a separate action brought for that purpose.

## 13. PARTIES TO ACT REASONABLY

The parties agree to act reasonably in exercising any discretion, judgment, approval, or extension of time which may be required to effect the purpose and intent of this Agreement.

## 14. PREVIOUS AGREEMENT

This Agreement shall be deemed to supersede any prior or collateral undertakings, warranties or Agreements, whether oral or written.

## 15. NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing and given by: (1) hand delivery; (2) registered or certified mail, return receipt requested; or (3) reputable overnight courier, to:

If to Company:
IndyzenInc- 2033 Gateway Place, Suite 500, San Jose, CA 95110

If to Customer:
Parkridge Limited - The Landmark 15 Queen's Rd Central 8/F Gloucester Tower, Central Hong Kong, China

or to such other address as any party may designate by notice complying with the terms of this Section. Each such notice shall be deemed delivered (a) on the date delivered if by personal delivery or overnight courier, and (b) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

## 16. NON-ASSIGNMENT

Company may not assign its rights or obligations hereunder without the prior written consent of Customer. Customer may not assign its rights and obligations hereunder without the consent of Company.

## 17. HEADINGS

The headings in this Agreement have been inserted for convenience only, and are not to affect the interpretation of this Agreement.

## 18. SEVERABILITY

If any provision of this Agreement is held invalid under an applicable statute or rule of law, such invalidity shall not affect other provisions of this Agreement, which can be given effect without the invalid provisions, and to this end the provisions of this Agreement are declared to be severable. Notwithstanding the above, such invalid provision shall be construed, to the extent possible, in accordance with the original intent of the Parties.

## 19. EMPLOYEES AND CONTRACTORS

During the term of this Agreement, and for a period of five years following the termination of this Agreement, Customer may not directly or indirectly solicit, contract or hire Company's employees or independent contractors for the purpose of having them perform work for Customer similar to the services being performed by Company for Customer, unless mutually agreed otherwise in writing.

## 20. NON-WAIVER

Failure by either Party to enforce any term of this Agreement shall not be deemed a waiver of enforcement of that term or any other term.

## 21. SUCCESSORS AND ASSIGNS

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective

successors and assigns.

**22. CURRENCY OF CONTRACT**

All payments and amounts referred to in this Agreement shall be in United States of America currency USD.

**23. ENTIRE AGREEMENT**

This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes and replaces all prior discussions, agreements, proposals, understandings, whether orally or in writing, between the parties related to the subject matter of this Agreement. This Agreement may be changed, modified or amended only in a written agreement that is duly executed by authorized representatives of the parties. If any provision(s) hereof is deemed to be illegal or unenforceable by a court of competent jurisdiction, the enforceability and effectiveness of the remainder of the Agreement shall not be affected and this Agreement shall be enforceable without reference to the unenforceable provision. No party's waiver of any breach or accommodation to the other party shall be deemed to be a waiver of any subsequent breach, or in any way to affect the validity of this Agreement.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed on the date indicated above.

For Customer:

_Park ridge Ltd_

Name: _Randy Gene Dobson_

Title: _CEO_

For Company:

_Indyzen Inc_

Name: _Praveen Narra_

Title: _CEO_

# Schedule A

**Customer:** Parkridge Limited
**Company:** IndyzenInc

**Description of Services:**

Company shall provide services to Customer in two phases. Phase 1 and Phase 2 as described below.

**Phase 1:**

In Phase 1, Company shall develop Social Networking Software (from now on, called Morfit) using open source platform ELGG. The deliverables will include the following:

Software will be developed for 3 different platforms: Web, iOS, and Android platforms.

Company shall create two different graphical user interfaces, one for Web, and another for iOS and Android Mobile Apps. Company shall create mockup designs, and consult with the client and get client approval before moving on to the development of the platform.

The main features will include the following:

- User Registration - Users will be able to register into the platform by providing their First Name, Last Name, Email Address and a Password.
- Facebook Login - Users will be able to register / login to Morfit website or mobile app using their existing Facebook account.
- Profile Information - If a user signs in using Facebook, the following information, if publicly posted, will be collected and filled into Morfit    : First Name, Last Name, Email Address and Profile picture (if available).
- User Profile: User will be able to create his profile by adding additional information into his profile including: User's interests, gender, About Me, Facebook URL, Twitter URL, Website, etc.
- User will be able to Edit Profile information or change his profile picture if necessary.
- Profile Page: User will be able to create his profile page with his profile information, and be able to upload a cover photo to his user profile page.
- Profile page shall show how many other Users are following him/her and how many Friends he/she have, and how many people he/she is following. Users will be able to click on these links, and see who are the other users following / followed by this user.
- User's Wall - Users will is a screen where all posts created by a user are displayed depending on the privacy set by the user.
- User will be able to post on to his wall text, picture(s) and videos (up to 1 video per post).
- User will be able to set privacy to his posts. The different privacy options available are:
- Private - Posts are visible only to himself/herself
- Friends - Posts are visible to the user's Friends on Morfit
- Public - Posts are visible to everyone
- Users will be able to click on a thumbs up icon to specify that they "Like" a post, picture or video.
- Users will be able to comment on a post, picture or video.
- Users will be able to share a post of another user on their own wall (if they can see that post).
- Users will be able to upload multiple pictures into a single post.
- Users will be able to tap on a picture to see it in full screen.
- Users will be able to double tap on the picture to zoom it.
- Users will be able to use a pinch gesture on a picture to zoom in and zoom out.
- User will be able to upload a video of up to 100 megabytes (depending on user's Internet

Bandwidth). Allowed video formats are .mp4 are .mov

- User will be able to like a video, comment on a video or share a video on his wall.
- User will be able to play, pause and stop a video.
- News Feed: News Feed is a screen where posts created by the user and his friends (based on privacy settings) will be visible.
- User will be able to like, comment on or share posts on his/her News feed.
- User will be able to scroll his News Feed page to load more posts (if available)
- Notifications: If another user likes or comments on a user's post, user shall receive a notification. The notifications may be visible within the app and/or outside the app, if the app is closed, depending on user's phone preferences.
- If there are unread notifications, user shall see a red "bubble" with a number inside that shows the number of unread notifications.
- User will be able to tap on a notification to go to the corresponding post.
- Chat: User will be able to text chat with his friends. The chat functionality will be provided using XAMPP chat server.
- Messages: When a user misses a chat message, the message is shown in Messages screen.
- Invitations: Users will be able to invite other friends to become their friends.
- User will be able to see the names of other Morfit users and/or friends who are working out at the gym, if their privacy settings allow visibility.
- User will be able to provide search criteria to find a trainer based on their needs, and the search criteria will include location, age & gender preference, expertise of the trainer, and will take into consideration trainer's activity score on the platform.
- User will be able to rate other trainers on a scale of 1 to 5 stars.
- Software will be built using third party and/or open source software modules, and restrictions, time constraints and limitations of those third party modules will apply to this software.

**Price:**

The total price for the above services shall be US$420,000 (four hundred twenty thousand United States Dollars). However, the parties agreed that the total price shall be discounted by US$300,000 (three hundred thousand United States Dollars), which shall be treated as an initial funding loan made by Mr. Parasurama Naidu Narra to the Customer. As a result, the total price payable by the Customer to the Company for the above services shall be US$120,000 (one hundred and twenty thousand United States Dollars).

**Phase 2:**

Phase 2 of Company's services shall start effective May 16th, 2015 and are as described below.

- Company shall allocate a team of full-time personnel as listed below based in India to develop software for the Customer. Full-time personnel shall work for an average of 40 hours per week.

  - One Project Manager
  - Three Team Leaders
  - Five iOS Programmers
  - Five Android Programmers
  - Four Web Developers
  - Three Quality Assurance Engineers
  - Two Graphics Designers
  - One Business Analyst

- Services described in Phase 2 of Schedule A shall renew automatically on a monthly basis until terminated by either party with a 30 day advanced written notice.

- Regular Development Fee for the above team of personnel is $60 per person per hour. However, discounted service fee offered to Customer is US$45 per person per hour (Forty Five USD per person per hour). Customer shall be invoiced in advance, usually every two weeks. Customer shall pay 50% of this Discounted Fee within 14 Business Days of invoice, and 50% of this fee will be provided by the Company to Customer as a loan with terms as set out below and described in Schedule C. Overtime hours, if any, shall be billed at 50% above the discounted service fee. However, Customer shall have the right to unauthorize overtime hours in advance.

- The Parties agree that any fee incurred in relation to the Services under Phase 2 shall be capped at $200,000 per month unless agreed otherwise by the Parties in writing. For the avoidance of doubt, this $200,000 shall be accounted as follows:

    o $100,000 per month to be paid by the Customer by way of cash; and
    o $100,000 shall be treated as a loan made by IndyzenInc (at a simple interest rate of 10% as set out in Schedule C).

Any changes to the capped fee of $200,000 must be agreed between the Parties with at least 30 Business Days notification from intended date of change.

- Customer may request additional services from Company. Cost for such additional services shall be as follows for each personnel.

    o USA Based Resource: $120/hr to $150/hr
    o Global Offshore Resource: $45/hr to $60/hr
    o Praveen Narra: $500 to $1,000/hr (Not charged unless previously agreed in writing)

- Company is responsible to provide the following for each personnel at no additional cost.

    o Office Space
    o Salary and Benefits
    o Internet connection
    o Laptop or Desktop Computer
    o PHP, MySQL, Cocoa, XCode, Java, or Android Studio
    o Snacks & Beverages

- Customer shall be responsible for all travel costs and charges, including, without limitation, airfare, accommodation, transportation, food & beverage, shipping charges, hardware, additional devices and any other material charges. However, such charges must be pre-authorized by Customer.

**Methodology:**

- Developers shall utilize the Agile (SCRUM) methodology to develop software. Customer shall have freedom to make changes to the requirements, change priorities of features / tasks with understanding that customer and company will co-operate in good faith to estimate such features / tasks. Customer shall have 14 Business Days for acceptance testing of the deliverables after each sprint according to the Software Development and License Agreement.

    o 2 week sprints unless otherwise agreed differently.
    o Desired functionality as described by Customer or Customer's Authorized Agent(s).

- o Sprint kickoff, story grooming, scoping and assignments are done bi-weekly or as otherwise agreed by both parties.

- The software requirements are subject to change and re-prioritization based on the Agile process.

**App Submission:**

- Company shall assist Customer in submitting the App(s) to Apple's App Store / Google Play Store.
- Company shall be responsible to create App icons, App Screenshots that are needed to submit the app to App Store, unless Customer prefers to do it by themselves.
- The deliverables shall include Apps, App icons, Design screenshots, as well as documentation on how the app's functionalities work.

**Hardware / Testing:**

- Company shall test the iOS App(s) in the following test equipment: iPhone 5 and iPhone 6 running iOS 7, and iOS 8 operating systems respectively.
- Company shall test the Android App in the following test equipment: Samsung Galaxy S5, Samsung Galaxy Note 3, HTC Explorer A310e, Google Nexus 7. Android Operating systems: Android 4.2.2, Android 4.4 and Android 5.0. Customer may purchase testing in additional devices at additional cost.

**For Customer:**

Parkridge Ltd

Name: Randy Gene Dobson

Title: CEO

**For Company:**

Indyzen Inc

Name: Praveen Narra

Title: CEO

# Schedule B
# CoreIntellectualProperty

- Trainer matching algorithm
- Trainer ranking algorithm
- Crowdfunding for fitness services
- Video library done exclusively for fitness services (does not include technology developed by Byji, Inc.)
- Photo morphing for fitness services
- Uber for fitness services
- Gamification utilizing "fitcoins"
- Fitness center recommendation using "gym location"
- List of "who's working out at a gym?"
- Scheduling logic of calendars for personal trainers
- Time based message expiration in chat

# SCHEDULE C
# Secured Promissory Note

CUSTOMER (MAKER):     **Parkridge Limited**
HOLDER:     **Indyzen Inc.**
PRINCIPAL:     **See Exhibit A**
INTEREST RATE     **10% per annum**
EFFECTIVE DATE:     **May 16, 2015**
DUE DATE:     **May 16, 2020**

1.    <u>Obligation</u>. FOR VALUE RECEIVED, Parkridge Limited, a company established under the laws of Hong Kong (the "Customer") promises to pay to the order of IndyzenInc, a company organized and existing under the laws of the State of California ("Holder") the principal balance to be listed under Exhibit A (the "Principal"), attached herein, together with interest thereon a 10% per annum on the terms set forth in this Secured Promissory Note (the "Note").

2.    <u>Calculation of Principal</u>. The parties subject to this Note have entered into a separate Software Development and License Agreement (the "Agreement"). Per the Agreement, Holder will put together a team of twenty-four (24) full-time personnel to develop software for Customer at a discounted development fee of $45 per person per hour (the "Development Fee"). Holder will invoice Customer biweekly for the Development Fee and additional services from the Holder. Customer will pay one-half of the Development Fee within fourteen (14) Business Days of receiving the invoice from Holder, and the full amount of any other fees due to Holder. The remaining one-half of the Development Fee will be added to the Aggregate Total listed under Exhibit A of this Note.

3.    <u>Payment</u>. Customer will make interest only payments once a year upon the yearly anniversary of the Effective Date of this Note. The outstanding Principal and unpaid interest shall be due and payable on the fifth anniversary of the Effective Date of this Note, or, upon a fifteen-Business Days (15) notice of demand by Holder which may not be made within the first three (3) years of the Effective Date of this Note. This Note is payable at the Holder's address or such other place as the Holder may designate in writing.

4.    <u>Fixed Interest Rate</u>. The interest rate on this Note shall be fixed at the simple rate of ten percent (10%) per annum.

5.    <u>Default</u>.Customer will be in default under this Note if Customer fails to make any payment required by this Note when due. Upon any default by Customer under this Note, Holder may pursue all legal and equitable remedies and shall be entitled to recover from Customer reasonable attorneys' fees and costs of collection.

6.    <u>Usury</u>. In no event will the interest rate hereunder exceed that permitted by applicable law. If any interest or other charge is finally determined by a court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted by law, and Holder may credit any excess amount previously collected against the balance due or refund the amount to Customer.

7.    <u>Security</u>. As security for the prompt and complete payment and performance in full by Customer of all outstanding amounts owed under this Note (the "Obligation"), Holder will retain possession of the source code for all Intellectual Property developed by Holder pursuant to the Agreement (the "Collateral").

8. <u>Continuing Security Interest</u>. This Note creates a continuing security interest in the Collateral and shall remain in full force and effect until performance in full of the Obligation. Once the Obligation has been satisfied, this document shall automatically be null and void and shall have no further force and effect without any action on the part of either party.

9. <u>Perfection of Security Interest</u>. Customer authorizes Holder to file such financing statements pursuant to the Uniform Commercial Code or similar filings from time to time or other notices appropriate under applicable law. Customer also agrees to take any and all other actions as Holder may determine to be necessary or useful for the attachment, perfection, and establishing priority of, and establishing or maintaining the ability of Holder to enforce, its security interest in the Collateral.

10. <u>Further Assurances.</u> Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Note and the transactions contemplated hereby.

11. <u>Force Majeure</u>. Neither party shall be liable for any breach of this Note or delay in performance resulting from a strike, lockout, or other labor dispute; fire, earthquake, flood, act of God, or other natural disaster; civil commotion, war, riot, criminal act of a third party; casualty or accident; or other cause beyond the reasonable control of or occurring without the fault of such party ("force majeure"). Any deadline or time within which a party must perform under this Note shall automatically be extended upon the occurrence of any such force majeure for a period equal to the time lost because of such event.

12. <u>Governing Law</u>. This Note is governed by and construed in accordance with the laws of the State of California, excluding its conflict of law rules and principles.

13. <u>Amendment</u>. This Note may be amended or modified only by an instrument in writing which by its express terms refers to this Note and which is duly executed by the party sought to be bound.

14. <u>Successors and Assigns</u>. This Note will be binding upon and inure to the benefit of the parties and their respective heirs, successors, and assigns.

15. <u>Severability</u>. If any provision or any word, term, clause, or other part of any provision of this Note shall be invalid for any reason, the same shall be ineffective but the remainder of this Note and any of its provisions shall not be affected and shall remain in full force and effect.

**Parkridge Limited**

By: _Randy Gene Dobson_

Title: _CEO_

**IndyzenInc**

By: _Praveen Narra_

Title: _CEO_

**Exhibit A**

**Principal Balance**

**(to be updated by the Parties at the end of every calendar month)**

| Date | Amount Loaned | Aggregate Total | |
|---|---|---|---|
| 31 May 2015 | $50,000 | $50,000 | |
| 30 June 2015 | $100,000 | $150,000 | |
| 31 July 2015 | $100,000 | $250,000 | |
| 31 August 2015 | $100,000 | $350,000 | |
| 30 September 2015 | $100,000 | $450,000 | |
| 31 October 2015 | $100,000 | $550,000 | |